

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8790
RWEINER@SIDLEY.COM

February 25, 2022

**PUBLIC VERSION**

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

   Re: <u>Nippon Steel Corporation v. United States, Court No. 21-00533</u>

Dear Mr. Toscano:

  On behalf of Nippon Steel Corporation ("NSC"), plaintiff in the above-captioned proceeding, we hereby file NSC's Rule 56.2 Motion for Judgment on the Agency Record, Memorandum of Points and Authorities in support thereof, and proposed Order.

  Copies of the attached confidential documents have been served on the parties listed in the attached certificate of service.

  Pursuant to the "one day lag rule" set out in Rules 5(g) and 73.2(c) of the Rules of this Court, the public version of this brief will be electronically filed on February 25, 2022, one business day after the date of this filing. In addition, copies of the public version of the attached documents will be served on the same day on the parties listed in the attached certificate of service.

# SIDLEY

The Honorable Mario Toscano
February 25, 2022
Page 2

Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

Respectfully submitted,

Richard L.A. Weiner
Rajib Pal
Shawn M. Higgins
Justin R. Becker
Alex L. Young

Counsel to Nippon Steel Corporation

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Court No. 21-00533 |
| Defendant, | |
| NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC, | |
| Defendant-Intervenors. | |

### MOTION FOR JUDGMENT
### ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Nippon Steel Corporation, hereby submits this Motion for Judgment on the Agency Record with regard to the three Counts set forth in its Complaint filed on October 6, 2021.    This action challenges the final results issued by the U.S. Department of Commerce in the third administrative review of Certain Hot-Rolled Steel Flat Products from Japan, Case No. A-588-874.    *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2018–2019*, 86 FR 47615 (Aug. 26, 2021).    In an order dated December 16, 2021, the Court directed that dispositive motions be filed by today's date.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

A proposed order is attached.

Respectfully submitted,

Richard L.A. Weiner
Rajib Pal
Shawn M. Higgins
Justin R. Becker
Alex L. Young

Counsel to Nippon Steel Corporation

February 25, 2022

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

NIPPON STEEL CORPORATION,

          Plaintiff,

     v.

UNITED STATES,

          Defendant,

NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC,

          Defendant-Intervenors.

Court No. 21-00533

**PUBLIC VERSION**

**Business Proprietary Information Has Been Removed in the Table of Contents and on pages 3-4, 6-7, 31-33, 36-41, 43-46**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Nippon Steel Corporation

February 25, 2022

**TABLE OF CONTENTS**

**Page No**

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ................................................ 1

I.   Administrative Determination of Which Review Is Sought ...................................................... 1

II.  Issues Presented and Summary of the Argument ..................................................................... 2

    A.   The Department's Deduction of Section 232 Duties from NSC's U.S. Prices Is Not
Supported by Substantial Evidence and Not Otherwise in Accordance with Law .................... 2

    B.   The Department's Application of Facts Otherwise Available with an Adverse Inference
to the Unreported Downstream Sales by [             ] Is Not Supported by Substantial
Evidence and Not Otherwise in Accordance with Law ............................................................... 3

    C.   The Department's Failure to Include the U.S. Revenue for Extra Services in the
Calculation of the Net U.S. Price Is Not Supported by Substantial Evidence and Not Otherwise
in Accordance with Law .............................................................................................................. 4

STATEMENT OF FACTS ............................................................................................................... 4

STANDARD OF REVIEW .............................................................................................................. 8

ARGUMENT .................................................................................................................................... 9

I.   The Department's Deduction of Section 232 Duties from NSC's U.S. Prices Is Not
Supported by Substantial Evidence and Not Otherwise in Accordance with Law ......................... 9

    A.   The Section 232 Steel Duties Are Not Like OCDs in that They Do Not Have the Purpose
and Function of Raising General Revenue for the U.S. Government, but Rather Are Special
Duties Like AD/CV and Section 201 Duties .............................................................................. 11

        1.   The Section 232 Steel Duties Do Not Serve a General Revenue Purpose Like OCDs,
But Rather Serve a Special Remedial Purpose Similar to AD/CV and Section 201 Duties. 13

        2.   The Section 232 Steel Duties Are Temporary ............................................................... 23

        3.   Deducting the Section 232 Steel Duties from U.S. Price Imposes an Impermissible
Double Remedy ....................................................................................................................... 24

    B.   Treating the Section 232 Steel Duties as OCDs Would Result in the United States
Violating Its WTO Obligations and Therefore, Under the *Charming Betsy* Canon, Is Not a
Plausible Interpretation of the Statute ....................................................................................... 30

        1.   The Imposition of the Section 232 Steel Duties as OCDs Would Exceed the Bound
Rate and Breach Article II:1(b) of the GATT 1994 ............................................................... 31

        2.   The Department Would Also Breach Article II:1(a) of the GATT 1994 ..................... 33

II.  The Department's Application of Facts Otherwise Available with an Adverse Inference to the
Unreported Downstream Sales by [            ] Is Not Supported by Substantial Evidence and
Not Otherwise in Accordance with Law ....................................................................................... 33

    A.   Legal Framework ............................................................................................................ 34

    B.   Factual Background ......................................................................................................... 35

C.   The Record Does Not Show that NSC "Failed to Cooperate by Not Acting to the Best of Its Ability" ....................................................................................................................... 38

1.   Objectively, the AR3 Record Does Not Support a Conclusion that the Department Could Reasonably Have Expected More from NSC............................................................ 38

2.   Subjectively, the AR3 Record Does Not Support a Conclusion that NSC Failed to Exert its Maximum Efforts ................................................................................................. 40

III. The Department's Failure to Include the U.S. Revenue for Extra Services in the Calculation of the Net U.S. Price Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ......................................................................................................... 41

CONCLUSION ....................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States,*
  367 F.3d 1339 (Fed. Cir. 2004)............................................................................30

*Asociacion Colombiana de Exportadores de Flores v. United States,*
  704 F. Supp. 1114 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir.
  1990) ..........................................................................................................................8

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
  494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ................................................. *passim*

*Canadian Wheat Board v. United States,*
  641 F.3d 1344 (Fed. Cir. 2011)............................................................................16

*Caribbean Ispat Ltd. v. United States,*
  450 F.3d 1336 (Fed. Cir. 2006)..............................................................................9

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984)..........................................................................................9, 10

*Deacero S.A.P.I de C.V. v. United States,*
  No. 20-03924, 2021 Ct. Intl. Trade LEXIS 174 (Ct. Int'l Trade Dec. 20, 2021) ............ *passim*

*Federal Mogul Corp. v. United States,*
  63 F.3d 1572 (Fed. Cir. 1995)..............................................................................30

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984)................................................................................8

*Micron Tech. Inc. v. United States,*
  117 F.3d 1386 (Fed. Cir. 1997)..............................................................................8

*Murray v. The Schooner Charming Betsy,*
  6 U.S. (2 Cranch) 64 (1804)..................................................................................11

*Nippon Steel & Sumitomo Metal Corp. v. United States,*
  483 F. Supp. 3d 1214 (Ct. Intl. Trade 2020)..................................................33, 35, 37

*Nippon Steel Corp. v. United States,*
  337 F.3d 1373 (Fed. Cir. 2003)..................................................................34, 35, 38, 40

*Power Steel Co. v. United States,*
  No. 20-03771, Ct. Intl. Trade LEXIS 175 (Ct. Int'l Trade Dec. 23, 2021) ..................... *passim*

*Rhone Poulenc, Inc. v. United States,*
  899 F.2d 1185 (Fed. Cir. 1990)...........................................................................28

*Shakeproof Assembly Components v. United States,*
  268 F.3d 1376 (Fed. Cir. 2001)...........................................................................28

*Steel Auth. of India, Ltd. v. United States,*
  149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ........................................................34

*Target Corp. v. United States,*
  609 F.3d 1352 (Fed. Cir. 2010)............................................................................8

*United States v. Am. Home Assurance Co.,*
  964 F. Supp. 2d 1342 (Ct. Int'l Trade 2014), *rev'd on other grounds, United
  States v. Am. Home Assurance Co.,* 798 F.3d 1313 (Fed. Cir. 2015) .....................16

*Wheatland Tube Co. v. United States,*
  495 F.3d 1355 (Fed. Cir. 2007)..................................................................15, 16, 27

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................8

19 U.S.C. § 1677(7) ............................................................................................25

19 U.S.C. § 1677a(c)(2)(A) ......................................................................... *passim*

19 U.S.C. § 1677e(a)........................................................................................3, 34

19 U.S.C. § 1677e(b) ...........................................................................3, 34, 38, 40

19 U.S.C. § 1862(d) ..................................................................................17, 18, 25

Antidumping Act of 1921, P.L. 67-10, 42 Stat. 11 (1921) .............................................15

Trade Act of 1974, P.L. 93-618, § 201, 88 Stat. 1978, 2011 (1974) ..........................2, 14

Trade Agreements Extension Act of 1954, P.L. 83-464, § 2, 68 Stat. 360, 360
  (1954).....................................................................................................................18

Trade Agreements Extension Act of 1955, P.L. 84-86, § 7, 69 Stat. 162, 166
  (1955).....................................................................................................................18

Trade Agreements Extension Act of 1958, P.L. 85-686, § 8, 72 Stat. 673, 679
  (1958).....................................................................................................................18

Trade Expansion Act of 1962, P.L. 87-794, § 232, 76 Stat. 872, 877 (1962) ...................... *passim*

**Regulations**

19 C.F.R. § 190.3(a)..................................................................................................29

19 C.F.R. § 351.202(b)(4)........................................................................................26

**Administrative Decisions**

*Certain Hot-Rolled Steel Flat Products From Japan: Final Results of
    Antidumping Duty Administrative Review and Final Determination of No
    Shipments; 2016-2017*, 84 FR 31025 (Jun. 28, 2019) ............................................41

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    84 FR 67712 (Dec. 11, 2019) ..................................................................................4

*Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United
    States*, 83 FR 11625 (Mar. 15, 2018)...............................................................5, 21

*Proclamation 9740 of April 30, 2018, Adjusting Imports of Steel Into the United
    States*, 83 FR 20683 (May 7, 2018) ..................................................................5, 29

*Removal of Certain General Approved Exclusions (GAEs) Under the Section 232
    Steel and Aluminum Tariff Exclusions Process*, 86 FR 70003 (Dec. 9, 2021) .......................22

*Report on the Effects of Imports of Steel on the National Security: An
    Investigation Conducted Under Section 232 of the Trade Expansion Act of
    1962, as Amended*, 85 FR 40202 (Jul. 6, 2020)...........................................5, 20, 21

*Section 232 Steel and Aluminum Tariff Exclusions Process*,
    85 FR 81060 (Dec. 14, 2020) ..................................................................................22

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of
    Antidumping Duty Administrative Review*, 69 FR 19153 (Apr. 12, 2004) ..............................28

**Other Authorities**

104 Cong. Rec. 12727 (1958) (statement of Senator Proxmire)....................................19

104 Cong. Rec. 16299 (1958) (statement of Representative Simpson)..........................19

108 Cong. Rec. 18767 (1962) (statement of Senator McCarthy) ..................................19

General Agreement on Tariffs and Trade 1994, Articles II:1(a) and (b)................................31, 33

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NIPPON STEEL CORPORATION,

                        Plaintiff,

            v.

UNITED STATES,

                        Defendant,

NUCOR CORPORATION, STEEL
DYNAMICS, INC. AND SSAB
ENTERPRISES, LLC,

                        Defendant-Intervenors.

Court No. 21-00533

**PUBLIC VERSION**

**Business Proprietary Information Has
Been Removed in the Table of Contents
and on pages 3-4, 6-7, 31-33, 36-41, 43-46**

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Nippon Steel Corporation ("NSC") submits this Memorandum of Points and

Authorities in Support of Motion for Judgment on the Agency Record, regarding the three

Counts in its Complaint.  For the reasons below, NSC respectfully requests that the Court

reverse the challenged determination of the U.S. Department of Commerce ("Department")

and remand with instructions to recalculate NSC's dumping margin.

**RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT**

**I.      Administrative Determination of Which Review Is Sought**

NSC seeks review of the final results of the third administrative review ("AR3") of

the antidumping ("AD") duty order covering Certain Hot-Rolled Steel Flat Products from

Japan ("HR Steel from Japan").  The period of review ("POR") for AR3 covered October 1,

2018, through September 30, 2019.  The Department published the final results in *Certain*

*Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 47615 (Aug. 26, 2021) ("*Final Results*") (APPX2483-2485), in which it calculated the dumping margin for NSC and its affiliated companies Nippon Steel Nisshin Co., Ltd. ("Nisshin") and Nippon Steel Trading Corporation ("NSTC") (collectively, "NSC/Nisshin/NSTC") to be 11.70%. The Department's associated analysis is contained in, *inter alia*: "Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Certain Hot-Rolled Steel Flat Products from Japan; 2018-2019," August 20, 2021 ("IDM") (APPX2461-2482); and Memorandum entitled "Final Results Analysis for Nippon Steel Corporation," August 20, 2021 ("Final NSC Analysis") (APPX83054-APPX83056).

## II.     Issues Presented and Summary of the Argument

This memorandum addresses three issues regarding the Department's calculation of NSC/Nisshin/NSTC's dumping margin in AR3 of the AD order on HR Steel from Japan.

### A.     The Department's Deduction of Section 232 Duties from NSC's U.S. Prices Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

In determining NSC/Nisshin/NSTC's weighted-average dumping margin in the *Final Results*, the Department improperly deducted duties on steel imports imposed under Section 232 of the Trade Expansion Act of 1962, P.L. 87-794, § 232, 76 Stat. 872, 877 (1962), as amended ("Section 232"), from NSC's U.S. prices. Pursuant to 19 U.S.C. § 1677a(c)(2)(A), the Department must reduce U.S. price in its AD calculations by, *inter alia*, "*United States import duties*" (emphasis added). However, the Section 232 duties on steel imports at issue here (the "Section 232 steel duties") are more similar to AD duties, countervailing ("CV") duties, and safeguard duties under Section 201 of the Trade Act of 1974, P.L. 93-618, § 201, 88 Stat. 1978, 2011 (1974), as amended ("Section 201")—which the Department has determined are not

2

"United States import duties" under § 1677a(c)(2)(A)—than to ordinary customs duties

("OCDs"). Specifically, the Section 232 steel duties are more similar to AD/CV and Section 201

duties than to OCDs because: (1) they serve a special remedial purpose and not a general revenue

purpose; (2) they are temporary; and (3) deducting them from NSC's U.S. prices imposes an

impermissible double remedy. Moreover, treating these Section 232 duties as OCDs would be

inconsistent with the United States' World Trade Organization ("WTO") obligations under the

General Agreement on Tariffs and Trade 1994 ("GATT 1994") because the U.S. duties on steel

imports would exceed its bound tariff rates, which results in an impermissible interpretation of

"United States import duties" under § 1677a(c)(2)(A) pursuant to the *Charming Betsy* canon.

Therefore, the Department's deduction of the Section 232 steel duties from NSC's U.S.

prices is not supported by substantial evidence and not otherwise in accordance with law.

**B.     The Department's Application of Facts Otherwise Available with an Adverse
Inference to the Unreported Downstream Sales by [                    ] Is Not
Supported by Substantial Evidence and Not Otherwise in Accordance with
Law**

The application of facts otherwise available and adverse inferences is governed by

19 U.S.C. § 1677e(a) and (b), respectively, with 19 U.S.C. § 1677e(b) authorizing the use of

adverse inferences (*i.e.*, adverse facts available or "AFA") if the Department "finds that an

interested party has failed to cooperate by not acting to the best of its ability to comply with a

request for information."

The Department unlawfully applied AFA to the unreported downstream sales by NSC's

affiliated home market reseller [                    ] in the *Final Results* because the record provides

neither an objective nor subjective basis for the Department to conclude NSC "failed to

cooperate by not acting to the best of its ability" under 19 U.S.C. § 1677e(b). The record shows

3

that: objectively, the Department could not have reasonably expected more from NSC; and subjectively, NSC exerted its maximum efforts to obtain the requested information.

Therefore, the Department's application of AFA to unreported downstream sales by [             ] is not supported by substantial evidence and not otherwise in accordance with law.

###### C. The Department's Failure to Include the U.S. Revenue for Extra Services in the Calculation of the Net U.S. Price Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

In its U.S. sales database, for constructed export price ("CEP") sales by NSC's U.S. affiliate, Steelscape LLC ("Steelscape"), NSC reported the U.S. revenue for extra services in individual revenue fields and in the total revenue field. In addition, NSC provided Steelscape's invoices that included separate line items for these services. In the *Final Results*, based on its statements in the IDM at Comment 4 (APPX2480-2481), the Department acknowledged that the U.S. revenue for extra services should be included in the calculation of the net U.S. price and purported to do so by using the values NSC reported in the total revenue field. However, the Department added only NSC's reported gross unit price field and billing adjustment field, and thus did not include the U.S. revenue for extra services. Consequently, the Department continued to miscalculate the net U.S. price for Steelscape's CEP sales.

Therefore, the Department's failure to include the U.S. revenue for extra services in the calculation of the net U.S. price is not supported by substantial evidence and not otherwise in accordance with law.

## STATEMENT OF FACTS

In *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 67712 (Dec. 11, 2019), the Department initiated AR3 of the AD order on HR Steel from Japan, including for Plaintiff, covering the POR of October 1, 2018, through September 30, 2019.

4

Previously, the Department conducted a Section 232 investigation on the effect of imports of steel on the national security, and completed its report recommending immediate action by the President on January 11, 2018. *See Publication of a Report on the Effects of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 FR 40202 (Jul. 6, 2020) ("*Section 232 Report*"). As a result, former-President Trump mandated the imposition of a global tariff of 25 percent on steel imports from all countries, except Canada and Mexico, via *Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United States*, 83 FR 11625, 11626 (Mar. 15, 2018) ("*Proclamation 9705*"). These Section 232 duties went into effect on March 23, 2018, *id.* at 11627, and were subsequently modified in various respects not relevant to the rate applicable to NSC. *See, e.g.*, *Proclamation 9740 of April 30, 2018, Adjusting Imports of Steel Into the United States*, 83 FR 20683 (May 7, 2018) ("*Proclamation 9740*"). Because the POR for AR3 is subsequent to March 23, 2018, imports of NSC's hot-rolled steel from Japan were subject to the Section 232 duties throughout the POR.

On May 1, 2020, the Department selected NSC as a mandatory respondent in AR3. *See* "Respondent Selection for the 2018-2019 Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan," May 1, 2020 (APPX1000-1007). The Department indicated it would treat the affiliated companies NSC, Nisshin, and NSTC as a single entity for purpose of AR3. *See id.* at note 1 (APPX1000).

From June 2020 through February 2021, Plaintiff supplied the Department with information in response to its questionnaires. *See, e.g.*, Letter from Sidley Austin LLP to the Hon. Wilbur L. Ross, Jr., "NSC's Response to the Department's Section B Questionnaire," DOC No. A-588-874, June 29, 2020 ("NSC's B_QR") (APPX80000-80887); Letter from Sidley

Austin LLP to the Hon. Wilbur L. Ross, Jr., "NSC's Response to the Department's Section C

Questionnaire," DOC No. A-588-874, June 29, 2020 ("NSC's C_QR") (APPX80888-81408);

and Letter from Sidley Austin LLP to the Hon. Wynn Coggins, DOC No. A-588-874, "NSC's

Response to the Department's Supplemental Questionnaire," February 1, 2021 ("NSC's

Supp_QR") (APPX81409-82267).

The Department published its preliminary results in *Certain Hot-Rolled Steel Flat

Products from Japan: Preliminary Results of Antidumping Duty Administrative Review and

Preliminary Determination of No Shipments; 2018-2019*, 86 Fed. Reg 10920 (Feb. 23, 2021)

("*Preliminary Results*") (APPX2458-2460), in which it calculated a weighted-average dumping

margin of 11.70% for products produced and/or exported by NSC/Nisshin/NSTC. *See id.* and

accompanying "Decision Memorandum for the Preliminary Results of Antidumping Duty

Administrative Review and Preliminary Determination of No Shipments: Certain Hot-Rolled

Steel Flat Products from Japan; 2018-2019," February 17, 2021 ("PDM") (APPX2433-2457),

and Memorandum entitled "Preliminary Results Margin Calculation for Nippon Steel

Corporation," February 17, 2021 ("Prelim NSC Analysis") (APPX82268-82991).

In determining the preliminary rate for NSC/Nisshin/NSTC, *inter alia*, the Department

found that "section 232 duties should be treated as 'United States import duties' for purposes of

{19 U.S.C. § 1677a(c)(2)(A)} – and thereby as 'U.S. Customs duties,' which are deducted from

U.S. price." PDM at 17 (APPX2449).

In addition, the Department based the preliminary rate for NSC/Nisshin/NSTC in part on

the application of AFA to the downstream sales by certain affiliated home market resellers,

including **[          ]**. *See id.* at 9-10 (APPX2441-2442). The Department applied such AFA

because it concluded NSC had failed to cooperate to the best of its ability. *Id.* at 10

(APPX2442).  As AFA, the Department applied the highest unaffiliated home market price of the commonly sold CONNUMs to the unreported downstream sales at issue.  *Id.*

Finally, the Department failed to include in the calculation of the net U.S. price the U.S. revenue for extra services provided by NSC's U.S. affiliate, Steelscape.  In its U.S. sales database, NSC reported the revenue for extra services in individual revenue fields for those services and in the reported total revenue field.  However, the Department did not use the values reported in the total revenue field to calculate CEP; rather, the Department used only the gross unit price and the transportation-related revenue fields.  *See* Prelim NSC Analysis (APPX82268-82991).

On March 25, 2021, and April 1, 2021, Plaintiff submitted its case brief and rebuttal brief, respectively, in which Plaintiff argued the Department, *inter alia*: (i) improperly deducted Section 232 duties from NSC's U.S. prices; (ii) improperly applied partial AFA with respect to the downstream sales by, among others, [                        ]; and (iii) erred by not including the U.S. revenue for extra services in the calculation of the net U.S. price.  *See* Case Brief of Nippon Steel Corporation, March 25, 2021 ("NSC's Case Brief") (APPX82992-83039); Rebuttal Brief of Nippon Steel Corporation, April 1, 2021 ("NSC's Rebuttal Brief") (APPX83040-83053).

On August 26, 2021, the Department published its *Final Results* maintaining NSC/Nisshin/NSTC's weighted-average dumping margin at 11.70%.  *See Final Results*, 86 FR at 47616 (APPX2484).  Thus, the Department continued to: (i) deduct Section 232 duties from NSC's U.S. prices; (ii) apply partial AFA to the downstream sales by, among others, [

]; and (iii) not include the U.S. revenue for extra services in the calculation of the net U.S. price.  *See* IDM at Comments 1, 2, and 4 (APPX2467-2475, APPX2480-2481); Final NSC Analysis (APPX83054-83056).  Because the Department did not make changes to the

7

preliminary results margin calculation for NSC, the Department did not issue new versions of its SAS program logs and outputs and Excel calculation worksheets.

NSC then timely commenced this action to challenge the Department's determination in this administrative review.

## STANDARD OF REVIEW

The Court "shall hold unlawful" the Department's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Under well-established legal principles, "substantial evidence" is "more than a mere scintilla{;} it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (*quoting Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 477 (1951)).  In addition, "{s}peculation ... is not {substantial evidence in} support for a finding." *Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1114, 1117 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir. 1990).

In determining whether the Department's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {any evidence} which fairly detracts from {the} weight" of the Department's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  If the Court finds that on balance the Department's determination was not supported by substantial evidence, it must remand the case to the Department for reconsideration.

8

In determining whether the Department's statutory interpretations are in accordance with the law, the Court follows the two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first step is to determine whether Congress has directly spoken to the issue at hand. If so, the Court must give effect to the unambiguously expressed intent of Congress, which ends the analysis. *Chevron*, 467 U.S. at 842-43. If the statute is silent or ambiguous with respect to the specific issue, the reviewing court, under the second step, is to determine whether the agency's interpretation of the statute is a permissible construction. *Id.* at 843. Further, the Court may defer to the Department's interpretation only if it is reasonable, considered and consistent with agency policy. *Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1340 (Fed. Cir. 2006).

As demonstrated below, the Department failed to act consistently with the plain language of the AD statute as interpreted by this Court and the Court of Appeals for the Federal Circuit ("CAFC"), or with a reasonable interpretation of that statute, so that its determination was not in accordance with law. Further, the Department failed to support its conclusions with substantial evidence, and in fact reached conclusions contrary to the record evidence. Therefore, the Court should find the Department's determination to be unlawful and remand this case to the Department to recalculate NSC's dumping margin.

## ARGUMENT

### I. The Department's Deduction of Section 232 Duties from NSC's U.S. Prices Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department's decision in its *Final Results* to treat the Section 232 steel duties as U.S. import duties that are deducted from NSC's U.S. prices is not supported by substantial evidence and not otherwise in accordance with law. *See* IDM at Comment 1 (APPX2467-2471).

9

The statute at 19 U.S.C. § 1677a(c)(2)(A) requires the Department to reduce U.S. price in its AD calculations by, *inter alia*, "*United States import duties*" (emphasis added), but does not define that phrase.  The question before this Court, therefore, is whether, under step two of *Chevron*, the Department's interpretation that "United States import duties" includes the Section 232 steel duties is reasonable and deserves deference.  *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1371 (Ct. Int'l Trade 2021) (*citing Chevron, 467 U.S. at 843, Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007), and *NSK Ltd. v. United States*, 26 CIT 650, 654, 217 F. Supp. 2d 1291, 1296 (2002)); *Deacero S.A.P.I de C.V. v. United States*, No. 20-03924, 2021 Ct. Intl. Trade LEXIS 174, at *6 (Ct. Int'l Trade Dec. 20, 2021) (*citing* same); *Power Steel Co. v. United States*, No. 20-03771, Ct. Intl. Trade LEXIS 175, at *5 (Ct. Int'l Trade Dec. 23, 2021) (*citing* same).

This Court has considered this question in the three cases just cited, each time deciding the Department's interpretation is reasonable, as opposed to arbitrary, and deserves deference. *See Borusan*, 494 F. Supp. 3d at 1371-1376; *Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at *6-9; *Power Steel*, Ct. Intl. Trade LEXIS 175, at *5-7.  However, the *Borusan* plaintiffs appealed that decision to the CAFC on July 26, 2021; the *Deacero* plaintiffs appealed that decision to the CAFC on February 16, 2022; and this Court remanded the *Power Steel* decision to the Department on other grounds.  Therefore, those decisions should not be treated as final judgments on this issue.

While the litigation is pending in those cases, this Court has the opportunity to revise its prior decisions by considering all relevant aspects of the question at hand.  NSC respectfully submits that, because plaintiffs in the prior cases did not argue otherwise, this Court did not conduct a fulsome analysis and therefore reached the wrong conclusions.  Specifically, this Court

did not consider in full all relevant statutory language, the applicable legislative history, the

particular facts upon which the Section 232 steel duties are based, the general revenue purpose of

OCDs, and the *Charming Betsy* canon that provides U.S. statutes must be construed consistent

with the United States' international obligations in the absence of clear Congressional intent

otherwise. *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804).

NSC respectfully asks this Court to reconsider its prior decisions and conclude here that

the Department's interpretation that "United States import duties" includes the Section 232 steel

duties is arbitrary and unreasonable, and therefore does not deserve deference under *Chevron*

step two. This is because, as explained below: (1) contrary to the Court's prior decisions, the

three factors considered by the Department indicate that the Section 232 steel duties are not like

OCDs in that they do not have the purpose and function of raising general revenue for the U.S.

government, but rather are special duties like AD/CV and Section 201 duties, which the

Department does not consider to be "United States import duties" under 19 U.S.C. §

1677a(c)(2)(A); and (2) the Department's interpretation of "United States import duties" to

include the Section 232 steel duties would result in the United States violating its WTO

obligations under the GATT 1994 and, therefore, pursuant to the *Charming Betsy* canon, cannot

be a plausible interpretation of the statute that deserves deference.

> **A.** **The Section 232 Steel Duties Are Not Like OCDs in that They Do Not Have the Purpose and Function of Raising General Revenue for the U.S. Government, but Rather Are Special Duties Like AD/CV and Section 201 Duties**

In its prior decisions, this Court examined the reasonableness of the Department's

interpretation that the Section 232 steel duties are "United States import duties" under 19 U.S.C.

§ 1677a(c)(2)(A) by examining the same three factors previously considered by the Department:

(1) whether the duties are remedial; (2) whether they are temporary; and (3) whether deducting

them from U.S. price would result in an impermissible double remedy. *See Borusan*, 494 F.

Supp. 3d at 1373-1374 (*citing Stainless Steel Wire Rod from the Republic of Korea: Final*

*Results of Antidumping Duty Administrative Review*, 69 FR 19153, 19159-61 (Apr. 12, 2004)

("*Stainless Steel Wire Rod from Korea*")); *Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at *6-9

(relying on *Borusan*); *Power Steel*, Ct. Intl. Trade LEXIS 175, at *5-7 (relying on *Borusan*).

Under this framework, which is based on the Department's earlier analysis concluding that

Section 201 safeguard duties are not "United States import duties," an answer of "yes" for each

factor is required to conclude that the duties are not "United States import duties." *See id.*

　　Here, as in the past, the Department concluded "no" for each factor and therefore

concluded such duties are "United States import duties" to be deducted from U.S. price. *See*

IDM at Comment 1 (APPX2467-2471).  In its prior decisions, this Court deferred to the

Department based on finding the Department was reasonable mainly on the third factor

(impermissible double remedy) and partly on the first factor (remedial purpose), while

concluding the Department was incorrect on the second factor (temporary nature). *See Borusan*,

494 F. Supp. 3d at 1374-1376; *Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at *6-9; *Power Steel*,

Ct. Intl. Trade LEXIS 175, at *5-7.  However, in reaching those conclusions, the Court did not

conduct a complete analysis.

　　For the reasons discussed below, NSC respectfully submits that this Court erred in its

previous conclusions with respect to the first and third factors, and that the only reasonable

answer to *each* factor is "yes" for the Section 232 steel duties, just as it is for AD/CV duties and

Section 201 duties.  In other words, for the reasons discussed below, the Section 232 steel duties

are not like the OCDs encompassed by the phrase "United States import duties" in 19 U.S.C. §

1677a(c)(2)(A); rather, they are like AD/CV and Section 201 duties because: (1) they serve a

special remedial purpose similar to AD/CV and Section 201 duties, not a general revenue purpose like OCDs; (2) they are temporary; and (3) deducting them from U.S. price imposes an impermissible double remedy. The Court should therefore conclude that the Department's interpretation that the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) is arbitrary and unreasonable, and accordingly does not deserve deference under *Chevron* step two.

> 1. The Section 232 Steel Duties Do Not Serve a General Revenue Purpose Like OCDs, But Rather Serve a Special Remedial Purpose Similar to AD/CV and Section 201 Duties

Regarding the first factor (remedial purpose), this Court has found the reasonableness of the Department's determination that the Section 232 steel duties do not serve a remedial purpose like AD/CV and Section 201 duties to be a close question, but has ultimately deferred to the Department. *See Borusan*, 494 F. Supp. 3d at 1374; *Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at *6 (referring to *Borusan*); *Power Steel*, Ct. Intl. Trade LEXIS 175, at *5 (referring to *Borusan*). NSC respectfully submits that the question is not close; rather, a complete analysis that takes into account all relevant aspects of the statute, its legislative history, the particular facts upon which the Section 232 steel duties are based, and the general revenue purpose of OCDs reveals that the Department's determination on this point is arbitrary and unreasonable, and does not deserve deference.

In its *Final Results*, as in its similar past determinations, the Department concluded that the Section 232 steel duties do not serve a remedial purpose like AD/CV and Section 201 duties because the latter "protect{} the bottom line of domestic producers" while the former concern "the effects on the national security of imports of the article." IDM at 9-10 (APPX2469-2470); *see also* PDM at 17 (APPX2449).

In considering this question in *Borusan*,[1] this Court disagreed with the Department's view that the national security objective of Section 232 duties means they do not serve a remedial purpose.  Instead, this Court conceded that "the purpose of Section 232 duties is … remedial in a broad sense," because they "are enacted in response to trade practices in specific instances in which the welfare of key domestic industries is impacted by foreign trade," and are "imposed after special findings that consider 'the impact of foreign competition on the economic welfare of individual domestic industries.'"  *Borusan*, 494 F. Supp. 3d at 1374.  Thus, this Court acknowledged that the "focus {of Section 232 duties} is on saving a United States industry" – *i.e.*, protecting the bottom line of certain domestic producers – in a similar sense as Section 201 safeguard duties.  *Id.*

Nonetheless, the Court concluded that the Department's "reasoning based on lack of remedial purpose, while not the strongest, is not completely bereft of logic" for two reasons: (i) "Section 201, but not Section 232, requires a finding of a particular level of injury or threat of injury"; and (ii) "Section 232 duties could be used to promote vital nascent industries, not just already established injured industries."  *Id.*

NSC respectfully submits that the Court mis-analyzed the issue by improperly focusing on whether Section 232 and Section 201 duties are dissimilar enough to support the Department's finding that Section 232 duties are not "special," when the question is instead whether Section 232 duties are different enough from OCDs to be considered "special."

---

[1]     In *Deacero* and *Power Steel*, the Court simply referred to its earlier decision from *Borusan* on the reasonableness of the Department's conclusion that Section 201 duties are "more akin to" or "more similar to" AD duties (*i.e.*, that Section 232 duties are not as similar to AD duties as Section 201 duties are) and did not provide any additional analysis of this point. *See Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at *7; *Power Steel*, Ct. Intl. Trade LEXIS 175, at *6. The ensuing discussion, therefore, focuses on the Court's reasoning from *Borusan*.

Importantly, when the CAFC upheld the Department's three-factor analysis concluding

Section 201 safeguard duties were not "United States import duties" in *Wheatland Tube Co.*, it

agreed that based on the statute and the legislative history of the Antidumping Act of 1921, P.L.

67-10, 42 Stat. 11 (1921), there is a clear line between "ordinary" customs duties encompassed

by the phrase "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) and "special" duties,

such as AD duties, not encompassed by that phrase:

> Based on Congress' distinction that "special dumping duties" *such
> as* antidumping duties are not "United States import duties,"
> Commerce determined that Congress did not intend all duties to be
> considered "United States import duties." Commerce concluded
> that Congress "recognized that at least some duties implementing
> trade remedies — including *at least* antidumping duties — are
> special duties that should be distinguished from ordinary customs
> duties."

*Wheatland Tube*, 495 F.3d at 1361 (emphases added) (internal citation omitted) (*quoting*

*Stainless Steel Wire Rod from Korea*, 69 FR at 19159). By using "such as" and "at least," the

CAFC made clear that AD duties were one *example* of a "special" duty not encompassed by the

phrase "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A), leaving no limit to the

number of such "special" duties that may fall outside the scope of that phrase.

The CAFC agreed with the Department that whether a duty was a "special" duty that fell

outside the scope of the phrase "United States import duties" was a question of whether the

purpose and function of the duty was more like that of OCDs or AD duties: "it was reasonable

for Commerce to conclude that § 201 safeguard duties are more like antidumping duties 'in

purpose and function than they are like ordinary customs duties.'" *Id.* at 1362. Regarding the

purpose and function of OCDs, the CAFC noted: "Normal customs duties … *have no remedial

purpose*. They are imposed regardless of whether the U.S. industry is suffering adverse effects

as a result of imports." *Id.* (emphasis added). By contrast, the CAFC explained that although

AD, CV, and Section 201 duties remedy distinct harms, "they are all directed at the same overarching purpose — *protecting the bottom line of domestic producers.*"  *Id.* at 1363-64 (emphasis added).

Therefore, it should be clear that as soon as the Court concluded in *Borusan* that "the purpose of Section 232 duties *is … remedial in a broad sense*" in that they are imposed after some finding of adverse effects of imports on the industry concerned, and hence protect the bottom line of certain domestic producers, *Borusan*, 494 F. Supp. 3d at 1374 (emphasis added), that should have ended the inquiry.  As the CAFC explained, "{n}ormal customs duties … *have no remedial purpose*," *Wheatland Tube*, 495 F.3d at 1362 (emphasis added), so logically duties that have *some* remedial purpose to protect certain domestic producers' bottom lines *cannot be* OCDs.  As such, they must be "special" duties and cannot be "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).

Should more analysis be required, the Court should consider the actual purpose and function of OCDs, which the Court has not considered previously.  In this regard, OCDs are aimed at raising general revenue for the U.S. government, and as such require no findings or specialized purpose at all.  *See United States v. Am. Home Assurance Co.*, 964 F. Supp. 2d 1342, 1352 (Ct. Int'l Trade 2014) ("{T}he critical purpose of early duties was to generate revenue for the nascent country—a purpose that is still reflected in modern customs duties.  Antidumping duties, in contrast, are not intended as revenue-generating devices." (citations omitted)), *rev'd on other grounds, United States v. Am. Home Assurance Co.*, 798 F.3d 1313 (Fed. Cir. 2015); *see also Canadian Wheat Board v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011) ("Antidumping duty orders are imposed 'for reasons other than the raising of revenue.'  They are imposed to protect American industries against unfair trade practices by foreign entities who sell

in the American market." (*quoting* 28 U.S.C. § 1581(i)(1)(B))).  The fact that Section 232 duties

require some finding of adverse effects of imports on the industry concerned before they are

imposed, just like AD/CV duties and Section 201 duties, indicates that Section 232 duties do not

have a general revenue purpose like OCDs.  Consequently, again, Section 232 duties must be

"special" duties and cannot be "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).

Should even further analysis be required, the Court may turn again to the Section 232

statute, its legislative history, and to the particular facts upon which the Section 232 steel duties

are based.

As an initial matter, while national security may be the headline concern addressed by

Section 232 duties, contrary to the Department's assertions, remedying the impact of the imports

being investigated on the economic welfare of individual U.S. industries is in fact the primary

focus of the Section 232 statute, as is the case with AD/CV and Section 201 duties.  On this

point, 19 U.S.C. § 1862(d) provides that:

> {t}he Secretary and the President shall further recognize the close
> relation of the economic welfare of the Nation to our national
> security, and shall take into consideration the impact of foreign
> competition on the economic welfare of individual domestic
> industries; and any substantial unemployment, decrease in
> revenues of government, loss of skills or investment, or other
> serious effects resulting from the displacement of any domestic
> products by excessive imports shall be considered, in determining
> whether such weakening of our internal economy may impair the
> national security.

The Department inappropriately focused on the language "national security" in its

attempt to distinguish Section 232 duties from other special duties.  The Department asserted

AD/CV duties and Section 201 duties "protect{} the bottom line of domestic producers" while

Section 232 duties concern "the effects on the national security of imports of the article,"

"separate and apart from any function performed by antidumping and 201 safeguard duties to

remedy injury to a domestic industry." IDM at 9-10 (APPX2469-2470); PDM at 17

(APPX2449). This is a distinction without a difference, because the national security concern at

issue under Section 232 is precisely ensuring that the domestic producers deemed important to

national security stay in business – *i.e.*, maintaining these companies' bottom line. The critical

distinction that is overlooked, however, is that the purpose of OCDs is to raise general revenue

for the U.S. government as discussed above, while the purpose of AD/CV, Section 201 and

Section 232 duties is to protect and support the bottom line of particular U.S.

companies/industries to ensure they do not go out of business.

This protectionist purpose of Section 232, as it stands today, is evidenced in its legislative

history. Section 232 has its origin in Section 2 of the Trade Agreements Extension Act of 1954,

P.L. 83-464, § 2, 68 Stat. 360, 360 (1954). That provision – *i.e.*, the precursor to Section 232 –

simply read as follows, without any relationship between national security and the economic

welfare of U.S. industries:

> No action shall be taken … to decrease the duty on any article if
> the President finds that such reduction would threaten domestic
> production needed for projected national defense requirements.

Congress made certain revisions to this provision in Section 7 of the Trade Agreements

Extension Act of 1955, P.L. 84-86, § 7, 69 Stat. 162, 166 (1955), but still without linking

national security with the economic welfare of U.S. industries.

Congress added the language quoted above from 19 U.S.C. § 1862(d) requiring

"consideration {of} the impact of foreign competition on the economic welfare of individual

domestic industries" and injury factors like unemployment and loss of investment before

imposing Section 232 duties in Section 8 of the Trade Agreements Extension Act of 1958, P.L.

85-686, § 8, 72 Stat. 673, 679 (1958). The legislative history of that provision makes clear that

while the precursor provision may have been geared solely toward national security, the

18

amended provision became another tool for remedying the impact of import competition on particular U.S. industries.  During Senate debate on the measure, Senator Proxmire explained:

> When Congress enacted the national security clause in 1955, it was giving explicit recognition to the significant difference between ordinary Tariff Commission cases which are judged on economic grounds and the few cases in which direct and substantial interests of national security are involved.  The amendment to this provision now being proposed … says in effect, that any economic effect of imports should be taken into account as affecting our national security.  If we adopt this amendment we are in reality writing a second escape clause, in the guise of national security.

104 Cong. Rec. 12727 (1958) (statement of Senator Proxmire).  In a similar vein, in the House debate, Representative Simpson explained the amendment under consideration had been proposed as a remedy because "{m}any of our strategic industries vital to our national defense have been affected by import competition."  104 Cong. Rec. 16299 (1958) (statement of Representative Simpson).

Then, during the Senate debate on the Trade Expansion Act of 1962, Senator McCarthy described the Act overall as a "'fair trade' bill" that "is protectionist, in the best sense of the word" including by "protect{ing} American workers and firms from unfair competition {and} from the consequences of imports and import competition."  108 Cong. Rec. 18767 (1962) (statement of Senator McCarthy).  He then "call{ed} … attention … to the provisions of the Trade Expansion Act which make this a fair trade measure," and in that list included "Section 232, which retains the present authority to adjust the level of imports when the President finds that they threaten to impair the national security."  *Id.*

The foregoing legislative history demonstrates that Section 232 duties, based on Section 232 as it stands today, are remedial in the same sense as AD/CV and Section 201 duties.

Moreover, the Court must consider not only the general purpose of the Section 232 statute but also the facts upon which these particular Section 232 steel duties are based.  This is

19

critical because, as explained in the *Section 232 Report*, the Department departed from earlier

interpretations of Section 232 by focusing this investigation "on the larger inquiry" of "whether

imports have harmed or threaten to harm U.S. producers writ large." *Section 232 Report*, 85 FR

at 40208. As discussed below, the facts in this particular Section 232 investigation demonstrate

that the Department and the President considered the Section 232 steel duties as an alternative

means of remedying injury to a domestic industry and protecting domestic producers.

As an initial matter, the *Section 232 Report* repeatedly discussed the effect of steel

imports on the domestic industry, and the inability of AD/CV orders to address those effects.

For example:

- "Despite efforts to level the playing field through AD/CV{} orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers, including the lack of ability to bid on some critical U.S. infrastructure projects." *Id*. at 40216.

- "Rising levels of imports of steel continue to weaken the U.S. steel industry's financial health." *Id*.

- "Steel producers in the United States are facing widespread harm from mounting imports." *Id*. at 40225.

This was a primary focus in the *Section 232 Report* because the Department viewed the

Section 232 steel duties as an alternative means of remedying the injury caused to the domestic

industry. According to the *Section 232 Report*:

> {AD/CV} duty actions can address specific instances of unfairly traded steel products. However, given the large number of countries from which the United States imports steel and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded steel, or attempts to transship or evade remedial duties ….
>
> Moreover, U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CV{} cases, with seemingly no end in sight to their outlays. Smaller steel manufacturers are financially unable to afford these type cases, or are hesitant to file

>       cases in light of possible market entry retaliation in foreign
>       markets for finished steel products.

*Id*. at 40211.

Further, as part of its Section 232 investigation, the Department considered, among other

factors, the "loss of domestic opportunities" and the "financial distress" of the domestic industry

in the face of "rising levels of imports." *Id*. at 40216-17. Its analysis included many of the same

factors weighed by the U.S. International Trade Commission ("ITC") in determining injury in

AD/CV and Section 201 cases, including the profit margins, net income, revenue, capacity

utilization rates, and capital expenditures of the domestic industry. As in those cases, the

Department's recommendation "that the President take immediate action by adjusting the level

of imports," *id*. at 40225, was based on its conclusion that "the present quantities and

circumstances of steel imports are 'weakening our internal economy,'" *id*. at 40204, most

notably the "financial viability" of U.S. steel producers. *Id*. at 40216.

The record is also clear that the President considered the Section 232 steel duties as an

alternative means of remedying injury to the domestic industry and protecting domestic

producers. In accepting the Department's recommendation to implement the Section 232 steel

duties, the President emphasized his decision was based on the Department's analysis and

conclusions in the *Section 232 Report*, as described above. *See Proclamation 9705*, 83 FR at

11625-26. The President further explained that, as with other special duties, the Section 232

duties were being imposed "in response to specific requests from affected domestic parties" for

the explicit purpose of protecting domestic steel producers from "the increased level of global

excess capacity" and the "increased level of imports." *Id*. at 11625. And as the Court has

recognized, the President issued *Proclamation 9705* imposing the Section 232 steel duties in

order to "enable domestic steel producers to use approximately 80 percent of existing domestic

21

production capacity and thereby achieve long-term economic viability through increased production." *Borusan*, 494 F. Supp. 3d at 1368 (*quoting Proclamation 9705*, 83 FR at 11625); *Deacero*, 2021 Ct. Intl. Trade LEXIS 174, at \*3 (*quoting* same); *Power Steel*, Ct. Intl. Trade LEXIS 175, at \*3 (*quoting* same).  In other words, the President imposed the Section 232 steel duties *precisely because* the U.S. steel industry was suffering some injury caused by imports and with the objective of boosting the industry's bottom line, no different than AD/CV and Section 201 duties.

It is also telling that in subsequent actions considering exclusions to the Section 232 steel duties, the Department itself has referred to them as "*remedial* actions" in its announcements regarding the duty exclusion process.  *Section 232 Steel and Aluminum Tariff Exclusions Process*, 85 FR 81060, 81072 (Dec. 14, 2020); *Removal of Certain General Approved Exclusions (GAEs) Under the Section 232 Steel and Aluminum Tariff Exclusions Process*, 86 FR 70003, 70007 (Dec. 9, 2021) (emphasis added).

Given that the Department and the President viewed the Section 232 steel duties as an alternative means to remedy injury to the domestic industry, equivalent to special duties like AD/CV and Section 201 duties, these particular Section 232 duties cannot be considered "separate and apart" from those provisions as the Department now claims.  Rather, it should be clear that the Section 232 steel duties serve a remedial purpose similar to AD/CV and Section 201 duties, and not a general revenue purpose like OCDs.

Finally, the two reasons this Court gave in *Borusan*, 494 F. Supp. 3d at 1374, for ultimately deferring to the Department on this point despite concluding that Section 232 duties have a broad remedial purpose are both incorrect.

First, although the Court is correct that Section 232 does not require "a finding of a *particular level* of injury or threat of injury," *id.* (emphasis added), the foregoing discussion makes clear the Department must make *some* finding of adverse effects by imports prior to the imposition of any Section 232 duties, and, did, in fact, make specific injury findings in the Section 232 steel investigation. As noted above, the *Section 232 Report* contains numerous findings regarding the injurious effects of steel imports on the domestic industry and the financial distress of the domestic steel industry in the face of rising import levels, and the President acted based on those findings.

Second, the Court is incorrect that only Section 232 duties may "promote vital nascent industries," *id.*, because AD/CV duties can serve this purpose if the ITC determines, pursuant to 19 U.S.C. § 1671(a)(2)(B) and/or 19 U.S.C. § 1673(2)(B), that the establishment of an industry in the United States is materially retarded by reason of imports of the subject merchandise. Moreover, even if Section 232 duties alone could be used to promote vital nascent industries, this unique characteristic is inapplicable here because the U.S. steel industry certainly is not nascent and there is no evidence that the Section 232 steel duties were imposed for this purpose.

For these reasons, the Court should reverse its decisions from *Borusan*, *Deacero* and *Power Steel*, and conclude instead that the Department's determination that the Section 232 steel duties do not serve a special remedial purpose similar to AD/CV and Section 201 duties is arbitrary and unreasonable, and does not deserve deference.

### 2.    The Section 232 Steel Duties Are Temporary

Regarding the second factor (temporary nature), this Court already concluded in *Borusan* that Section 232 duties are temporary. The Court observed that although Section 201 duties are time limited by statute and Section 232 duties may be terminated when the President believes their purpose has ended, that difference in how these duties are time limited "does not make

23

Section 232 duties significantly more permanent than Section 201 duties," so "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties." *Borusan*, 494 F. Supp. 3d at 1374-75. Rather, the critical distinction for the Court was that "Section 232 duties and Section 201 duties are both temporary in that no Congressional action is needed to end them," while OCDs are enacted by Congress and are permanent unless modified by Congress. *Id.* This factor therefore does not support a conclusion that the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).

        3.     Deducting the Section 232 Steel Duties from U.S. Price Imposes an Impermissible Double Remedy

This Court in *Borusan*, *Deacero* and *Power Steel* deferred to the Department's interpretation that the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) based largely on the third factor of the analysis (impermissible double remedy). In *Borusan*, the Court said the third factor is the one that "bears greater consideration," and concluded that deducting the Section 232 steel duties from U.S. price does not impose an impermissible double remedy because of a lack of "statutory interplay" between Section 232 duties and AD duties. In the Court's view, no such "statutory interplay" exists because the statute does not require: (i) the ITC to make a particular injury determination (*e.g.*, imports are "a substantial cause of serious injury, or threat thereof") before Section 232 duties are imposed; and (ii) the President to consider existing AD/CV duty relief as the preferred remedy when setting Section 232 duties. In the Court's view, the statute requires these elements for Section 201 duties but not Section 232 duties, so Section 201 duties are "complimentary {sic}" to AD duties but Section 232 duties are not. *Borusan*, 494 F. Supp. 3d at 1375. In *Deacero* and *Power Steel*, the Court recalled and stressed that "impermissible double counting" or "circularity" does not exist if Section 232 duties are considered "United States import duties" because of the lack of

24

"statutory interplay" between Section 232 duties and AD duties. *Deacero*, 2021 Ct. Intl. Trade

LEXIS 174, at \*7-8 (*citing Borusan*, 494 F. Supp. 3d at 1375-76); *Power Steel*, Ct. Intl. Trade

LEXIS 175, at \*6-7 (*citing Borusan*, 494 F. Supp. 3d at 1375-76). NSC respectfully submits the

Court erred in concluding there is no "statutory interplay" between Section 232 duties and AD

duties.

The Court's first reason for lack of "statutory interplay" between Section 232 duties and

AD duties – lack of requirement for the ITC to make a particular injury determination – is a

distinction without a difference. While the ITC may not be involved and there may be no

specified threshold of "serious" or "material" injury, the Section 232 statute clearly contemplates

an interplay between Section 232 duties and traditional AD/CV trade remedy duties because, at

19 U.S.C. § 1862(d), it specifically requires the Department and the President, before imposing

Section 232 duties, "shall take into consideration," *inter alia*, "*the impact of foreign competition*

*on the economic welfare of individual domestic industries*," "*any substantial unemployment*,"

"*loss of skills or investment*," and "*other serious effects resulting from the displacement of any*

*domestic products by excessive imports*." Emphases added. These elements are no different than

those the statute calls the ITC to consider in a material injury analysis in an AD/CV proceeding,

where the ITC must determine, *inter alia*, "the impact of imports … on domestic producers of

domestic like products" by considering factors like "employment" and "investment." *See* 19

U.S.C. § 1677(7). Whether the Department and President make the injury determination or the

ITC makes the injury determination is neither here nor there. Very clearly, under the statute,

absent *some level* of determination of injury by imports on the domestic industry of concern by

the Executive Branch, neither Section 232 duties nor AD/CV duties may be imposed. This

establishes the requisite "statutory interplay" between Section 232 duties and AD/CV duties.

Moreover, the Department's own regulations evidence that "statutory interplay." Importantly, one requirement for an AD/CV petition under 19 C.F.R. § 351.202(b)(4) is for the petitioner to state whether it "has filed for relief from imports of the subject merchandise under section 337 of the Act (19 U.S.C. 1337, 1671a), sections 201 or 301 of the Trade Act of 1974 (19 U.S.C. 2251 or 2411), or *section 232 of the Trade Expansion Act of 1962* (19 U.S.C. 1862)." Emphasis added.  Thus, the Department's AD/CV regulations consider AD/CV duties, Section 201 duties and Section 232 duties all to be complementary forms of import relief, making the "statutory interplay" between these various duties patently clear.

The Court's second reason for lack of "statutory interplay" between Section 232 duties and AD duties – lack of requirement for the President to consider existing AD/CV duties when imposing Section 232 duties – is incorrect.  As just described, the statute does not permit the President to impose Section 232 duties unless the President finds imports are having some adverse effects on the domestic industry of concern.  It follows that if existing AD/CV duties were sufficiently addressing the effects of imports on the domestic industry of concern, the statute would provide no basis for the President to impose Section 232 duties.  As a corollary, Section 232 does not authorize the President to impose duties at a level more than necessary to combat the effects of imports on the domestic industry not already being combatted by AD/CV or other trade remedy duties.

Moreover, in this particular case, the Department and the President considered the Section 232 steel duties to be complementary to AD/CV duties.  As explained in Section I.A.1 above, the Department and the President viewed the Section 232 steel duties as an alternative means to remedy injury to the domestic industry that in their view had not been sufficiently addressed by AD/CV trade remedy duties.  Of note, as quoted above, the *Section 232 Report*

addresses many of the same factors weighed by the ITC in determining injury in AD/CV and

Section 201 cases, and contains numerous findings regarding the effect of steel imports on the

domestic industry and the financial distress of the domestic industry in the face of rising import

levels despite existing AD/CV duties, as well as expressions of the President's intent to boost

domestic steel production and capacity utilization.

In this context, it is worth recalling that when the CAFC agreed with the Department that

Section 201 duties should not be considered "United States import duties" deducted from U.S.

price when calculating AD duties under 19 U.S.C. § 1677a(c)(2)(A), because doing so would

impose an impermissible double remedy, the CAFC wrote:

> Safeguard duties can reduce or eliminate the injury from dumping
> because, to a large extent, the overarching injury remedied by
> safeguard duties is similar to the overarching injury remedied by
> antidumping duties.  To assess both a safeguard duty and an
> antidumping duty on the same imports without regard to the
> safeguard duty, would be to remedy substantially overlapping
> injuries twice.  The balance between § 201 safeguard duties and
> antidumping duties is reached when the imposition of § 201
> safeguard duties ameliorates the very injury that justifies the
> antidumping duty order in the first instance.

*Wheatland Tube*, 495 F.3d at 1365.

In this case, as just discussed, the Department and the President viewed the Section 232

steel duties as an alternative means to remedy injury to the domestic industry caused by imports.

Accordingly, the CAFC's finding in *Wheatland Tube* above applies equally to the Department's

deduction of Section 232 duties in this proceeding: to assess both a Section 232 duty and an AD

duty on the same steel imports without regard to the Section 232 duty remedies substantially

overlapping injuries twice, and increases AD duties and Section 232 duties beyond the amounts

authorized under U.S. law.  That is, deducting the Section 232 steel duties from U.S. price

creates an artificial dumping margin, and results in collection of the Section 232 duties twice –

27

first as Section 232 duties, and then a second time as an increase in the dumping margin.  This is contrary to the remedial purpose of the AD statute and the Department's obligation to calculate dumping margins "as accurately as possible."  *See, e.g., Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  This also provides Section 232 relief beyond what the President approved, because the statute and regulations do not contemplate such double relief, and there is no indication in Presidential Proclamations that the President believed the Department effectively would increase the Section 232 steel duties by taking them into account in calculating subsequent dumping margins.  *See Stainless Steel Wire Rod from Korea*, 69 FR at 19160.

The Department and this Court attempt to mask the double remedy inherent in treating the Section 232 steel duties as "United States import duties" by citing to statements in the associated Presidential Proclamations that provide the Section 232 duties are to be imposed "in addition to" AD duties or the AD duties are to "continue."  *See* IDM at 10 (APPX2470) (*quoting Proclamation 9740*, 83 FR at 20685-87); *Borusan*, 494 F. Supp. 3d at 1375 (*quoting Proclamation 9705*, 83 FR at 11627).  The Department and Court ignore the fact that AD duties would be imposed even if the Department does not deduct Section 232 duties from U.S. price. Indeed, *all* AD duties – *i.e.*, an accurate and non-punitive amount of AD duties – would be imposed, consistent with the President's intent, only if the Department does not deduct Section 232 duties from U.S. price.  The issue here is not whether AD duties would continue to apply to steel imports, but rather whether the Department should be permitted to increase AD duties as a result of the imposition of the Section 232 duties and/or collect Section 232 duties a second time in the form of an increased AD margin.

Moreover, although the Annex to *Proclamation 9740* refers to Section 232 duties as "ordinary" customs duties, the President's characterization of these duties elsewhere in *Proclamation 9740* is inconsistent with the regular treatment of OCDs.  For example, in clause 6 of *Proclamation 9740*, the President states: "No drawback shall be available with respect to the duties imposed on any steel article pursuant to Proclamation 9705."  *Proclamation 9740*, 83 FR at 20685.  This directly contradicts U.S. Customs and Border Protection regulation 19 C.F.R. § 190.3(a), which lists "ordinary customs duties" as one of the types of "duties, taxes, and fees paid on imported merchandise which were imposed under Federal law upon entry or importation" for which drawback is allowable.  Therefore, the Department is incorrect that these Section 232 steel duties were intended to be "treated as any other duties."  IDM at 10 (APPX2470).

For these reasons, the "double remedy" or "circularity" problem the Court found lacking in *Borusan*, *Deacero* and *Power Steel* does exist if the Section 232 steel duties are treated as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).  Thus, the Court should reverse its prior decisions on this point, and conclude instead that the Department's determination that treating the Section 232 steel duties as "United States import duties" does not result in an impermissible double remedy is arbitrary and unreasonable, and does not deserve deference.

\* \* \*

For the foregoing reasons, the only reasonable answer to each factor of the analysis for determining whether the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) is "yes": (1) yes, the Section 232 steel duties serve a special remedial purpose similar to AD/CV and Section 201 duties; (2) yes, the Section 232 steel duties are temporary; and (3) yes, deducting the Section 232 steel duties from U.S. price imposes an

impermissible double remedy. The Department's interpretation that the Section 232 steel duties are "United States import duties" to be deducted from NSC's U.S. prices when calculating NSC's AD margin therefore does not deserve deference by this Court under *Chevron* step two.

> **B.    Treating the Section 232 Steel Duties as OCDs Would Result in the United States Violating Its WTO Obligations and Therefore, Under the *Charming Betsy* Canon, Is Not a Plausible Interpretation of the Statute**

Should more analysis be required, the phrase "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) must also be interpreted consistent with the United States' WTO obligations. As the CAFC has explained, U.S. statutes "must be interpreted to be consistent with {international} obligations, absent contrary indications in the statutory language or its legislative history." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (alteration in original) (*quoting Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1368 (Fed. Cir. 2002)). That principle of statutory construction, known as the *Charming Betsy* canon, explains:

> {A}n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

*Id*. (*quoting Charming Betsy*, 6 U.S. (2 Cranch) at 118). In *Federal Mogul*, where the statute was unclear whether the Department may determine dumping margins in a tax neutral fashion, the CAFC deferred to the Department's interpretation that it may do so under *Chevron* step two in part because that interpretation was consistent with the United States' obligations under the General Agreement on Tariffs and Trade and its Antidumping Code, while the opposite interpretation would not be. *See Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1581-82 (Fed. Cir. 1995). Conversely, where the Department's interpretation of a statute is inconsistent with the United States' international obligations, as it is here, pursuant to the *Charming Betsy* canon that interpretation cannot be accorded deference under *Chevron* step two.

Here, permitting the Department to treat the Section 232 steel duties as OCDs would result in the United States imposing OCDs on steel imports from Japan exceeding its bound tariff rates. Accordingly, the United States would be in violation of its obligations under Article II:1 of the GATT 1994, which requires WTO Members to exempt products of another WTO Member from OCDs exceeding those set forth in their Schedule of Concessions ("Schedule").

NSC demonstrates below how treating Section 232 duties as OCDs imposes OCDs on NSC's merchandise exceeding the United States' bound rate in its Schedule and, therefore, is inconsistent with Articles II:1(a) and (b) of the GATT 1994. Consequently, consistent with the *Charming Betsy* canon, the Court must conclude that the Department's interpretation of the term "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) to encompass the Section 232 steel duties is not plausible and does not deserve deference under *Chevron* step two.

      1.     The Imposition of the Section 232 Steel Duties as OCDs Would Exceed the Bound Rate and Breach Article II:1(b) of the GATT 1994

Initially, the imposition of the Section 232 steel duties as OCDs would exceed the bound rate and breach Article II:1(b) of the GATT 1994, which states:

> The products described in Part I of the Schedule relating to any {Member}, which are the products of territories of other {Members}, shall, on their importation into the territory to which the Schedule relates, and subject to the terms, conditions or qualifications set forth in that Schedule, be exempt from ordinary customs duties in excess of those set forth and provided therein.

Accordingly, a WTO Member must exempt the products of another WTO Member from any "ordinary customs duties" exceeding the bound rates set forth in its Schedule when such products are imported into the territory of the former.

During the POR, all of NSC's sales entered the United States under HTSUS [         ]. *See* NSC's Supp_QR at Revised Exhibit C-1 (APPX81458-81524). The uppermost level constituting the bound rate at which the United States may impose duties for this

31

tariff line is 0 percent. *See* United States' Schedule of Concessions and Commitments, annexed to the GATT 1994.[2]  Accordingly, if the Section 232 steel duties are classified as OCDs, this would result in the United States exceeding its bound rate commitment for the HTSUS [          ] tariff line.  On this basis, the United States would breach its obligation, under Article II:1(b) of the GATT 1994, not to apply OCDs exceeding its tariff commitments.

In the IDM, the Department claimed inexplicably that it can treat the Section 232 steel duties as both OCDs and exclusive of the United States' bound rate commitments. *See* IDM at 10 (APPX2470).  This claim has no basis in substantial evidence or law.  The United States' bound rate commitments allow for no exception for any sort of "special" OCDs exceeding the commitments set forth in its Schedule.  The Department must therefore treat the Section 232 steel duties as either (1) special duties not deducted from NSC's U.S. price or (2) OCDs included in the United States' bound rate commitments.  The Department cannot have it both ways.

---

[2]     The portion of the United States' Schedule currently applicable to the tariff line at issue was transmitted by the United States to the World Trade Organization on May 17, 2005, via WTO Doc. No. WT/Let/493, and provides in relevant part:

| Tariff item number | Description of products | Rate of duty | | Present concession established in | Initial negotiating right (INR) on the concession | Concession first incorporated in a WTO schedule in | INR's on earlier concessions | Other duties and charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | | 4 | 5 | 6 | 7 | 8 |
| 7208 | Flat-rolled products of iron or non-alloy steel, of a width of 600 mm or more, hot-rolled, not clad, plated or coated: | | | | | | | |
| 7208.10 | In coils, not further worked than hot-rolled, with patterns in relief: | | | | | | | |
| 7208.10.15 | Pickled. | Free | ⋄ | G/HS/94 | | | | |
| | Other: | | | | | | | |
| 7208.10.30 | Of a thickness of 4.75 mm or more. | Free | ⋄ | G/HS/94 | | | | |
| 7208.10.60 | Of a thickness of less than 4.75 mm. | Free | ⋄ | G/HS/94 | | | | |
| | Other, in coils, not further worked than hot-rolled, pickled: | | | | | | | |
| 7208.25 | Of a thickness of 4.75 mm or more: | | | | | | | |
| 7208.25.30 | Of high-strength steel | Free | ⋄ | G/HS/94 | | | | |
| 7208.25.60 | Other. | Free | ⋄ | G/HS/94 | | | | |
| 7208.26.00 | Of a thickness of 3 mm or more but less than 4.75 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.27.00 | Of a thickness of less than 3 mm. | Free | ⋄ | G/HS/94 | | | | |
| | Other, in coils, not further worked than hot-rolled: | | | | | | | |
| 7208.36.00 | Of a thickness exceeding 10 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.37.00 | Of a thickness of 4.75 mm or more but not exceeding 10 mm | Free | ⋄ | G/HS/94 | | | | |
| 7208.38.00 | Of a thickness of 3 mm or more but less than 4.75 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.39.00 | Of a thickness of less than 3 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.40 | Not in coils, not further worked than hot-rolled, with patterns in relief: | | | | | | | |
| 7208.40.30 | Of a thickness of 4.75 mm or more. | Free | ⋄ | G/HS/94 | | | | |
| 7208.40.60 | Of a thickness of less than 4.75 mm. | Free | ⋄ | G/HS/94 | | | | |
| | Other, not in coils, not further worked than hot-rolled: | | | | | | | |
| 7208.51.00 | Of a thickness exceeding 10 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.52.00 | Of a thickness of 4.75 mm or more but not exceeding 10 mm | Free | ⋄ | G/HS/94 | | | | |
| 7208.53.00 | Of a thickness of 3 mm or more but less than 4.75 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.54.00 | Of a thickness of less than 3 mm. | Free | ⋄ | G/HS/94 | | | | |
| 7208.90.00 | Other. | Free | ⋄ | G/HS/94 | | | | |

PUBLIC VERSION

2.    The Department Would Also Breach Article II:1(a) of the GATT 1994

Further, by breaching Article II:1(b), the United States would also breach Article II:1(a) of the GATT 1994, which states: "Each {Member} shall accord to the commerce of the other {Members} treatment no less favourable than that provided for in the appropriate Part of the appropriate Schedule annexed to this Agreement."  Because Article II:1(b) proscribes the type of measures that are equally inconsistent with Article II:1(a), in breaching the former, the United States would also breach the latter.

*   *   *

In sum, interpreting "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) to include the Section 232 steel duties would result in the United States violating its obligations under Articles II:1(a) and (b) of the GATT 1994.  Therefore, that interpretation of the statute is not supported by substantial evidence and not in accordance with law, because the *Charming Betsy* canon requires U.S. statutes to be interpreted consistent with the United States' international obligations absent clear Congressional intent to violate international law, which does not exist here.

II.    **The Department's Application of Facts Otherwise Available with an Adverse Inference to the Unreported Downstream Sales by [                    ] Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law**

The Department's application of AFA in its *Final Results* to the unreported downstream sales by NSC's affiliated home market reseller [                    ], *see* IDM at Comment 2 (APPX2471-2475), is not supported by substantial evidence and not otherwise in accordance with law.[3]  As explained below, the record of this case is very different from that of *Nippon Steel*

---

[3]        The Department applied AFA in its *Final Results* to the unreported downstream sales by [                                        ]. NSC pursues this Count with respect to only [
], because the Department's decision pertaining to the other companies did not impact NSC/Nisshin/NSTC's weighted average dumping margin.

33

& *Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214 (Ct. Intl. Trade 2020) ("*Nippon Steel II*"), in which this Court rejected the claim by NSC's predecessor, Nippon Steel and Sumitomo Metal Corporation ("NSSMC"), that the Department improperly applied AFA to certain affiliated home market resellers' unreported downstream sales in the appeal of the Department's first administrative review ("AR1") final results, because this record provides neither an objective nor subjective basis for the Department to conclude NSC "failed to cooperate by not acting to the best of its ability" under 19 U.S.C. § 1677e(b). Below, NSC reviews the relevant legal framework and factual background, and then turns to how the Department erred in its decision to apply AFA in AR3.

### A.    Legal Framework

When "necessary information is not available on the record" or an interested party provides insufficient information, 19 U.S.C. § 1677e(a) provides that the Department "shall … use the facts otherwise available." If, however, the Department *also* finds that a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" – *i.e.*, AFA. *Id.* at § 1677e(b).

The CAFC has made clear that the latter finding under § 1677e(b) is separate and distinct from the former finding that the Department must make under § 1677e(a). *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Steel I*"). For the latter finding, the Department "cannot merely recite the relevant standard or repeat its facts available finding." *Steel Auth. of India, Ltd. v. United States*, 149 F. Supp. 2d 921, 930 (Ct. Int'l Trade 2001).

Moreover, to determine whether the Department may apply AFA, the CAFC in *Nippon Steel I* "established a standard that requires Commerce, based on both an objective and

subjective showing, to determine whether the respondent had acted to the 'best of its ability.'" *Nippon Steel II*, 483 F. Supp. 3d at 1222 (quoting *Nippon Steel I* at 1382).

For the objective showing, the Department must explain why it would have a reasonable expectation that the respondent would have been able to obtain the requested information. *See id*. "An adverse inference may not be drawn merely from a failure to respond, but *only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made*; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel I*, 337 F.3d at 1383 (emphasis added).

Additionally, the Department must make a subjective showing that the respondent has not only failed to produce the requested information, but also "the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id*. at 1382-83. This requires the Department to "examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id*. at 1382. While respondents may not be inattentive or careless, courts also do not require perfection. *See id*.

### B. Factual Background

Next, it is instructive to review the relevant facts on the AR3 record, which is distinct in important ways from the records of the prior reviews, including AR1 in which this Court upheld the Department's application of AFA.

First, the AR3 record shows that NSC expended significant time and resources to collect the downstream sales data requested by the Department, and offered assistance to its affiliates in doing so. As NSC explained:

> NSC once again hired local Japanese counsel for the sole purpose
> of managing the data collection efforts, and has worked closely
> with that law firm to assist the affiliates with their data collection
> issues. Further, NSC provided each of the affiliates with a
> database containing all of the information in NSC's possession
> related to the relevant sales of subject merchandise during the
> POR. NSC began requesting data from these affiliates even before
> the Department initiated this review, and these efforts have
> continued after initiation, during which time NSC and its Japanese
> counsel have made multiple written requests and numerous
> telephone calls to each of the affiliates.

*See* NSC's B_QR at B-6 (APPX80012).

Unlike in prior reviews, NSC provided documentation, including emails, letters, and communication logs, demonstrating NSC's significant efforts to collect downstream sales information from its affiliated resellers, particularly from [                    ]. *See* NSC's Supp_QR at Exhibit SB-1 (APPX81703-81747). The record shows that NSC and its Japanese counsel made [                                                                    ] throughout 2020 trying to get the requested information. *See id.* Those documents also show that to assist [              ], NSC provided [

                                    ]. *See id.*

Second, NSC also explained with evidence that it is illegal in Japan to use commercial threats to induce cooperation from its affiliates, so NSC could not have used its superior bargaining power (to the extent it existed) to induce cooperation from [                ]. *See* NSC's B_QR at B-7, Exhibit B-23 (APPX80013, APPX80633-80835). As NSC explained and documented, such action would violate the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 54 of April 14, 1947) ("Japanese Antimonopoly Act"). *Id.* Specifically, any threat by NSC to cease selling to or doing business with, or actually ceasing sales to, [              ] for not providing downstream sales data would constitute abuse of any

36

superior bargaining position NSC had, which is a type of unfair trade practice prohibited under Article 2(9)(v) of the Japanese Antimonopoly Act. *See* NSC's B_QR at Exhibit B-23, pp. 2-7 (APPX80634-80639). Moreover, it would violate Article 2(9)(vi) of the Japanese Antimonopoly Act, which prohibits NSC from engaging in actions that impede fair competition, such as dealing with another party on such conditions as will unjustly restrict the business activities of that party. *Id.* NSC submitted in Exhibit B-23 over 200 pages in support of its position regarding the Japanese Antimonopoly Act, including the text of the act, guidelines on how the act applies from the Japanese government, and a memorandum prepared by a Japanese law firm advising NSC that threatening to cease selling to or doing business with, or actually ceasing sales to, its affiliates for not providing downstream sales data would violate the act.

Third, NSC put on the record information showing that it maintained only a small [          ] ownership share of [          ] during the POR. NSC's Supp_QR at Exhibit SB-1, p. 3 (APPX81705). Therefore, while [          ] is an affiliate of NSC pursuant to 19 U.S.C. § 1677(33)(E), there is no record evidence that NSC exerts sufficient control over [          ] such that it could compel [          ] to provide any requested information.

Thus, the record in AR3 is unlike that in AR1, where this Court found it significant that the record "reveal{ed} that plaintiff sent one letter to its affiliated resellers," lacked information on how NSSMC helped address its affiliated resellers' difficulties (*e.g.*, "financial and labor burden," "system limitations"), and was "devoid of any information that plaintiff exerted any leverage to induce, or attempt to induce" its affiliated resellers. *Nippon Steel II*, 483 F. Supp. 3d at 1226. Here, the AR3 record shows that NSC made significant efforts to obtain the requested information from [          ] and offered assistance, and it explains why NSC could not have

37

exerted any leverage to induce cooperation because of the Japanese Antimonopoly Act and

NSC's limited ownership share of [                    ].

### C. The Record Does Not Show that NSC "Failed to Cooperate by Not Acting to the Best of Its Ability"

The Department's decision to apply AFA to the unreported downstream sales by [

] is unsupported by substantial evidence on the record and not otherwise in accordance with

law because the AR3 record provides neither an objective nor subjective basis for the

Department to conclude NSC "failed to cooperate by not acting to the best of its ability" under

19 U.S.C. § 1677e(b).

### 1. Objectively, the AR3 Record Does Not Support a Conclusion that the Department Could Reasonably Have Expected More from NSC

To recall, the Department may not apply AFA under 19 U.S.C. § 1677e(b) unless it

objectively concludes based on the record that it could reasonably have expected NSC to do

more to comply with the Department's requests for information. *See Nippon Steel I*, 337 F.3d at

1383. The Department's basis for any reasonable expectation that NSC could have done more to

obtain the downstream sales of [                    ] is unclear based on the IDM, which should itself

be fatal to the Department's application of AFA. Only two statements may be pertinent, but

these statements either do not support this conclusion or are not supported by substantial record

evidence.

First, the Department asserts that "NSC had the choice of selling to affiliates which

would cooperate and those that will not." IDM at Comment 2 (APPX2471-2475). However,

NSC could not have possibly known that [                    ] would fail to provide the requested

information until well after NSC made the sales. NSC made its sales during the POR, *i.e.*,

between October 1, 2018, and September 30, 2019. But NSC did not and could not know

38

[                    ] would fail to provide the necessary information until the course of this review (throughout 2020).

Moreover, to the extent the Department is implying NSC should have ceased making current sales (or at least threatened to do so) in order to obtain information about past sales, NSC had every reason to believe that [                    ] would cooperate in AR3. As the recorded communications between NSC and [                    ] from January to December 2020 show, [                    ] acknowledged NSC's requests and indicated multiple times it would try to cooperate. For instance, on April 1, 2020, [

]. NSC's Supp_QR at Exhibit SB-1, p. 26 (APPX81728). Again, on September 29, 2020, [

]. *Id.* at 33 (APPX81735). In these circumstances, the Department could not have reasonably expected NSC to take such drastic action as ceasing sales (or threatening to do so).

Second, although acknowledging NSC's explanation that it would be "contrary to Japanese law to use commercial threats to induce cooperation," the Department inexplicably asserts: "NSC has provided an insufficient explanation as to if and how {Japanese law} would apply to the current situation." IDM at Comment 2 (APPX2471-2475). However, as discussed in Section II.B above, NSC placed on the record over 200 pages of information, including a Japanese law firm memorandum, explaining precisely how a refusal to trade with an affiliated reseller to obtain downstream sales data would violate the Japanese Antimonopoly Act. The

39

Department neither mentions nor analyzes any of this information, contrary to its obligation to ground its determination on the record as a whole under the substantial evidence standard.

For these reasons, any implicit conclusion in the IDM that the Department reasonably expected NSC to do more to obtain [                    ] downstream sales information is unsupported by substantial evidence and not in accordance with law.

        2.      Subjectively, the AR3 Record Does Not Support a Conclusion that NSC Failed to Exert its Maximum Efforts

In addition to its objective conclusion, the Department must also subjectively show the respondent's lack of cooperation was the result of either "failing to keep and maintain all required records" or "failing to put forth its maximum efforts" before it may apply AFA under 19 U.S.C. § 1677e(b). *Nippon Steel I*, 337 F.3d at 1382-83. The former does not apply here because NSC's own records are not at issue. As for the latter, the record does not support a conclusion that NSC failed to exert its maximum efforts.

In fact, the Department makes no subjective finding whatsoever in the IDM that NSC failed to exert its maximum efforts because it cannot do so based on the AR3 record. As discussed in Section II.B above, the AR3 record contains extensive detail regarding NSC's efforts to obtain the information at issue, including: [                                        ]; explanations as to why commercial threats would violate Japanese law; and evidence showing NSC's limited ownership of and lack of control over [                    ]. The Department does not consider any of this information in its IDM, again contrary to its obligation to consider the record as a whole. Instead, the Department bases its decision to apply AFA largely on a policy statement applicable to "respondents like NSC" that "make non-arm's length sales to affiliates" and may "potentially be able to manipulate the dumping calculations." IDM at Comment 2 (APPX2471-2475). That is an inadequate justification for applying AFA under 19 U.S.C. §

40

1677e(b).  Notably, unlike AR1 where the Department based its decision to apply AFA on a

factual finding that "the record shows that Nippon Steel has ownership leverage" that it could

have utilized to make more effort to obtain the requested information, *Certain Hot-Rolled Steel*

*Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2016-2017*, 84 FR 31025 (Jun. 28, 2019) and accompanying

Issues and Decision Memorandum at 16, the Department makes no such factual finding that

could serve as a basis for concluding NSC did not exert its maximum efforts in the AR3 PDM or

IDM.  The Department has therefore failed to make the subjective showing necessary for it to

apply AFA in this instance, and hence its application of AFA is unsupported by substantial

evidence and not in accordance with law.

*   *   *

For these reasons, including evidence of NSC's extensive efforts to obtain the

information at issue from [               ] and evidence of why the Department could not have

reasonably expected NSC to do more, this case is distinguishable from *Nippon Steel II*.  Here, the

Court should remand this case to the Department with instructions to apply facts otherwise

available *without* an adverse inference to the unreported downstream sales by [               ].

### III.     The Department's Failure to Include the U.S. Revenue for Extra Services in the Calculation of the Net U.S. Price Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

Finally, the Department's failure to include the U.S. revenue for extra services provided

by Steelscape in the calculation of the net U.S. price is not supported by substantial evidence and

not otherwise in accordance with law.  As explained below, the Department committed such

legal error because it acknowledged in the *Final Results* that the U.S. revenue for extra services

should be included in the calculation of the net U.S. price, *see* IDM at Comment 4 (APPX2480-

2481), but did not carry through with doing so.

41

NSC explained to the Department that the CEP sales included in its U.S. sales database involved sales by Steelscape, NSC's U.S. affiliate, to unaffiliated customers in the United States. NSC's C_QR at C-25 (APPX80919). NSC further explained that for these CEP sales, NSC reported U.S. revenue on a per MT basis in the following six separate fields:

- GRSUPR1U – the gross price reported on the original invoice on a per lb basis converted to a per MT basis;

- FRTREVU – a separate freight charge charged by Steelscape to some of its customers;

- FUELREVU – a separate fuel surcharge charged by Steelscape to some of its customers;

- EMBOSSREVU – an extra charge for embossing services charged by Steelscape to some of its customers;

- SLITREVU – an extra charge for slitting services charged by Steelscape to some of its customers;

- CTLREVU – an extra charge for cutting services charged by Steelscape to some of its customers.

*Id.* at C-36 to C-37 (APPX80930-80931). NSC submitted sample invoices to establish that Steelscape charged some of its customers separately for the above freight, fuel, and extra service items. *See id.* at Exhibit C-12 and Exhibit C-13 (APPX81172-81177). The field TOTALREVU summed the amounts in the above six fields to report the total U.S. revenue on Steelscape's CEP sales. *Id.* at C-37 (APPX80931). Thus, NSC's final U.S. sales database included the above revenue fields for all of the reported Steelscape CEP sales. *See* NSC's Supp_QR at Revised Exhibit C-1 (APPX81458-81524).

At issue is the Department's failure to include the three extra service charges (EMBOSSREVU, SLITREVU, and CTLREVU) in U.S. revenue in its calculation of the net U.S. price for Steelscape's CEP sales. The Department purports to have done so, and acknowledges it should have done so, but the record makes clear the Department did not.

The Department released its SAS margin program code for calculating net U.S. price with its *Preliminary Results*.  *See* Prelim NSC Analysis at Attachment 2 (SAS Log – Margin Program) (APPX82532-82730).  The Department did not issue a new SAS margin program code with its *Final Results* because it made no changes.  *See* Final NSC Analysis (APPX83054-83056).  The ensuing discussion therefore addresses the *Preliminary Results* SAS margin program code.

The relevant portions of the SAS margin program code are the following:



Prelim NSC Analysis at Attachment 2 (SAS Log – Margin Program) (APPX82532-82730).

As this code shows **[**

PUBLIC VERSION

], which reflects NSC's reported billing adjustments. *See* NSC's

C_QR at C-37 to C-38 (APPX80931-80932).  None of this indicates the Department included

the extra service revenues NSC reported in variables EMBOSSREVU, SLITREVU, and

CTLREVU when calculating the net U.S. price.  Indeed, [

].  *See* Prelim NSC

Analysis at Attachment 2 (SAS Log – Margin Program) (APPX82532-82730).  For the

Department to have included the extra service revenues when calculating the net U.S. price,

[

]

(underline added).

In the *Final Results*, the Department purported to have addressed this issue, and therefore

did not make any changes to the preliminary results margin calculation for NSC, because in its

view:

> Commerce relied on the total revenue as reported by NSC in its
> Section C sales database ….  NSC has not identified in the record a
> single instance of reported service-related revenue that is not
> included in its total revenue field.  Therefore, we continue to rely
> on the total revenue as reported by NSC for these final results.

IDM at 21 (APPX2481).

As an initial matter, the Department appears to have misunderstood NSC's argument on

this issue.  NSC never argued that its total revenue field did not include all of its reported

service-related revenue, so there were no instances in the record for NSC to identify to support

44

its argument. Rather, NSC argued that when calculating the net U.S. price, the Department erroneously included only NSC's reported gross revenue field (GRSUPR1U) but failed to include the separately reported extra service revenue fields (EMBOSSREVU, SLITREVU, and CTLREVU). *See* NSC's Case Brief at 38 (APPX83038).

As the above discussion shows, the Department continued to make that error in its *Final Results* by maintaining the same SAS margin program code it used in its *Preliminary Results*. That is, while acknowledging in the above-quoted portion of the IDM that the Department should have used NSC's reported total revenue (which included the extra service revenues), the Department did not do so in either the *Preliminary Results* or the *Final Results* when calculating the net U.S. price. As the portions of the SAS margin program code quoted above reveal, the Department did not use NSC's reported TOTALREVU when calculating the net U.S. price; instead, [                                                                    ], and those variables did not include the extra service revenues NSC reported in variables EMBOSSREVU, SLITREVU, and CTLREVU.

As further confirmation that the Department should have included the extra service revenues NSC reported in variables EMBOSSREVU, SLITREVU, and CTLREVU when calculating the net U.S. price for Steelscape's CEP sales, Steelscape's submitted quantity and value reconciliation reconciles to a sales value that is based on the company's total invoice revenue calculated as the sum of (GRSUPR1U + EMBOSSREVU + SLITREVU + CTLREVU) * QTYU. *See* NSC's C_QR at Exhibit C-3 (APPX81053-81064).[4] Thus, Steelscape

---

[4]     Exhibit C-3 shows that the total revenue for subject merchandise from Steelscape's financial statements before discounts, claims, freight revenue and fuel surcharge was [                    ]. Summing across NSC's reported CEP sales (*i.e.*, excluding NSC's reported EP sales) in NSC's final U.S. sales database, NSC's Supp_QR at Revised Exhibit C-1 (APPX81458-81524), the reported values are [                    ] for GRSUPR1U, [            ] for

PUBLIC VERSION

demonstrated the veracity of its sales reporting and that each of its reported revenue items reconcile to its financial statements and should be included in the calculation of the net U.S. price.

Consequently, the Department continued to miscalculate the net U.S. price in its *Final Results* for those Steelscape CEP sales for which NSC reported extra service revenues in the fields EMBOSSREVU, SLITREVU, and CTLREVU.  The Court should therefore find the Department's calculation of the net U.S. price is not supported by substantial evidence and not otherwise in accordance with law, and remand this case to the Department to correct this error.

---

EMBOSSREVU, **[                ]** for SLITREVU, and **[          ]** for CTLREVU, which adds to **[                          ]** – a negligible difference from **[                    ]**.

PUBLIC VERSION

## CONCLUSION

For the foregoing reasons, NSC respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case with instructions to recalculate NSC's dumping margin.

A proposed order is attached.

Respectfully submitted,

Richard L.A. Weiner
Rajib Pal
Shawn M. Higgins
Justin R. Becker
Alex L. Young

Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel for Nippon Steel Corporation

Dated: February 25, 2022

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NIPPON STEEL CORPORATION,

          Plaintiff,

    v.

UNITED STATES,

          Defendant,

NUCOR CORPORATION, STEEL
DYNAMICS, INC. AND SSAB
ENTERPRISES, LLC,

          Defendant-Intervenors.

Court No. 21-00533

**ORDER**

      Upon consideration of the Motion for Judgment on the Agency Record filed by plaintiff, Nippon Steel Corporation ("NSC"), and upon all other papers and proceedings herein, it is hereby

      **ORDERED** that NSC's Motion for Judgment on the Agency Record is granted; and it is further

      **ORDERED** that the U.S. Department of Commerce's determination in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 47615 (Aug. 26, 2021) is unsupported by substantial record evidence and otherwise contrary to law in the following respects: (i) the deduction of Section 232 duties from NSC's U.S. prices; (ii) the application of facts otherwise available with an adverse inference to the unreported downstream sales by certain of NSC's affiliated home market resellers; and (iii) the failure to include the U.S. revenue for extra services in the calculation of net U.S. price; and it is further

      **ORDERED** that this action is remanded to the Department of Commerce for the purpose of recalculating NSC's dumping margin after: (i) including in NSC's U.S. prices the Section 232 duties on steel imports; (ii) applying facts otherwise available without an adverse inference to the unreported downstream sales by certain affiliated home market resellers; and

(iii) including in the calculation of the net U.S. price the U.S. revenue for extra services reported by NSC; and it is further

**ORDERED** that the Department of Commerce shall file its remand determination with the Court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

**SO ORDERED.**

_____
Stephen Alexander Vaden, Judge

Dated: _____, 2022

New York, New York

## CERTIFICATE OF COMPLIANCE

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 13,985 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Richard L.A. Weiner
Richard L.A. Weiner

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached document are being served by CM/ECF, on February 25, 2022, addressed to the following parties:

**On Behalf of the United States:**
Kelly Ann Krystyniak
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

**On behalf of Nucor Corporation:**
Alan H. Price
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

**On Behalf of the United States:**
David W. Richardson
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3614
Washington, DC 20230

**On behalf of Steel Dynamics, Inc. and SSAB Enterprises, LLC:**
Roger Brian Schagrin
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001

/s/ Richard L.A. Weiner
Richard L.A. Weiner