## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

<table>
<tr><td>

———————————————————————<br>
)<br>
NIPPON STEEL CORPORATION,    )<br>
)<br>
         Plaintiff,    )<br>
)<br>
    v.    )<br>
)<br>
UNITED STATES,    )<br>
)<br>
        Defendant,    )<br>
)<br>
NUCOR CORPORATION, STEEL    )<br>
DYNAMICS, INC., AND SSAB    )<br>
ENTERPRISES, LLC,    )<br>
)<br>
     Defendant-Intervenor.    )<br>
———————————————————————)

</td><td>

Court No. 21-00533

**PUBLIC VERSION**

Business Proprietary Information<br>
Removed On Pages 2, 4-5, and 31-32

</td></tr>
</table>

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

<div style="float:right">

BRIAN M. BOYNTON<br>
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY<br>
Director

TARA K. HOGAN<br>
Assistant Director

KELLY A. KRYSTYNIAK<br>
Trial Attorney<br>
U.S. Department of Justice, Civil Division<br>
Commercial Litigation Branch<br>
P.O. Box 480<br>
Ben Franklin Station<br>
Washington, D.C. 20044<br>
Telephone: (202) 307-0163<br>
Facsimile: (202) 514-8640<br>
E-mail: Kelly.A.Krystyniak@usdoj.gov

</div>

OF COUNSEL:<br>
DAVID RICHARDSON<br>
Office of the Chief Counsel for<br>
Trade Enforcement & Compliance<br>
Department of Commerce

April 29, 2022                              Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

RULE 56.2 STATEMENT ............................................................................................1

    I. The Administrative Determination Under Review...........................................1

    II. Issues Presented For Review........................................................................1

STATEMENT OF FACTS ..........................................................................................2

SUMMARY OF THE ARGUMENT ...........................................................................7

ARGUMENT ...............................................................................................................8

    I.     Standard Of Review.......................................................................8

    II.    Commerce's Determination That Section 232 Duties Are United States
           Import Duties For The Purposes Of 19 U.S.C. § 1677a(c)(2)(A) Is
           Supported By Substantial Evidence And In Accordance With Law ...................10

          A.  Commerce Reasonably Determined That Section 232 Duties Are
              "United States Import Duties" That Must Be Deducted From Export
              Price.........................................................................................11

          B.  Commerce's Interpretation Is Consistent With Law And Precedent.............13

    III.    Commerce's Determination That Nippon Steel Failed To Act To The Best
           Of Its Ability When It Did Not Report Certain Affiliated-Party, Downstream,
           Home-Market Sales Is Supported By Substantial Evidence And Is
           In Accordance With Law .......................................................................24

          A.    Legal Standard .......................................................................24

          B.    Commerce's Determination That Nippon Steel Failed To Act To
              The Best Of Its Ability In Selecting Among Facts
              Otherwise Available Is Supported By Substantial Evidence...................25

    IV.    Commerce Respectfully Requests A Partial Remand To Commerce To
           Recalculate Certain Service Revenues Inadvertently Omitted From The
           United States Price Calculation ...........................................................31

CONCLUSION..........................................................................................................32

# **TABLE OF AUTHORITIES**

**Cases**

*AK Steel Corp. v. United States*,
  988 F. Supp. 594 (Ct. Int'l Trade 1997)................................................................. 13

*Am. Inst. for Int'l Steel, Inc. v. United States*,
  806 F. App'x. 982 (Fed. Cir. 2020)....................................................................... 21

*Apex Exports v. United States*,
  777 F.3d 1373 (Fed. Cir. 2015).............................................................................. 11

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984)................................................................................ 9

*Borusan Mannesman Boru Sanayi ve Ticaret A.S. and Borsuan Mannesman Pipe U.S. Inc. v. United States*,
  494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021).................................................... *passim*

*Bethlehem Steel Corp. v. United States*,
  27 F. Supp. 2d 201 (Ct. Int'l Trade 1998)............................................................. 13

*Buttfield v. Stranahan*,
  192 U.S. 470, 48 L. Ed. 525, 24 S. Ct. 349 (1904) ............................................. 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................. 9

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................................. 8

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................. 9

*Corus Staal BV v. Dep't of Com.*,
  395 F.3d 1343 (Fed. Cir. 2005)............................................................................. 24

*Deacero S.A.P.I DE C.V. et al v. United States*,
  No. 03924, Slip Op. 21.171 (Ct. Int'l Trade Dec. 20, 2021)................................. 23

*Fujitsu General, Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996)............................................................................... 10

*Hoogovens Staal BV v. United States*,
    4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) ........................................................................ 13

*Hyundai Steel Co. v. United States*,
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .................................................................... 30

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015) ...................................................................................... 10

*Kawasaki Steel Corp. v. United States*,
    110 F. Supp. 2d 1029 (2000) .......................................................................................... 30

*Mueller Comercial De Mexico v. United States*,
    753 F.3d 1227 (Fed. Cir. 2014) ...................................................................................... 29

*Murray v. Schooner Charming Betsy, The*,
    6 U.S. 64, 2 L. Ed. 208 (1804) ...................................................................................... 24

*NEC Corp. v. United States*,
    151 F.3rd 1361 (Fed. Cir. 1998) .................................................................................... 30

*Nippon Steel & Sumitomo Metal Corp. v. United States*,
    483 F. Supp. 3d 1214 (Ct. Int'l Trade 2020) .................................................................... 29

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ...................................................................................... 25

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................................................ 9

*Power Steel Co. v. United States*,
    Slip Op. 21.173 (Ct. Int'l Trade Dec. 23, 2021). ........................................................ 10, 22

*SKF USA Inc. v. United States*,
    254 F.3d 1022, (Fed. Cir. 2001). .................................................................................... 31

*Ticaret A.S. and Borsuan Mannesmann Pipe U.S. Inc. v. United States*,
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) .................................................................... 10

*Timken Co. v. United States,*
 354 F.3d 1334 (Fed. Cir. 2004) ......................................................................... 9, 12

*Totes-Isotoner Corp. v. United States,*
 594 F.3d 1346 (Fed. Cir. 2010) ........................................................................... 23

*Universal Steel Prods. v. United States,*
 495 F. Supp. 3d 1336, 1350 (Ct. Int'l Trade 2021), appeal docketed, Fed. Cir. 21-1726.......19

*U.S. Steel Grp., a Unit of USX Corp. v. United States,*
 15 F. Supp. 2d 892, 898-900 (Ct. Int'l Trade 1998) .............................................. 13

*U.S. Steel Grp. v. United States,*
 96 F.3d 1352 (Fed. Cir. 1996) ............................................................................. 10

*United States v. Eurodif S.A.,*
 555 U.S. 305 (2009) ......................................................................................... 8, 9

*Wheatland Tube Co. v. United States,*
 495 F.3d 1355, (Fed. Cir. 2007) ................................................................. *passim*

*Zenith Electronics Corp. v. United States,*
 77 F.3d 426 (Fed. Cir. 1996) ............................................................................... 13

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ....................................................................................... 8

1673 U.S.C. § 1673 ................................................................................................. 22

19 U.S.C. § 1675(d) ................................................................................................ 19

19 U.S.C. §1677a(c)(2)(A) ...................................................................................... 10

19 U.S.C. § 1677(35) ......................................................................................... 25, 27

19 U.S.C. §1677b(a) .......................................................................................... 25, 27

19 U.S.C. §1677m(d) ................................................................................. 25

19 U.S.C. § 1677a(c)(2) ............................................................................ 11

19 U.S.C. § 1677a(c)(2)(A) ................................................................ 10, 12

19 U.S.C. § 1677b(a)(1)(B) ....................................................................... 11

19 U.S.C. § 1677b(a)(6) ............................................................................ 11

19 U.S.C. § 1677e(a) ................................................................................. 24

19 U.S.C. § 1677e(b) ................................................................................. 24

19 U.S.C. § 1862 ................................................................................. 15, 21

19 U.S.C. § 1862(b)(1)(A) ........................................................................ 20

19 U.S.C. § 1862(b)(3)(A) .......................................................................... 3

19 U.S.C. § 1862(c) ................................................................................... 19

19 U.S.C. § 2251 ................................................................................. 13, 19

## Regulations

Title 19 C.F.R. §351.403 ............................................................................ 27

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty-
Administrative Review,*
    69 Fed. Reg. 19,159 (Dep't of Commerce, Apr. 12, 2004) ........................................ 14

*Certain Hot-Rolled Steel Flat Products From Japan: Final Determination of Sales at Less Than
Fair Value and Final Affirmative Determination of Critical Circumstances,*
    81 Fed. Reg. 53409 (Dep't of Commerce, Aug. 12, 2016) ........................................ 28

*Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,*
84 Fed. Reg. 31025 (Dep't of Commerce, June 28, 2019) ...................................................... 28

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
84 Fed. Reg. 67712 (Dep't of Commerce Dec. 11, 2019) ........................................................ 4

*Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018,*
85 Fed. Reg 57821 (Dep't of Commerce, Sept. 16, 2020) ...................................................... 28

*Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019,*
86 Fed. Reg. 47615 (Dep't of Commerce August 26, 2021) .................................................... 1

**Other Authorities**

*Presidential Proclamation 4907 of March 10, 1982: Imports of Petroleum*,
48 Fed. Reg. 10,507 (Mar. 10, 1982). ................................................................... 17

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*,
83 Fed. Reg. 11,625 (Mar. 15, 2018) ................................................................ *passim*

*Stainless Steel Wire Rod from Korea*,
69 Fed. Reg. at 19,160 (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994), 1994 U.S.C.C.A.N. 3773 ......................................................... 25

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the administrative record filed by plaintiff, Nippon Steel Corporation (plaintiff or Nippon Steel).  Plaintiff challenges the final determination of the United States Department of Commerce in the third administrative review of the antidumping duty order covering certain hot rolled steel flat products from Japan.  As explained below, Commerce's determination to subtract the Section 232 duties from the United States price and to apply partial adverse facts available is supported by substantial evidence and is otherwise in accordance with law.  However, Commerce respectfully requests a partial remand in order to address the service-related revenue calculation.

## RULE 56.2 STATEMENT

### I.        The Administrative Determination Under Review

The administrative determination under review is Commerce's determination in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019,* 86 Fed. Reg. 47615 (Dep't of Commerce August 26, 2021) (final results), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 162).[1]  The period of review is October 1, 2018, through September 30, 2019.

### II.       Issues Presented For Review

1.        Whether Commerce's deduction of Section 232 duties from Nippon Steel's export prices is supported by substantial evidence and in accordance with law.

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

2.      Whether Commerce's finding that Nippon Steel did not act to the best of its ability when it failed to provide the affiliated party's downstream sales is supported by substantial evidence and in accordance with law.

3.      Whether a partial remand is appropriate where Commerce intended, but inadvertently failed, to include in the United States price calculation certain service revenues, [                                                  in the margin calculation program.

## STATEMENT OF FACTS

On March 8, 2018, pursuant to his authority under Section 232 of the Trade Expansion Act of 1962 (Section 232), 19 U.S.C. § 1862, the President of the United States imposed a 25 percent *ad valorem* tariff on imports of steel articles from all countries, except Canada and Mexico, effective March 23, 2018.  *See Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018).

The President concurred with the Secretary of Commerce's finding that steel articles were being imported into the United States in such quantities and under such circumstances as to threaten to impair the country's national security.  *Id.* ¶ 5; *see* 19 U.S.C. § 1862 (b)(3)(A). The Secretary found that excessive steel imports were weakening the United States economy and shrinking our ability to meet national security steel production requirements in a national emergency.  Proclamation 9705, ¶ 2.  The goal of the 25 percent tariff was to reduce imports to a level that would "ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense."  *Id.* ¶¶ 4-5, 8.  The President indicated that the new 25 percent tariff applied "in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles."  *Id.* clause 2.

To establish the tariff, the President modified subchapter III, chapter 99, of the

Harmonized Tariff Schedule of the United States (HTSUS) to add a new heading, 9903.80.01,

which provided for an additional 25 percent tariff for "products of iron or steel provided for in

the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of

Canada {or} of Mexico…or any exclusions that may be determined and announced by the

Department of Commerce."  HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (Posted

Mar. 29, 2018).  The President also added a new Note 16, subsection (a) of which provided:

> Heading 9903.80.01 sets forth the *ordinary customs duty* treatment
> applicable to all entries of iron or steel products from all countries,
> except products of Canada and of Mexico, classifiable in the
> headings or subheadings enumerated in this note.  Such goods shall
> be subject to duty as provided herein.  No special rates of duty
> shall be accorded to goods covered by heading 9903.80.01 under
> any tariff program enumerated in general note 3(c)(i) to the tariff
> schedule.  *All anti-dumping, countervailing, or other duties and*
> *charges applicable to such goods shall continue to be imposed.*

Proclamation 9705, Annex (U.S. Note 16(a) (emphasis added)).  Consistent with the President's

instructions, the following row was added to the HTSUS:

| Heading/ Subheading | Stat Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 9903.80.01 | 1/ | Products of iron or steel provided for in the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of Canada, of Mexico, of Australia, of Argentina, of South Korea, of Brazil, or of the member countries of the European Union or any exclusions that may be determined and announced by the Department of Commerce.................. | 1/ | 25% | | The duty provided in the applicable subheading + 25% |

HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (posted Mar. 29, 2018).

Imports of steel rebar produced by Nippon Steel were thus subject to the 25 percent tariff

after March 23, 2018.  *See* Proclamation 9705, clause 2.

On December 11, 2019, Commerce published notice of the initiation of the third administrative review of the antidumping duty order covering hot-rolled steel flat products from Japan.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67712 (Dep't of Commerce Dec. 11, 2019).  The review covered many producer/exporters of the subject merchandise, with Nippon Steel and Tokyo Steel Manufacturing Co., Ltd. serving as the mandatory respondents.  Respondent Selection Memo (P.R. 45) at 1.

Commerce issued a questionnaire to Nippon Steel on February 24, 2020, including Section B of the questionnaire concerning home market sales.  P.R. 46.  In this initial questionnaire, Commerce specifically requested that Nippon Steel submit the downstream home market sales of affiliated resellers to the first unaffiliated customer in the home market when the sale from Nippon Steel to the affiliated reseller did not pass the arms-length test.  *Id.* at B-2 and B-3.  On June 30, 2020, Nippon Steel submitted its Section B questionnaire response.  Nippon Steel Section B Questionnaire Response (Section B Questionnaire Response) (C.R. 114-149).

Nippon Steel reported that it had sales to affiliated resellers that did not pass the arms-length test.  Section B Questionnaire Response (C.R. 114) at B-7.  However, for certain of these affiliated resellers, it did not report the downstream sales; including – relevant here – [

].  *Id.* at B-7 to B-8.[2]  Nippon Steel explained that it attempted to get the data from

[                    ] but was unable to, and could not (under Japanese law) force the affiliate to

comply.  *Id.*

---

[2] As it states in footnote 3 of its brief, Nippon Steel only challenges Commerce's determination with regard to [                    ] because the other affiliated companies' data (for which Commerce requested but did not receive downstream data) evidently do not affect the margin calculation.  *See* Pl. Br., ECF No. 29, at 33 n.3; *see also*, Nippon Steel Supplemental Questionnaire Response at 1-3 (C.R. 224) (indicating that the other [
]).  Commerce found that other than this statement, Nippon Steel provided no support for its claim.  IDM at 14.

In a supplemental questionnaire, Commerce notified Nippon Steel of the deficiency.

Supplemental Questionnaire, at 1, Q1 (P.R. 120).   Nippon Steel again responded with

documentary support indicating that it had attempted to obtain the downstream sales information

from [                ], but the affiliate refused to provide it.  Supplemental Questionnaire

Response, at 1-3 (P.R. 126).

Also, in part C of the initial questionnaire, Commerce instructed Nippon Steel, as part of

its United States sales submission, to report all of its United States sales-related revenues.

Questionnaire, at C-18 and C-38 (P.R. 46).  Nippon Steel reported its revenues for each sale,

including, in relevant part, [

                                        ].  Nippon Steel Section C Questionnaire

Response (Section C Questionnaire Response), at C-37 (P.R. 94).

In the preliminary results, Commerce deducted the Section 232 duties from Nippon

Steel's United States price.  Preliminary Decision Memorandum, at 15-18 (P.R. 139).

Commerce also applied adverse facts available for the home-market, downstream sales of the

affiliated resellers that Nippon Steel had failed to report.  *Id*. at 7-10, s*ee also*, Nippon Steel

Preliminary Calculation Memorandum Section III,1. (P.R. 141) (C.R. 267).  Finally, Commerce

included some service-related revenues in the preliminary calculation, leaving out

[

                                        ].  *See* Preliminary Calculation Memo, at Attachment 2, lines

9338-9339 (P.R. 141) (C.R. 267).

Nippon Steel filed an administrative case brief in which it argued:  (1) Section 232 duties

are not ordinary duties and should not be deducted from the United States price; (2) Commerce

cannot resort to adverse fact available regarding its unreported home-market, affiliate-reseller,

downstream sales because Nippon Steel acted to the best of its ability; and (3) Commerce improperly calculated the net United States price by leaving out certain separately reported revenues.  Nippon Steel Corp Admin Case Brief, at 5-22, P.R. 148-150.

Commerce issued its final results on August 26, 2021.  *See Final Results*, 86 Fed. Reg. 47,615.  Commerce found that Nippon Steel's rate of dumping during the period of review was 11.70 percent.  *Id*. at 47,616.  In the IDM – documenting the rationale underlying the final results – Commerce addressed the issues raised by Nippon Steel in its case brief, explaining why it disagreed with Nippon Steel's position.

First, Commerce explained why it continued to deduct the Section 232 duties from Nippon Steel's United States sales.  IDM, at 7-11.  Commerce found that the Section 232 duties were analogous to import duties and – pursuant to statute – must be deducted from the United States price.  *Id*. at 8-9.  Commerce explained that, unlike other duties (which are temporary or remedial in nature and are thus not deducted from the United States price), the Section 232 duties address national security concerns and, as import duties, must be deducted from the United States price.  *Id*. at 9-10.

Next, Commerce continued to apply facts available with an adverse inference to affiliated-reseller, home-market, downstream sales that Nippon Steel failed to report.  *Id*. at 13-15.  Commerce found that Nippon Steel had failed to act to the best of its ability to provide the information.  *Id*.  Commerce explained that Nippon Steel had a history of failing to report downstream sales, including in each segment of this proceeding to date: the original investigation and the two prior administrative reviews.  *Id.* at 12.  Notwithstanding this, Nippon Steel continued to do business with affiliated resellers that failed, repeatedly, to provide it with required downstream sales data.  *Id*. at 13.  Commerce explained that Nippon Steel ". . . had a

6

choice of selling to affiliates {that} would cooperate and those that will not." *Id*.  In choosing to continue to do business with these companies despite a demonstrated history of failing to provide information requested by Commerce, Nippon Steel had failed to act to the best of its ability.  *Id*. Commerce further explained why it needed the sales data the Nippon Steel failed to provide. Specifically, Commerce explained that if a respondent could be shielded from reporting certain home-market downstream sales despite knowing that the entities would not cooperate, they could be in a position to manipulate the dumping margin calculation by channeling high priced downstream sales through an affiliate that would not report those sales, artificially skewing its dumping margins.  *Id*., at 13-14.  As facts otherwise available with an adverse inference, Commerce applied the highest home market price of the commonly sold control numbers covered by the Order reported by an unaffiliated entity to Nippon Steel's unreported downstream sales.  *Id.* at 6.

Lastly, regarding service-related revenues, Commerce found that by using the respondent's "total revenue," as reported in the total revenue field, Commerce had included all of the appropriate revenues in the United States price.  *Id*., at 21.

## SUMMARY OF THE ARGUMENT

Commerce's determination to subtract the Section 232 tariffs imposes on imports of steel articles from Nippon Steel's United States price is consistent with statute, the Presidential Proclamation, and binding precedent.  Nippon Steel asks the Court to disregard instances where the Court has already found in Commerce's favor on this exact issue, asserting that the Court's analysis was flawed.  But the Presidential Proclamation was clear that, due to national security concerns, the Section 232 duties were to be assessed "in addition to" other customs duties.

Nippon Steel presents no convincing argument for why this Court should reach a different conclusion than that reached by other judges of the Court.

With regard to the application of partial adverse facts available, Nippon Steel has – in each segment of this proceedings – been notified that Commerce must receive information on the downstream sales by its affiliates.  And the necessity of this information is clear: without it, Commerce has no way to determine whether Nippon Steel products are being dumped in its home market.  Yet, Nippon Steel has again failed to provide the information, instead asserting that it is wholly unable to induce compliance from affiliated entities.  The Court has previously sustained Commerce's application of partial adverse facts available based upon a failure by an affiliate to provide precisely the same type of data that Commerce requested here..  This Court should reach the same conclusion here.

Finally, after consideration of the arguments raised by Nippon Steel regarding service-related revenues, Commerce believes that its calculation was in error, and respectfully requests a partial remand in order to recalculate service-related revenues.

## ARGUMENT

## I.   Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not make Commerce's findings unsupported by

substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party

challenging Commerce's determination under the substantial evidence standard "has chosen a

course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352

(Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains

Commerce's factual determinations as long as they are reasonable and supported by the record as

a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v.

United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court reviews Commerce's statutory interpretations, it employs the two-

pronged test established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837,

842-43 (1984).  The Court first examines "whether Congress has directly spoken to the precise

question at issue," and if it has, the agency must comply with Congress's clear intent. *Id*. at 842-

43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of

the statute." *Id*. at 843.  In such cases, "{a}ny reasonable construction of the statute is a

permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004)

(citation and quotation marks omitted), and Commerce's "interpretation governs in the absence

of unambiguous statutory language to the contrary or unreasonable resolution of language that is

ambiguous." *United States v. Eurodif S. A.*, 555 U.S. 305, 316 (2009) (citation omitted).  The

Court "need not conclude that the agency construction was the only one it permissibly could

have adopted to uphold the construction, or even the reading the court would have reached if the

question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11.  Indeed,

"'{t}he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute

with the implementing agency.'" *Eurodif*, 555 U.S. at 316 (citation omitted).

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.* (quoting *U.S. Steel Grp.*, 96 F.3d at 1362). Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

II.    **Commerce's Determination That Section 232 Duties Are United States Import Duties For The Purposes Of 19 U.S.C. § 1677a(c)(2)(A) Is Supported By Substantial Evidence And In Accordance With Law**

Commerce determined that Section 232 duties constitute "United States import duties" under the antidumping statute, and consequently deducted the amounts from Nippon Steel's United States price. IDM at 8-11. Though a relatively novel legal issue, the Court has, on three recent occasions, sustained Commerce's determination that Section 232 duties must be deducted from United States price on three occasions. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borsuan Mannesmann Pipe U.S. Inc. v. United States*, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021); *Deacero S.A.P.I DE C.V. et al. v. United States*, No. 03924, Slip Op. 21-171 (Ct. Int'l Trade Dec. 20, 2021); *Power Steel Co. v. United States*, Slip Op. 21-173 (Ct. Int'l Trade Dec. 23, 2021). Nippon Steel has not raised any new or persuasive arguments that warrant departing from the Court's holdings in *Borusan, Deacero,* and *Power Steel*.

10

Commerce's determination to subtract the Section 232 duties from Nippon Steel's United States export price is a reasonable construction of the antidumping duty statute, as well as the language of the Presidential Proclamation, and should be sustained. Commerce must adjust the export price for "the amount, if any, included in such price, attributable to any . . . United States import duties." 19 U.S.C. §1677a(c)(2)(A); IDM at 8-9. As the Court explained in *Borusan*, the phrase "United States import duties" is broad. 494 F. Supp. 3d at 1375. Moreover, in establishing the Section 232 duties, the President clarified that the new tariff heading "sets forth the *ordinary* customs duty treatment" applicable to steel imports, and that all antidumping duties shall continue to be imposed "*in addition to*" Section 232 duties. Proclamation 9705, clause 2 and Annex (emphasis added).

Further, Commerce's determination is consistent with the decision by the United States Court of Appeals for the Federal Circuit in *Wheatland Tube Co. v. United States*. 495 F.3d 1355, 1357 (Fed. Cir. 2007). As Commerce explained, "section 232 duties are not akin to {special} antidumping or section 201 duties," the duties at issue in *Wheatland Tube*, because Section 232 duties serve a different purpose, do not have a statutorily-imposed duration, and there is no risk of double counting antidumping and Section 232 duties. IDM at 10. Thus, as set forth in greater detail below, the Court should sustain Commerce's decision to deduct Section 232 duties from Nippon Steel's export price.

### C. Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price

The intent of Commerce's statutorily prescribed antidumping calculation is to allow Commerce to compare the fair value of the merchandise to the price charged in the United States. 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6); *see also, e.g., Apex Exports v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (holding that "{t}he

overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.").  Accordingly, both constructed export price and normal value are subject to adjustments "so that they closely reflect the price of subject merchandise at a common point in the chain of commerce."  *Id.* at 1374 (citing 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6)).

Pertinent here, the antidumping statute directs Commerce to reduce Nippon Steel's constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties . . . .*"  19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  The term "United States import duties" is not defined in the statute; as a result, Commerce's interpretation need only be reasonable to be sustained.  *See* 19 U.S.C. § 1677a(c)(2)(A); *Timken Co.*, 354 F.3d at 1342; *Wheatland Tube*, 495 F.3d at 1359-60.

Commerce explained that its determination is consistent with the statute because the statute directs Commerce to adjust constructed export price for United States import duties, and Section 232 duties are indisputably import duties.  *See* IDM at 9.  Commerce also explained that the Presidential proclamations implementing the tariffs contained no exception or indication that Section 232 duties should not be treated as "United States import duties" under the statute.  *See id* at 9-10.  To the contrary, the President directed that "section 232 duties are to be imposed *in addition to* other duties unless expressly provided for in the proclamation."  Proclamation 9705, clause 2 and Annex (emphasis added).  Indeed, the President explicitly referred to the Section 232 duties as "ordinary" customs duties, *id.*, further supporting Commerce's determination that "section 232 duties are treated as any other duties."  IDM at 10; *see* HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (Posted Mar. 29, 2018) (table indicating that the rate of duty for steel imports is the duty provided in the regular, applicable subheading plus 25%).

12

Commerce's interpretation of the phrase "United States import duties" is reasonable and is entitled to deference because it is consistent with the broad language of the statute and with the President's proclamations. *See, e.g.*, *Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996) (the Court must interpret an ambiguous statute "with deference to Commerce's interpretation. . . .").

Nippon Steel does not articulate how Commerce's interpretation is inconsistent with the terms of the antidumping statute, instead merely disagreeing with the Court's holdings in the three prior cases. But those decisions, which found that Commerce acted lawfully in determining to subtract the Section 232 duties from the United States price for the purposes of its analysis are consistent with the statute and Presidential Proclamation 9705.

### D.  Commerce's Interpretation Is Consistent With Law And Precedent

In addition to being consistent with statute and  Proclamation 9705, Commerce's determination is also consistent with Federal Circuit precedent. As an initial matter, Commerce's interpretation of the phrase "United States import duties" as not including antidumping duties has been consistently sustained by the Court. *See AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997); *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998); *U.S. Steel Grp., a Unit of USX Corp. v. United States,* 15 F. Supp. 2d 892, 898-900 (Ct. Int'l Trade 1998); *Bethlehem Steel Corp. v. United States*, 27 F. Supp. 2d 201, 208 (Ct. Int'l Trade 1998); *see also Wheatland Tube*, 495 F.3d 1355.

Moreover, in *Wheatland Tube*, the Federal Circuit sustained Commerce's interpretation of the same statutory language as not including Section 201 safeguard[3] duties.  495 F.3d at 1355-60.  In comparing Section 201 duties with antidumping duties, the Federal Circuit explained:

> (1) "{l}ike antidumping duties, {Section} 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports{;}"

> (2) "{n}ormal customs duties, in contrast, have no remedial purpose{;}"

> (3) "antidumping duties and {section} 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise{;}" and

> (4) "{Section} 201 safeguard duties are like antidumping duties . . . because they provide only temporary relief from the injurious effects of imports{,}" whereas normal customs duties "have no termination provision and are permanent unless modified by Congress."

495 F.3d at 1362-63.  The Federal Circuit also held that "{t}o assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice."  *Id.* at 1365.

After a thorough analysis based on the factors considered in *Wheatland Tube*, Commerce determined here that Section 232 duties are not akin to Section 201 or antidumping duties and, therefore, must be deducted from the United States price.  IDM at 26-29; *see also Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153, 19,159 (Dep't of Commerce Apr. 12, 2004) ("Although the {antidumping duty} law does not define the term 'United States import duties,' the Senate

---

[3] Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise 'if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'"  *Wheatland Tube*, 495 F.3d at 1357 (quoting § 2251).

Report that accompanied the Antidumping Act of 1921 {} contrasts antidumping duties (which it refers to as 'special dumping duties') with normal customs duties (which it refers to as 'United States import duties'). . . .  Thus, Congress has long recognized that at least some duties implementing trade remedies—including at least antidumping duties—are *special duties that should be distinguished from ordinary customs duties*.")) (emphasis added) (citing S. Rep. No. 67-16 at 4 (1921)); *see also Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Dep't of Commerce Oct. 20, 2004).

In *Wheatland Tube*, "Commerce found that antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise." 495 F.3d at 1362.  By comparison, here, Commerce found that Section 232 duties are not focused on remedying a domestic injury; rather, Section 232 concerns itself with the effects on the national security of import of the article.  IDM at 9-10.

Nippon Steel disagrees, arguing that Section 232 tariffs are "remedial" in nature like Section 201 and antidumping duties because Section 232 duties are "related directly to the extent of the particular conditions determined to exist with regards to the domestic industry."  Pl. Br. at 11-16.  But even if Section 232 might be considered remedial in a "broad sense," *Borusan*, 494 F. Supp. 3d at 1374, Section 232 duties are not imposed *because* a domestic industry is being injured or threatened.  *See* IDM at 27; *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,159 (finding that Section 201 duties were similar to antidumping duties and therefore special remedial duties because they are intended to provide "temporary relief for an industry suffering from serious injury.").  Rather, Section 232 duties are imposed to address imports that threaten to

impair national security, *see* 19 U.S.C. § 1862; IDM at 10, and can be "used to promote vital nascent industries, not just already established injured industries." *Borusan*, 494 F. Supp. 3d at 1374. While an *effect* of the Section 232 duties may be to assist a weakened domestic injury, the *purpose* of the duties is to avert the threat of impairment to national security concern, a purpose much broader than Section 201 or antidumping duties.

In Proclamation 9705, the President found that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the *national security* . . . ." Proclamation 9705, ¶ 11 (emphasis added); *see also* IDM at 10 (quoting the text of Section 232). The President sought to alleviate the national security risk that our country's steel "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people." Proclamation 9705, ¶ 11. Antidumping duties and Section 201 safeguard measures, on the other hand, are both "directed at the same overarching purpose – protecting the bottom line of domestic producers." *See Wheatland Tube,* 495 F.3d at 1364.

Moreover, Section 232 concerns itself with "the effects on the *national security* of imports of the article." *See* 19 U.S.C. § 1862(b)(1)(A) (emphasis added). The President may not act to adjust imports *unless* he concurs with the finding of the Secretary that articles are being imported in such quantities or under such circumstances as to threaten to impair the national security. *Id.* § 1862(c). By contrast, for an antidumping duty to be imposed, a domestic industry must be materially injured or threatened with material injury. *Wheatland Tube*, 495 F.3d at 1362. Likewise, Section 201 duties may only be imposed if a domestic producer is experiencing serious injury or threat. *Id.* (citing section 2251). Normal customs duties can be imposed

"regardless of whether the U.S. industry is suffering adverse effects as a result of imports."

*Wheatland Tube,* 495 F.3d at 1362.  Contrary to plaintiff's assertions otherwise, Pl. Br. at 15-16,

Section 232 duties may be imposed regardless of whether a United States industry is presently

suffering.[4]  Thus, Commerce reasonably determined that the law and purpose behind Section 232

duties materially differ from Section 201 safeguard and antidumping duties.  *See* IDM at 27.

Nippon Steel emphasizes that the Section 232 duties were intended to remedy harms on

the domestic industry and protect its viability and thus Commerce must consider the domestic

industry in applying the duties.  Pl. Br. at 17-23.  This argument misses the point.  The plain

language of the statute makes it clear that its fundamental concern is national security; it does not

prioritize the economic welfare of domestic industries.  *See* 19 U.S.C. § 1862 (b)(1)(A) ("the

Secretary of Commerce . . . shall immediately initiate an appropriate investigation to determine

the effects on the *national security* of imports of the article which is the subject of such request,

application, or motion.) (emphasis added); *id.* at § 1862(b)(3)(A) ("the Secretary shall submit to

the President a report on the findings of such investigation with respect to the effect of the

importation of such article in such quantities or under such circumstances upon the national

security"); *id.* at § 1862(c)(1)(A)(ii) ("if the President concurs, determine the nature and duration

of the action that, in the judgment of the President, must be taken to adjust the imports of the

article and its derivatives so that such imports will not threaten to impair the national security.").

Indeed, the viability of the domestic steel industry for defense capabilities *is the very national*

*security interest* that the President sought to address.  Proclamation 9705, ¶ 2.  Commerce

---

[4] For example, President Reagan used Section 232 authority to embargo oil imports from Libya due to concerns that the Libyan government supported terrorism.  *See Presidential Proclamation 4907 of March 10, 1982: Imports of Petroleum*, 48 Fed. Reg. 10,507 (Mar. 10, 1982).  Proclamation 4907 was issued without regard to whether United States industries were suffering.

reasonably determined that Section 232 duties are imposed to address the threat of impairment to national security, not to remedy injury to a domestic industry in the same way that Section 201 and antidumping duties are focused.  IDM at 10.  Its interpretation should be upheld.

Indeed, in *Borusan*, while finding that Section 232 duties have some remedial purpose in "a broad sense," the Court nevertheless held that they are not remedial in the sense of AD/CVD duties.  494 F. Supp. 3d at 1374.  Moreover, the Court held that – while more like Section 201 duties – there were still sufficient distinctions from Section 232 duties, including the ability to impose non-remedial remedies, to render Commerce's interpretation "not completely bereft of logic."  *Id*.

Nippon Steel asserts that the Secretary's report repeatedly references antidumping orders, implying that Section 232 duties are similar to antidumping duties.  Pl. Br. at 19-22.  But the Secretary's report—like the President's proclamations—states that a global Section 232 tariff should be imposed "*in addition* to any antidumping or countervailing duty collections applicable to any imported steel products," establishing that the duties are, in fact, independent from one another.  Steel Report at 8 (emphasis added).  Indeed, the Secretary's report explains that antidumping and countervailing duty actions are insufficient to treat the broader national security threat because "it could take years to identify and investigate every instance of unfairly traded steel, or attempts to transship or evade remedial duties."  *Id.* at 28.  The goal of the President's Section 232 measures, was thus to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production."  Proclamation 9705, ¶ 4.  In the same vein, Nippon Steel's references to the underlying Section 232 investigation are without merit because consideration of the overall health of the United States steel industry is a *precursor* to the

18

President's ultimate finding that there is a threat of impairment to national security.  Pl. Br. at 19-22.

While the Court in *Borusan* disagreed with some of Commerce's analysis, it ultimately concluded that Commerce's reasoning was logical because there are material differences between Section 232 and Section 201 duties.  *See* 494 F. Supp. 3d at 1374.  Plaintiff's attempts to equate special remedial duties with Section 232 duties are unpersuasive.

Additionally, in *Wheatland Tube*, the Federal Circuit sustained Commerce's reasoning that, unlike normal customs duties, Section 201 and antidumping duties provide "only temporary relief from the injurious effects of imports."  495 F.3d at 1362.  Section 201 duties are generally limited to four years, and antidumping duty orders provide for a termination after five years, with some exceptions.  *Id.* (citing 19 U.S.C. §§ 2251 and 1675).  "Normal customs duties, however, have no termination provision and are permanent unless modified by Congress."  *Id.*  Similarly, Section 232 does not have a termination provision; to the contrary, the President has discretion to determine the duration of Section 232 duties.  *See* 19 U.S.C. § 1862(c) (providing that the President "shall…determine the nature and *duration of the action that*…must be taken to adjust the imports…so that such imports will not threaten to impair the national security.") (emphasis added); *Universal Steel Prods. v. United States*, 495 F. Supp. 3d 1336, 1350 (Ct. Int'l Trade 2021), appeal docketed, Fed. Cir. 21-1726 .  In contrast, antidumping and Section 201 duties have a statutory expiration date tied to the cessation of injury.  *See* 19 U.S.C. § 2251; *see also* 19 U.S.C. § 1675(d).  Plaintiff's assertion that Section 232 duties are as temporary as Section 201 duties fails.  *See* Pl. Br. at 23-24.

Nippon Steel also asserts that Section 232 duties are temporary because, unlike ordinary customs duties, Section 232 duties are adjusted and changed.  Pl. Br. at 23-24.  But, the fact that

the duties can be modified or changed at some point does not make them inherently temporary in the same way antidumping and Section 201 duties are temporary.  19 U.S.C. §§ 2251 and 1675. To the contrary, normal customs duties "have no termination provision and are permanent *unless modified by Congress*."  *Wheatland Tube*, 495 F.3d at 1362 (emphasis added).  Congress delegated broad authority to the President to determine the duration of Section 232 duties; Section 232 has no express termination provision; and the duties are permanent unless modified by the President.  Put simply: Section 232 provides no express time-limit on the imposition of duties.[5]

Finally, the Federal Circuit reasoned in *Wheatland Tube* that, because section 201 safeguard and antidumping duties effectively treat the same injury, Commerce reasonably found that deducting Section 201 duties from United States price could improperly result in the collection of Section 201 duties twice.  495 F.3d at 1362-63.  As explained by Commerce in *Stainless Steel Wire Rod from Korea*, the Statement of Administrative Action accompanying the 1921 Act states that "{i}n determining whether to provide {Section 201} relief, and, if so, in what amount, the President will continue the practice of taking into account relief provided under other provisions of law, such as the antidumping" law.  69 Fed. Reg. at 19,160 (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994) reprinted in 1994 U.S.C.C.A.N. 3773).  Congress thus explicitly intended that the President would take into

---

[5] We recognize that the Court found that "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties."  *Borusan*, 494 F. Supp. 3d at 1374-75. Notwithstanding the Court's disagreement with this aspect of Commerce's reasoning, the Court sustained Commerce's determination to treat Section 232 duties as United States import duties, *id*. at 1375-76. The Court should do so here as well.

account any potential overlap between Section 201 and antidumping duties when setting the level of Section 201 duties. *Id.*

By contrast, there is no indication that Congress intended that the President take into account potential overlap between Section 232 and antidumping duties. And here, the President directed that Section 232 duties should be applied in addition to "any other duties, fees, exactions, and charges applicable to such imported steel articles{.}" Proclamation 9705, clause 2. Indeed, the Federal Circuit has acknowledged that the President's Section 232 tariffs are to be applied "on top of already-applicable antidumping or countervailing duties." *See Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982, 986 (Fed. Cir. 2020). Commerce was appropriately concerned about 'double-counting' in *Wheatland Tube* because the legislative history indicated that Congress intended the President to take antidumping duties into account when setting Section 201 duties. No similar concerns are present here.

Rather, Commerce reasonably determined that "the function of section 232 duties and section 201 duties are separate and distinct; there is no overlap between the two distinct types of duties and, thus, they do not provide multiple remedies for the same situation." IDM at 10. Section 232 duties are not limited to addressing injury, material or otherwise, to the relevant domestic industry caused by imports. *See* 19 U.S.C. § 1862. The purpose of measures taken pursuant to Section 232 is much different; Section 232 addresses "the capacity of the United States to meet national security requirements." *Id.* Unlike the similarity in purpose and function of antidumping and Section 201 duties, Section 232 actions to "adjust imports" are not limited to addressing the injury to industries caused by import surges or unfairly traded imports. The Court in *Borusan*, agreed with Commerce that "{t}here is a clear statutory interplay between Section

201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns." *Borusan*, 494 F. Supp. 3d at 1375; *see also Power Steel*, Slip Op. 21-173 at 6-9.

Nippon Steel contends that Commerce is effectively collecting Section 232 duties "a second time in the form of an increased antidumping margin{.}" Pl. Br. at 24-29.  Plaintiff is wrong, and its reasoning – if implemented – would allow importers to circumvent the Section 232 duty on the back end: if Commerce did not deduct Section 232 duties from United States price, then Nippon Steel would benefit from an inflated constructed export price, thereby reducing its antidumping margin, and rendering the Section 232 duties effectively useless.  If plaintiff's interpretation prevailed, Commerce would be prevented from deducting any United States import duty from constructed export price, contrary to the clear requirements of section 1677a(c)(2)(A).

In sum, Commerce thoroughly explained why it concluded that Section 232 and 201 duties are different such that *Wheatland Tube* is not controlling, and as the Court determined in *Borusan* and *Power Steel*, there is no overlap between Section 232 and antidumping duties such that double counting is a reasonable concern.  Commerce's interpretation of "United States import duties" to include Section 232 duties is reasonable and in accordance with law because it is consistent with the text of the statute, the President's proclamations, and *Wheatland Tube.*

Nippon Steel's assertion – that dumping duties and Section 232 duties both protect the United States steel producers of steel and thus serve the same purpose – misses the mark.  Pl. Br. at 18.  First, that the President decided to address national security concerns under Section 232 in the form of an import duty does not mean the duties are *dumping* duties; a dumping duty may only be imposed after extensive administrative proceedings, and only to the extent of the dumping.  19 U.S.C. § 1673.  In contrast, under Section 232, the President had several options to

address the perceived national security threat, including but not limited to: quotas, an import ban, or duties on other products. *See Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976) (sustaining President's selection of import licensing system as permissible remedy under Section 232). None of those remedies are permissible under antidumping duty law.

Moreover, Nippon Steel's assertion that ordinary tariffs were originally imposed primarily to raise general revenue, while correct, overlooks the fact that the current tariff rates were negotiated between countries, and thus based on more than raising general revenue concerns. Pl. Br. 30-33; *see Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1357 (Fed. Cir. 2010) ("The rates of duty applicable to different product classifications are the result of multilateral international trade negotiations and reflect reciprocal trade concessions and particularized trade preferences.") Indeed, as discussed below, Nippon Steel concedes as much in its arguments concerning the WTO and GATT. *See* Pl. Br. at 31-32. Thus, Nippon Steel's assertion that current ordinary customs duties must be only for general revenue purposes fails.

Finally, Nippon Steel argues that by adding Section 232 duties as ordinary customs duties to the existing, negotiated ordinary customs duties, Commerce is violating Article II:1(a) and (b) of the General Agreement on Tariffs and Trade (GATT) 1994 because the addition exceeds the negotiated tariff rates. Pl. Br. 30-33; GATT 1994 Article II:1(a) and (b). This argument is meritless. The GATT explicitly excepts actions taken for national security reasons: "Nothing in this Agreement shall be construed . . . (b) to prevent any contracting party from taking any action which it considers *necessary for the protection of its essential security interests* . . . (iii) . . . taken in time of war or other emergency in international relations." Article 21(b) of the GATT 1994

(emphasis added).  Therefore, even if – as Nippon Steel argues –  the *Charming Betsy* doctrine[6]

applies in this case, Commerce's treatment of Section 232 duties does not violate its obligations

under the 1994 GATT.

This Court should affirm Commerce's determination to deduct Section 232 duties as

United States import duties paid by Nippon Steel from its United States price.

**III.    Commerce's Determination That Nippon Steel Failed To Act To The Best Of Its Ability When It Did Not Report Certain Affiliated-Party, Downstream, Home-Market Sales Is Supported By Substantial Evidence And Is In Accordance With Law**

In the final results, Commerce resorted to the use of partial adverse facts available for

Nippon Steel's failure to report requested affiliated-party, downstream, home-market sales.  IDM

at 11-15.  Nippon Steel asserts that it tried to get the information from its affiliated-party reseller

but the affiliated-party reseller refused to provide it and, thus, Nippon Steel acted to the best of

its ability.  Consequently, Nippon Steel argues, Commerce cannot resort to an adverse inference

when selecting from among the facts available on the record to fill in the missing data.  Pl. Br. at

33-41.  As we demonstrate below, Commerce's determination that Nippon Steel did not act to

the best of its ability to obtain information related to these affiliated-party, downstream, home-

market sales, is supported by substantial record evidence and in accordance with law.

**A.    Legal Standard**

Commerce will use facts otherwise available to fill gaps in the record if:  (1) necessary

information is not available or (2) an interested party withholds information requested by

---

[6]  Taking its name from *Murray v. Schooner Charming Betsy, The*, 6 U.S. 64, 2 L. Ed. 208 (1804), the *Charming Betsy* doctrine provides that "courts should interpret U.S. law, whenever possible, in a manner consistent with international obligations."  *Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343, 1347 (Fed. Cir. 2005).

Commerce, (3) fails to provide the information by the deadline or in the manner requested, (4) significantly impedes the proceedings, or (5) provides information that cannot be verified. 19 U.S.C. § 1677e(a). If Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b). Indeed, Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003).

A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id*. at 1382. Further, the standard requires that importers "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." *Id*. While the statutory requirement that a party act "to the best of its ability …does not require perfection and recognizes that mistakes sometimes occur," it also "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Finally, Commerce must provide the respondent with an opportunity to remedy any deficiency before it may resort to adverse facts available. 19 U.S.C. §1677m(d).

**B.    Commerce's Determination That Nippon Steel Failed To Act To The Best Of Its Ability In Selecting Among Facts Otherwise Available Is Supported By Substantial Evidence**

Commerce's determination to resort to the use of partial adverse facts available is supported by substantial evidence. The fundamental basis for Commerce's dumping calculation is the comparison of the United States price with, in this case, the home market prices. This comparison permits Commerce to determine if a company is selling its product at a higher price

in the home market than in the United States, *i.e.*, dumping. *See* 19 U.S.C. §1677b(a) (To

determine whether a product is sold at less than fair value, *i.e.*, dumped, a "comparison shall be

made between the export price or constructed export price {U.S. sales} and  normal value {in

this case home market sales}.); *see also* 19 U.S.C. § 1677(35) ("The term 'dumping margin'

means the amount by which the normal value {in this case home market sales} exceeds the

export price or constructed export price {U.S. sales} of the subject merchandise.").  Therefore, to

determine whether a company is dumping, Commerce must review all of the respondent's home

market sales of the foreign like product to perform the dumping calculation.  Without this critical

information, Commerce cannot calculate an accurate dumping margin, and a respondent could

potentially manipulate the dumping calculation.

Nippon Steel does not dispute that:  (1) Commerce requested the affiliated party

downstream sales at issue (2) Nippon Steel did not provide the requested sales, (3) Commerce

notified Nippon Steel of the deficiency in its reporting, and (4) Nippon Steel once again did not

provide the information.  *See* Section B. Questionnaire at B-2 and B-3; Section B Questionnaire

Response, at B-7 and B-8; Supplemental Questionnaire, at 1, Q1; and Supplemental

Questionnaire Response, at 1-3 (C.R. 114, 115).  Notwithstanding this, Nippon Steel argues it

acted to the best of its ability by requesting information from the affiliate that refused to comply,

and Nippon Steel cannot force their affiliate to provide the requested data.  *Id.*  To the contrary, it

is not contested that Commerce is entitled to request and review downstream sales to an affiliate,

yet Nippon Steel has *repeatedly* failed to provide that data, notwithstanding Commerce's

indication of this deficiency in the investigation and two preceding administrative reviews.  As

Commerce explained, "{w}ithout access to the appropriate home market pricing, which is a

fundamental requirement for the accuracy of the dumping calculation, the entire dumping calculation is undermined."  IDM at 14.

Moreover, Commerce explained why it believed Nippon Steel has the capacity to induce compliance from its affiliated suppliers.  Commerce explained that it was not asking Nippon Steel to "violate Japanese law" in requesting the information, but that Nippon Steel "had the choice of selling to affiliates {that} would cooperate and those that will not."  IDM at 13.  And Commerce explained the import of the information it requested:  "If respondents like {Nippon Steel} are able to make non-arm's length sales to affiliates and those affiliates refuse to provide the downstream sales information, such a respondent would potentially be able to manipulate the dumping calculations by shielding high priced home market sales behind a wall of uncooperative affiliates."  *Id.*  If Commerce did not insist on receiving this information, it would "permit respondents to sell at least some sales at less than fair value without consequence."  *Id.*

Moreover, Commerce's regulations define what constitutes the home market sales price to be used in the dumping calculation.  Commerce "may calculate normal value based on" an affiliated party sale, "only if satisfied that the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller."  19 C.F.R. § 351.403.  If sales to an affiliate do not pass this "arm's-length test", Commerce instead relies on the downstream sale price to the first unaffiliated purchaser for its dumping calculation.

Here, Nippon Steel does not dispute that the sales to the affiliate at issue were not at arm's length and that Commerce requested the downstream sales.  Pl.Br. at 40.  Nippon Steel, nevertheless, argues that its obligation to provide the data is fulfilled by documenting its attempts

to obtain the sales data from the affiliate.  Pl. Br. at 33-41.  Commerce reasonably found that

Nippon Steel failed to act to the best of its ability.

First, a finding that Nippon Steel acted to the best of its ability would undermine the

accuracy of the dumping calculation by putting respondents in the position of using affiliates to

shield themselves from reporting "high priced home market sale{s} behind a wall of

uncooperative affiliates" to "manipulate the dumping calculations."  IDM at 13.  To permit such

shielding is not a reasonable interpretation of Commerce's statutory directive.  *See* 19 U.S.C.

§1677b(a); 19 U.S.C. § 1677(35).

Moreover, simply requesting the data several times is not the only action that Nippon

Steel can take to induce compliance.  As Commerce explained, Nippon Steel is well aware that

Commerce requires a respondent to report downstream affiliate sales when its sales to the

affiliate fail to pass the arm's-length test.  Indeed, this precise issue arose in the investigation and

both prior reviews.  IDM at 13; *See also, Certain Hot-Rolled Steel Flat Products From*

*Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative*

*Determination of Critical Circumstances*, 81 Fed. Reg. 53409 (Dep't of Commerce, Aug. 12,

2016) and accompanying Issues and Decision Memorandum at Comment 2 (Whether the

Department Should Continue to Apply AFA to Home Market Sales by Certain of Nippon

Group's Affiliated Downstream Resellers);  *Certain Hot-Rolled Steel Flat Products From*

*Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No*

*Shipments; 2017-2018*, 85 Fed. Reg 57821 (Dep't of Commerce, Sept. 16, 2020), and

accompanying Issues and Decision Memorandum, at Comment 4 (Whether Commerce Should

Continue to Apply Partial AFA to Certain NSC's Affiliated Downstream Resales in the Home

Market); *Certain Hot-Rolled Steel Flat Products From Japan: Final Results*

*of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017,* 84 Fed. Reg. 31025 (Dep't of Commerce, June 28, 2019), and accompanying Issues and Decision Memorandum, at Comment 3 (Whether Commerce Should Continue to Apply Partial AFA to Certain Nippon Steel's Affiliated Downstream Resales in the Home Market).  Indeed, in the context of Nippon Steel's predecessor entity failing to provide data of this nature, the Court has found that Commerce's consistent requests for the data in prior reviews "would indicate to a reasonable respondent that Commerce would likely want this same information in a subsequent review."  *Nippon Steel & Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214, 1225 (Ct. Int'l Trade 2020).

Since the investigation in 2016, Nippon Steel has had ample time to make compliance with requests of this nature part of its contractual agreement with downstream affiliates.  IDM at 13 ("In this administrative review, NSC had the choice of selling to affiliates {that} would cooperate and those that will not.").  Indeed, the Federal Circuit has sustained Commerce's adverse facts available determination based on a respondent's decision to do business with third parties that refuse to provide the respondent with necessary cost data.  *Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1233-4 (Fed. Cir. 2014).  Here, as in *Mueller*, an affiliated supplier will be deterred from declining to comply with Nippon Steel's requests for data if it is not able to access a supply of hot rolled steel from Nippon Steel without doing so.  *Id*. at 1235.

Nippon Steel asserts that it cannot force its affiliate to provide this information because it is against Japanese law.  Pl. Br. at 39-40.  But Commerce considered this argument, finding that Nippon Steel provided *no support* that making such a requirement part of a sales contract for purposes of complying with a foreign dumping proceeding violates the Japanese law.  IDM at

14.   Moreover, it is a privilege – not a right – to import products into the United States, and along with the privilege is the obligation to comply with requests of this nature from Commerce.  *See NEC Corp. v. United States*, 151 F.3rd 1361, 1370 (Fed. Cir. 1998) ("Indisputably, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process.); *Buttfield v. Stranahan*, 192 U.S. 470, 492-93, 48 L. Ed. 525, 24 S. Ct. 349 (1904).

Moreover, the Court has addressed "affiliated persons" in the context of the best of its ability standard.  In *Kawasaki*, the Court recognized that Commerce has a "general practice of attributing failure of an affiliate to the respondent{.}"  *Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029, 1038 (2000).  Similarly, in *Hyundai Steel Co*., the Court determined that an "assessment of whether {a respondent} 'put forth its maximum efforts to investigate and obtain the requested information from its records,' necessarily must assess whether {it} could or should have been able to obtain the information in its affiliate's possession."  *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1345 (Ct. Int'l Trade 2018).

Nippon Steel has – for four segments of the antidumping duty proceeding – resisted supplying all of the required home market downstream sales prices by affiliates to which it sold subject merchandise not at arm's length.  To accept Nippon Steel's assertion – that it is acceptable for it to repeatedly fail to provide downstream home market sales by its affiliates – would create a system in which a party has acted "to the best of its ability" simply because an affiliated party declined to comply, without any requirement that the respondent leverage its commercial relationship in an attempt to obtain the information Commerce requires.  Such a principle violates Commerce's statutory directive and binding precedent and should be rejected.

Because Nippon Steel did not act to the best of its ability to report its affiliated party downstream home market sales, Commerce reasonably relied on an adverse inference when

selecting from among the facts otherwise available on the record. That determination is supported by substantial evidence and in accordance with law. To find otherwise would create a loophole through which "uncooperative" affiliates will never have to report their downstream sale directly undermining the dumping calculations.

**IV.    Commerce Respectfully Requests A Partial Remand To Commerce To Recalculate Certain Service Revenues Inadvertently Omitted From The United States Price Calculation**

Finally, Commerce respectfully requests a remand for the purpose of recalculating certain service revenues inadvertently omitted from the U.S. price calculation. In the final results, Commerce stated that it was using the data for total revenue reported by Nippon Steel, which included all of the relevant service-related revenues. IDM at 21. Nippon Steel argues that Commerce omitted three service-related expenses, [

            ], from the calculation. Pl. Br. at 41-46. Upon reviewing Nippon Steel's argument and the dumping calculation program, Commerce agrees that it unintentionally left out the three service-related revenues listed above and respectfully requests that the Court remand the issue to Commerce to include those three service-related revenues in the calculation of Nippon Steel's United States prices for which such revenues were received.

The Federal Circuit in *SKF USA Inc. v. United States* has outlined four scenarios in which an agency may seek a remand: (1) to reconsider its decision because of intervening events outside of the agency's control; (2) to reconsider its previous position (absent any intervening events) without confessing error; and (3) to change the result because the agency believes the original decision was incorrect on the merits or (4) "to correct simple errors, such as clerical errors, transcription errors, or erroneous calculations." 254 F.3d 1022, 1029 (Fed. Cir. 2001). Commerce's erroneous calculation falls under the fourth category.

In the final results, Commerce stated that it intended to include all of the revenue Nippon

Steel reported in its total revenue field in its United States sales database.  IDM at 21.  As

Nippon Steel explains in its brief, the actual computer program used by Commerce did not

include all of the revenues included in its reported total revenue.  Pl. Br. at 43-46.  Commerce

unintentionally left out the three revenues, [                                                    ].

This was an unintentional programing error that Commerce now seeks to correct.  Therefore, we

request a partial remand so that Commerce may correct this error.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's

determination to subtract Section 232 duties from Nippon Steel's United States price and to

apply an adverse inference in selecting from among facts otherwise available, and remand this

matter to Commerce in part to reconsider the calculation of service-related revenues.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan.
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Kelly A. Krystyniak

DAVID RICHARDSON
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce

KELLY A. KRYSTYNIAK
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0163
Facsimile: (202) 514-8640

E-mail: Kelly.A.Krystyniak@usdoj.gov

April 29, 2022                              Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, this brief contains a total of 9,693 words.

<u>s/ Kelly A. Krystyniak</u>

April 29, 2022