NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**NIPPON STEEL CORPORATION,**

                **Plaintiff,**

      **v.**

**UNITED STATES,**

                **Defendant,**

      **and**

**NUCOR CORPORATION, STEEL DYNAMICS, INC., and SSAB ENTERPRISES LLC,**

                **Defendant-Intervenors.**

Before:  Hon. Stephen A. Vaden,
             Judge

Court No. 21-00533

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 33-37

## <u>DEFENDANT-INTERVENOR NUCOR CORPORATION'S RESPONSE BRIEF</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Enbar Toledano, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: May 13, 2022

Court No. 21-00533                                NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   RULE 56.2 STATEMENT ................................................................................... 1

      A.    Administrative Decision Under Review .................................................1

      B.    Issues Presented and Summary of Argument ........................................1

III.  STATEMENT OF FACTS ................................................................................... 2

      A.    Commerce's Deduction of Section 232 Duties from U.S. Prices .................2

      B.    NSC's Fourth Consecutive Failure to Obtain Necessary Downstream
            Sales Data from Its Affiliates................................................................10

      C.    NSC's Claim to a Revenue-for-Extra-Services Price Adjustment ..............14

IV.   STANDARD OF REVIEW ................................................................................ 14

V.    ARGUMENT ..................................................................................................... 16

      A.    Commerce Properly Deducted Section 232 Duties from NSC's U.S.
            Prices.....................................................................................................16

      B.    Commerce Properly Applied Partial AFA to NSC ...............................30

      C.    NSC Must Demonstrate Entitlement to a Revenue-for-Extra-Services
            Price Adjustment...................................................................................37

VI.   CONCLUSION................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Tubular Prods., LLC v. United States,*
    847 F.3d 1354 (Fed. Cir. 2017) .................................................................38

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
    287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018) ...........................................36

*Apex Exps. v. United States,*
    777 F.3d 1373 (Fed. Cir. 2015).............................................................15, 16

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) .................................... *passim*

*Ceramica Regiomontana, S.A. v. United States,*
    810 F.2d 1137 (Fed. Cir. 1987)..................................................................15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984) ....................................................................................15

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ....................................................................................15

*Corus Staal B.V. v. United States,*
    395 F.3d 1343 (Fed. Cir. 2005)........................................................9, 10, 29

*Deacero S.A.P.I. de C.V. v United States,*
    No. 20-3924, slip op. 21-171 (Ct. Int'l Trade Dec. 20, 2021) ..................8

*Dongtai Peak Honey Indus. Co. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015)..................................................................15

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)....................................................................14

*Haixing Jingmei Chem. Prods. Sales Co. v. United States,*
    357 F. Supp. 3d 1337 (Ct. Int'l Trade 2018) ...........................................31

*Hoogovens Staal BV v. United States,*
    22 CIT 139, 4 F. Supp. 2d 1213 (1998)..................................................5, 22

*Hyundai Steel Co. v. United States,*
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ......................................11, 31

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992)...................................................................................15

*Kawasaki Steel Corp. v. United States,*
    24 CIT 684, 110 F. Supp. 2d 1029 (2000).........................................11, 32, 34, 36

*Maclean-Fogg Co. v. United States,*
    753 F.3d 1237 (Fed. Cir. 2014)...................................................................16

*Marvin Furniture (Shanghai) Co. v. United States,*
    744 F.3d 1319 (Fed. Cir. 2014)...................................................................16

*Matsushita Elec. Indus. Co. v United States,*
    750 F.2d 927 (Fed. Cir. 1984)....................................................................15

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017)...................................................................37

*Medellin v. Texas,*
    552 U.S. 491 (2008).....................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).....................................................................................15

*Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States,*
    753 F.3d 1227 (Fed. Cir. 2014).............................................................16, 32

*Murray v. Schooner Charming Betsy,*
    6 U.S. (2 Cranch) 64 (1804)..........................................................................9

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005)....................................................................................16

*Nippon Steel & Sumitomo Metal Corp. v. United States,*
    483 F. Supp. 3d 1214 (Ct. Int'l Trade 2020) ................................... *passim*

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003).........................................................31, 32, 33, 37

*Norsk Hydro Canada, Inc. v. United States,*
    472 F.3d 1347 (Fed. Cir. 2006)......................................................................9

*Power Steel Co. v. United States,*
    No. 20-3771, slip op. 21-173 (Ct. Int'l Trade Dec. 23, 2021) ..................................8

*PSC VSMPO-AVISMA Corp. v. United States,*
    35 CIT 283, 755 F. Supp. 2d 1330 (2011) ...........................................................37

Court No. 21-00533                                    NON-CONFIDENTIAL VERSION

*SKF USA Inc. v. Ina Walzlager Schaeffler KG,*
    180 F.3d 1370 (Fed. Cir. 1999)................................................................37, 38

*SKF USA Inc. v. United States,*
    19 CIT 625, 888 F. Supp. 152 (1995) ..............................................................37

*SolarWorld Ams., Inc. v. United States,*
    273 F. Supp. 3d 1254 (Ct. Int'l Trade 2017) .................................................34

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
    24 CIT 841 (2000) .......................................................................31, 32, 34

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)......................................................................................15

*Universal Steel Prods., Inc. v. United States,*
    495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) .....................................................3

*Wheatland Tube Co. v. United States,*
    495 F.3d 1355 (Fed. Cir. 2007)..................................................... *passim*

**Statutes**

19 U.S.C. § 1516a ...........................................................................14, 29

19 U.S.C. § 1673 .......................................................................5, 20, 21

19 U.S.C. § 1675(c) ...........................................................................6

19 U.S.C. § 1677a ............................................................... *passim*

19 U.S.C. § 1677e(a)........................................................................30

19 U.S.C. § 1677f-1(d) ..................................................................4, 21

19 U.S.C. § 1862................................................................. *passim*

19 U.S.C. § 2251...........................................................................6, 20, 21

19 U.S.C. § 2252(c)(5)..................................................................6, 7, 25

19 U.S.C. § 2253(e) ...........................................................................6

19 U.S.C. § 3512(c)(l)(B)...............................................................10, 29

28 U.S.C. § 1581(c).........................................................................29

Antidumping Act of 1921, Pub. L. No. 67-10, § 203, 42 Stat 9 ....................................5

Smoot-Hawley Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590 ............................................19

Acts of the First Congress of the United States, ch. 2, 1 Stat. 23, 24 (1789) ...............................19

Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 162 ..........................6

Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 8, 72 Stat. 673 ........................6

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872 ........................................6

**Regulations**

19 C.F.R. § 351.202(b)(4) ............................................................................................................25

19 C.F.R. § 351.403(d) ................................................................................................................10

**Administrative Materials**

*Certain Hot-Rolled Steel Flat Products from Japan*,
      84 Fed. Reg. 31,025 (Dep't Commerce June 28, 2019) ......................................................11

*Certain Hot-Rolled Steel Flat Products from Japan*,
      83 Fed. Reg. 56,813 (Dep't Commerce Nov. 14, 2018)......................................................12

*Certain Hot-Rolled Steel Flat Products from Japan*,
      85 Fed. Reg. 57,821 (Dep't Commerce Sept. 16, 2020)......................................................13

*Certain Hot-Rolled Steel Flat Products from Japan*,
      84 Fed. Reg. 68,402 (Dep't Commerce Dec. 16, 2019) ......................................................33

*Certain Hot-Rolled Steel Flat Products from Japan*,
      81 Fed. Reg. 53,409 (Dep't Commerce Aug. 12, 2016)......................................................11

*Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
      85 Fed. Reg. 3,616 (Dep't Commerce Jan. 22, 2020) ........................................................3, 8

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United
      States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ...............................................................3, 26, 27

*Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United
      States*, 83 Fed. Reg. 20,683 (May 7, 2018).........................................................................27

*Stainless Steel Wire Rod from the Republic of Korea*,
      69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004)............................................5, 6, 22, 28

**Other Authorities**

104 Cong. Rec. 16299 (1958) (statement of Rep. Simpson) .......................................................21

108 Cong. Rec. 18766 (1962) (statement of Sen. McCarthy) .......................................21

H.R. Rep. No. 103-826(I) (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773 .....................9

H.R. Rep. No. 1761 (1958)........................................................................7, 20, 25, 26

H.R. Rep. No. 1818 (1962) ......................................................................................7

S. Rep. No. 67-16 (1921) .....................................................................................5, 18

S. Rep. No. 93-1298 (1974) .......................................................................................6

S. Rep. No. 103-412 (1994) .......................................................................................9

S. Rep. No. 1838 (1958) ........................................................................................7, 20

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .................................6, 7, 25

## I.       INTRODUCTION

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the following response to the February 25, 2022 memorandum in support of the motion for judgment on the agency record submitted by Plaintiff Nippon Steel Corporation ("NSC").  *See* Mem. of P. & A. in Supp. of Mot. for J. on the Agency R. (Feb. 25, 2022), ECF No. 32 ("NSC's Br.").  For the reasons discussed below, in conjunction with those presented by Defendant the United States, Nucor respectfully requests that this Court reject the arguments raised by NSC and affirm the final results of the third administrative review of the antidumping duty ("AD") order covering certain hot-rolled steel flat products from Japan.

## II.      RULE 56.2 STATEMENT

### A.       Administrative Decision Under Review

The administrative determination challenged in this appeal is the U.S. Department of Commerce's ("Commerce") final results in the third administrative review of the AD order covering Certain Hot-Rolled Steel Flat Products from Japan.  *See Certain Hot-Rolled Steel Flat Products from Japan*, 86 Fed. Reg. 47,615 (Dep't Commerce Aug. 26, 2021) (final results of AD admin. rev. and final deter. of no shipments; 2018–2019), Appx2483–2485 ("Final Results"), and accompanying Issues and Decision Memorandum, Appx2461–2482 ("Final I&D Memo").

### B.       Issues Presented and Summary of Argument

#### 1.       Was Commerce's Deduction of Section 232 Duties from NSC's U.S. Prices Supported by Substantial Evidence and In Accordance With Law?

Yes.  Commerce and the Court have repeatedly—and correctly—determined that Section 232 duties are appropriately deducted from a respondent's U.S. prices as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).  Commerce's treatment of Section 232 duties as "United States import duties" serves the aims of 19 U.S.C. § 1677a(c)(2)(A), and appropriately

reflects meaningful distinctions between Section 232 duties on the one hand and antidumping and Section 201 duties on the other.  Further, NSC does not persuade that the United States' obligations under international law render Commerce's interpretation unreasonable.

> **2.** **Was Commerce's Application Of Adverse Facts Available ("AFA") To The Unreported Downstream Sales By Certain Affiliated Home Market Resellers Supported By Substantial Evidence And In Accordance With Law?**

Yes.  Starting with the original investigation, and in every administrative review since, NSC[1] has failed to provide complete downstream sales data from its affiliated resellers.  In each proceeding, Commerce has consequently applied partial AFA to fill the gap created by NSC's failure.  At this juncture, NSC is well aware of Commerce's downstream sales reporting requirements and the importance of ensuring that its affiliates understand and comply with them.  But NSC continues to do business with affiliates who are either not prepared, or simply not willing, to cooperate.   NSC's continued failure to provide Commerce with necessary information—including the failure, *e.g.*, to make compliance with Commerce's reporting requirements a condition of doing business with NSC—is inexcusable.  Accordingly, substantial evidence supports Commerce's determination in the Final Results to apply AFA to the unreported downstream sales by certain of NSC's affiliated home market resellers.

## III.   STATEMENT OF FACTS[2]

### A.   Commerce's Deduction of Section 232 Duties from U.S. Prices

Prior to the time period covered by the appealed administrative review, the President of the United States ("the President") imposed 25% duties on imported Japanese steel articles

---

[1]      For simplicity, references to NSC in this context refer both to NSC and its predecessor, Nippon Steel and Sumitomo Metal Corporation.

[2]      NSC has provided the relevant procedural history of this case in its opening brief.  For the sake of efficiency, Nucor does not repeat that history and will focus this section instead on the facts relevant to each issue on appeal.

pursuant to Section 232 of the Trade Expansion Act of 1962.  *See, e.g.*, *Universal Steel Prods., Inc. v. United States*, 495 F. Supp. 3d 1336, 1340–41 (Ct. Int'l Trade 2021) (describing imposition of Section 232 duties on steel articles from various countries); *see also Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("Proclamation 9705").  NSC acted as the U.S. importer for Japanese hot-rolled steel flat products that it shipped into the United States during the review period, paying Section 232 duties.  Preliminary Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 86 Fed. Reg. 10,920 (Dep't Commerce Feb. 23, 2021) (prelim. results of AD admin. rev. and prelim. deter. of no shipments; 2018–2019), Appx2449 ("Preliminary Memo").

In calculating NSC's AD liability for the review period, Commerce deducted the Section 232 duties that NSC paid from the company's U.S. prices pursuant to 19 U.S.C. § 1677a(c)(2)(A).  Final I&D Memo, Appx2468–2471; Preliminary Memo, Appx2447–2450.  In explaining its basis for doing so, Commerce referenced past proceedings in which it deducted such duties, particularly the 2017–2018 administrative review of the AD order on Turkish circular welded steel pipe products.  Final I&D Memo, Appx2469; *see also* Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 85 Fed. Reg. 3,616 (Dep't Commerce Jan. 22, 2020) (final results of AD admin. rev. and final deter. of no shipments; 2017–2018) at 27–33 ("*CWP Turkey* I&D Memo").  The agency also stated that, contrary to NSC's arguments, it did not view the United States' obligations under the 1994 General Agreement on Tariffs and Trade ("GATT 1994") as preventing deduction of the Section 232 duties pursuant to 19 U.S.C. § 1677a(c)(2)(A).  Final I&D Memo, Appx2470.

Below, Nucor lays out facts and legal background relevant to NSC's arguments regarding (1) the relationship between antidumping duties, Section 201 duties, and Section 232 duties, and (2) the United States' GATT 1994 commitments and the *Charming Betsy* canon.

### 1.    The Relationship Between Antidumping Duties, Section 201 Duties, and Section 232 Duties

The Tariff Act of 1930 ("the Act") directs Commerce to determine AD margins by comparing the prices at which companies under review (known as "respondents") sell the goods subject to an AD order in their home market against the prices that they charge for those goods in the United States. *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). The Act requires Commerce to make certain adjustments to a respondent's home market and U.S. prices before comparing them. *Id.* § 1677a(c); *id.* § 1677b(a)(6). These adjustments are meant to ensure that the home market and U.S. prices are expressed on a comparable basis. *See, e.g.*, *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1373 (Ct. Int'l Trade 2021).[3]  One such adjustment requires Commerce to reduce respondents' U.S. prices by the amount of any "United States import duties" included in those prices. 19 U.S.C. § 1677a(c)(2)(A). Because import duties are, naturally, not charged by the United States on goods sold in a respondent's home market, the statutory reduction brings a respondent's duty-inclusive U.S. prices to the same duty-exclusive basis as home market prices. *See, e.g.*, *Borusan*, 494 F. Supp. 3d at 1373.

The Act does not define the phrase "United States import duties." *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007). Neither did the Antidumping Act of 1921, the statute in which Congress first directed the deduction of "United States import duties"

---

[3]    Unless otherwise noted, all emphasis in this brief has been added, and all internal quotations, citations, and alterations have been omitted.

in calculating antidumping duties. *See* Antidumping Act of 1921, Pub. L. No. 67-10, § 203, 42 Stat 9, 12 ("The '21 Act"). However, in a report that accompanied the '21 Act, Congress distinguished "United States import duties" from "special dumping duties." *Wheatland Tube*, 495 F.3d at 1361; *see also Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19,153, 19,159 (Dep't Commerce Apr. 12, 2004) (final results of AD admin. rev.) ("*SSWR Korea* Final Results"); S. Rep. No. 67-16, at 4 (1921) ("S. Rep. 67-16"). Consistent with this distinction, Commerce has long considered antidumping duties to be outside the scope of the statutory phrase "United States import duties." *SSWR Korea* Final Results, 69 Fed. Reg. at 19,159. This treatment makes sense because antidumping duties equal the difference between home market prices and U.S. prices, *i.e.*, the degree to which U.S. prices reflect less than fair value. Antidumping duties are imposed to bring the U.S. prices to the same, presumptively fair basis as home market prices. *See, e.g.*, *Hoogovens Staal BV v. United States*, 22 CIT 139, 146, 4 F. Supp. 2d 1213, 1220 (1998). Given this purpose, "to deduct the dumping duty from the U.S. price in calculating the dumping margin essentially would be to deduct the dumping margin itself from the U.S. price in calculating the margin—a circular calculation." *SSWR Korea* Final Results, 69 Fed. Reg. at 19,159 n.22.

Similarly, Commerce does not treat duties imposed under Section 201 of the Trade Act of 1974 as "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A). While Section 201 did not exist at the time of the '21 Act, Commerce has reasoned that Section 201 duties are "interchangeable" with antidumping duties. *Id.* at 19,160. Both antidumping and Section 201 duties are imposed for the specific purpose of remedying injury to a U.S. industry, and only after the U.S. International Trade Commission ("ITC") determines that such injury exists. *See* Preliminary Memo, Appx2448; 19 U.S.C. § 1673 (calling for imposition of

antidumping duties after finding of injury); 19 U.S.C. § 2251 (calling for imposition of Section 201 duties after finding of injury).  The statutory provisions authorizing Section 201 duties expressly require the ITC to consider whether dumping and/or subsidization is taking place. 19 U.S.C. § 2252(c)(5). Congress has further explained that pre-existing antidumping duties must be taken into account when setting the amount of Section 201 duties.  *SSWR Korea* Final Results, 69 Fed. Reg. at 19,160; *see also* S. Rep. No. 93-1298, § 123 (1974); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 964 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4267 ("SAA").  The statutes providing for antidumping duties and Section 201 duties also require both kinds of duties to terminate after a specific length of time, or if specific conditions are met.  Preliminary Memo, Appx2448; *see also* 19 U.S.C. § 1675(c) (indicating that antidumping duties must be reviewed every five years and will be revoked unless specific circumstances are found); 19 U.S.C. § 2253(e) (imposing time limit on remedies under Section 201).

Meanwhile, Section 232 duties have their origins in the Trade Agreements Extension Act of 1955, which authorized action to address imports' effects on "national security."  Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 162, 166.  The relevant statutory provision was amended in 1958, and again in 1962.  *See, e.g.*, Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872, 877; Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 8, 72 Stat. 673, 678–79.  In its current form, Section 232 authorizes Commerce to conduct investigations into whether imports "threaten to impair the national security."  19 U.S.C. §§ 1862(b)(3)(A) & (c)(1)(A).  If the agency makes an affirmative determination, the President may take action "to adjust the imports" to resolve the threat.  *Id.* § 1862(c)(1)(A)(ii).  The statute directs Commerce and the President, in discharging their duties

under the statute, to "recognize the close relation of the economic welfare of the Nation to our national security," and consider "domestic production needed for projected national defense requirements," as well as "the impact of foreign competition on the economic welfare of individual domestic industries." *Id.* § 1862(d). To the extent that the President determines to impose import duties as a means of resolving national security threats, these duties are subject to no specific time limit. *See generally id.* § 1862.

As noted above, Section 201 requires the ITC to consider whether dumping and/or subsidization is taking place. *Id.* § 2252(c)(5); *see also SSWR Korea* Final Results, 69 Fed. Reg. at 19,160. Section 232 does not incorporate such a requirement, or provide a role for the ITC. 19 U.S.C. § 1862. Nor is there any requirement that pre-existing antidumping duties be taken into account when setting Section 232 duties. *Compare* SAA at 964, 1994 U.S.C.C.A.N. at 4267, *with* 19 U.S.C. § 1862; *see also* H.R. Rep. No. 1818, at 41 (1962); S. Rep. No. 1838, at 12 (1958) ("S. Rep. 1838"); H.R. Rep. No. 1761, at 13 (1958) ("H.R. Rep. 1761"). Indeed, the legislative history of Section 232 confirms that while "the country's national security is tied closely to its internal economic welfare," S. Rep. 1838 at 12, Section 232 is "not an alternative {} means" for providing relief to "industries which believe themselves injured." H.R. Rep. 1761 at 13. This is because "the avoidance or remedy of injury to industries is not the object per se" of Section 232 duties. *Id.* Instead, "{t}he interest to be safeguarded is the security of the Nation," rather than the "output or profitability of any plant or industry" in its own right, or for its own sake. *Id.* at 14. Unlike antidumping or Section 201 duties, Section 232 duties are not subject to any statutory termination period or process. *Compare* 19 U.S.C. § 1862, *with id.* §§ 1675(c) & 2253(e) (imposing time limits on antidumping and section 201 duties).

Consistent with these differences, Commerce does not treat Section 232 duties in the same way as antidumping or Section 201 duties.  Rather, Commerce treats Section 232 duties as "United States import duties" that are deductible from U.S. prices pursuant to 19 U.S.C. § 1677a(c)(2)(A).  *See, e.g.*, *CWP Turkey* I&D Memo at 27–33.  In the *CWP Turkey* I&D Memo, Commerce applied the analytical framework that it applied to Section 201 duties in the *SSWR Korea* Final Results, and which was affirmed in *Wheatland Tube*, to Section 232 duties.  *Id.* Commerce found Section 232 duties dissimilar enough from antidumping and Section 201 duties to justify their treatment as "United States import duties."  *Id.*  The Court affirmed this treatment in *Borusan*, 494 F. Supp. 3d 1365, in *Power Steel Co. v. United States*, No. 20-3771, slip op. 21-173 (Ct. Int'l Trade Dec. 23, 2021), and in *Deacero S.A.P.I. de C.V. v United States*, No. 20-3924, slip op. 21-171 (Ct. Int'l Trade Dec. 20, 2021).[4]

## 2.    The United States' GATT 1994 Obligations and the *Charming Betsy* Canon

In its brief below, NSC argued that the deduction of Section 232 duties from the company's U.S. prices was inconsistent with the United States' legal obligations under Article II:1 of the GATT 1994.  *See* Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Hot-Rolled Steel Flat Products from Japan: NSC's Case Brief* (Mar. 25, 2021), Appx83020–83023 ("NSC's Case Br.").  Specifically, NSC argued that deducting the Section 232 duties from its U.S. prices would result in "ordinary customs duties" being collected on Japanese hot-rolled steel at a rate beyond that to which the United States had agreed when signing the GATT 1994.  *Id.*, Appx83020–83021 (quoting GATT 1994 art. II, 1(b)).

---

[4]    The *Borusan* decision was appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"), where it is currently pending under Court No. 21-2097.  The *Deacero* decision has also been appealed to the CAFC, where action has been stayed pending the outcome of the *Borusan* appeal.

Pursuant to the rule first announced in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804), U.S. statutes are to be interpreted as consistently as possible with international law, including the United States' obligations under international agreements. In that case, the U.S. Supreme Court considered whether a statute prohibiting commercial transactions between American citizens and France should be construed to permit confiscation of a merchant vessel owned by a Danish citizen. In deciding the question in the negative, the Court noted approvingly the litigants' observation that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Charming Betsy*, 6 U.S. (2 Cranch) at 118. Federal courts have relied on the decision for the proposition that U.S. statutes should be construed, where possible, as not in conflict with U.S. international obligations. *See, e.g.*, *Norsk Hydro Canada, Inc. v. United States,* 472 F.3d 1347, 1360 n.21 (Fed. Cir. 2006); *Corus Staal B.V. v. United States*, 395 F.3d 1343, 1347 (Fed. Cir. 2005).

However, the *Charming Betsy* canon has its limits. Relevant here, Congress has expressly prohibited challenging U.S. agency action as inconsistent with certain agreements, including the GATT 1994. Under U.S. law, the GATT 1994 is not "self-executing"—*i.e.*, the agreement is not part of U.S. law. *See, e.g.*, H.R. Rep. No. 103-826(I), at 25 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3797 (noting that neither the Uruguay Round Agreements nor any amendments thereto are self-executing); *see also* S. Rep. No. 103-412, at 13 (1994); *Medellin v. Texas*, 552 U.S. 491, 504–05 (2008) (finding that because the Optional Protocol of the Vienna Convention on Consular Relations was not a self-executing treaty, its provisions were not incorporated into U.S. law). Further, U.S. law expressly prohibits any person or entity other than the U.S. government from challenging, "in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any

State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with" certain agreements, including the GATT 1994.  19 U.S.C. § 3512(c)(l)(B); *see also id.* § 3511(d)(1) (identifying the GATT 1994 as one of the agreements subject to, *inter alia*, 19 U.S.C. § 3512(c)(l)(B)).

Consistent with 19 U.S.C. § 3512(c)(l)(B), the CAFC has found that the *Charming Betsy* doctrine cannot be applied to compel an agency to adopt GATT 1994-compliant interpretations of ambiguous federal statutes.  *See, e.g.*, *Corus Staal*, 395 F.3d at 1348 (finding the *Charming Betsy* cannon inapposite in a case involving Commerce's interpretation of ambiguous statutory language, because "{n}either the GATT nor any enabling international agreement outlining compliance therewith . . . trumps domestic legislation; if U.S. statutory provisions are inconsistent with the GATT or an enabling agreement, it is strictly a matter for Congress").

### B.    NSC's Fourth Consecutive Failure to Obtain Necessary Downstream Sales Data from Its Affiliates

Commerce requires respondents to report downstream sales made through affiliated resellers unless such sales account for less than five percent of the respondent's total home market sales or were made at arm's-length prices.  *See* 19 C.F.R. § 351.403(d).  Commerce needs this information because sales from respondents to affiliates that are not at arm's length do not reflect market prices and cannot be used as normal value.  Final I&D Memo, Appx2473 n.61.  In lieu of those sales, Commerce uses the downstream sales made by the affiliates to unrelated customers as normal value benchmarks.  *Id.*  If the affiliates do not provide the requested information, then necessary data is missing from the record, and Commerce resorts to facts available.  *Id.*, Appx2473.

Respondents are responsible for obtaining their affiliates' downstream sales data and for ensuring their affiliates "take reasonable steps to keep and maintain full and complete records

documenting the information that a reasonable importer should anticipate being called upon to produce." *See Nippon Steel & Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214, 1223–24 (Ct. Int'l Trade 2020) ("*NSC I*"); *accord Kawasaki Steel Corp. v. United States*, 24 CIT 684, 694, 110 F. Supp. 2d 1029, 1038 (2000) (noting Commerce's "general practice of attributing failure of an affiliate to the respondent"). The failure by a respondent to exert maximum efforts to obtain requested affiliate data is thus cause for the application of AFA. *See, e.g.*, *NSC I*, 483 F. Supp. 3d at 1223–27; *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343–48 (Ct. Int'l Trade 2018); *Kawasaki Steel*, 24 CIT at 694, 110 F. Supp. 2d at 1038.

This proceeding represents NSC's fourth consecutive failure to provide information regarding downstream home market sales by affiliated resellers, which NSC knows is vital to Commerce's calculations. In the original investigation, Commerce applied partial AFA to fill the gap created by NSC's failure to report affiliated downstream sales. *See* Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 81 Fed. Reg. 53,409 (Dep't Commerce Aug. 12, 2016) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances) at cmt. 2. As AFA, Commerce selected the highest NSC home market price for unaffiliated customers. *See id.*

In the first administrative review, NSC again failed to report affiliated downstream sales. Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 84 Fed. Reg. 31,025 (Dep't Commerce June 28, 2019) (final results of AD admin. rev. and final deter. of no shipments; 2016–2017) at 15–16 ("1AD Final I&D Memo"). NSC asserted that, despite issuing numerous requests to its affiliates, certain resellers simply could not or would not comply. But Commerce determined again that AFA was warranted, explaining:

> {NSC} cannot be allowed to shield certain home market sales prices from
> disclosure and use in the dumping calculations in situations where it made non-

arm's-length sales to affiliated parties. Putting respondents in a position to pick and choose which affiliated party downstream sales will be reported would create significant potential and incentives to manipulate margin calculations.

In addition to ownership leverage, respondents have absolute veto power over whether to sell to, or continue to do business with, an affiliate. In fact, {NSC} is the one that establishes the prices to its affiliates, and is in a position to make them at arm's-length prices or not. We have preliminarily determined that {NSC} is in a position to induce these companies to report their downstream sales. As such, {NSC} has failed to cooperate to the best of its ability in obtaining these companies' downstream sales.

Preliminary Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 83 Fed. Reg. 56,813 (Dep't Commerce Nov. 14, 2018) (prelim. results of AD admin. rev. and prelim. deter. of no shipments; 2016–2017) at 12 (line break added); *see also* 1AD Final I&D Memo at 15–16 (incorporating preliminary rationale).

On appeal, this Court sustained Commerce's determination. *See NSC I*, 483 F. Supp. 3d at 1227. Judge Reif agreed that NSC had ownership leverage over its affiliated resellers and that, as the "top exporter/producer" of hot-rolled steel in Japan, NSC was in a "strong market position" to induce its affiliates' cooperation. *Id.* at 1224, 1226 (noting an ownership interest as little as five percent is "sufficient to prove affiliation, and as such, an indication of control"). Judge Reif also emphasized that NSC "had specific notice that Commerce would request its affiliated resellers' downstream sales" based on its participation in the original investigation. *Id.* at 1224. Thus, a reasonable respondent in NSC's position would have known that Commerce would require this information. *Id.* at 1224–26. Finally, Judge Reif agreed that NSC had not put forth maximum efforts to comply. Although NSC argued that it "made repeated {} requests, as well as numerous telephone calls, to each of the affiliated resellers" in addition to sending them a

"database containing the relevant sales," NSC made no apparent attempt to "exert{} any leverage to induce, or attempt to induce" their cooperation. *Id.* at 1225–27.[5]

In the second administrative review, NSC again failed to report downstream sales from affiliated resellers. In its defense, NSC argued that (i) it lacks the power to induce affiliates' cooperation, (ii) Japanese law forbids the use of commercial threats to induce affiliates' cooperation, and (iii) in any event, certain resellers were simply incapable of providing the requested information. *See* Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 85 Fed. Reg. 57,821 (Dep't Commerce Sept. 16, 2020) (final results of AD admin. rev. and final deter. of no shipments; 2017–2018) at 14 ("2AD Final I&D Memo"). But Commerce disagreed. Regardless of NSC's requests to its affiliates, NSC's continued choice to do business with uncooperative affiliates and to sell to them at non-arm's length prices demonstrated ***its own*** failure to exert maximum efforts. *Id.*

In the third administrative review, NSC once again failed to provide downstream sales data for certain affiliated resellers. NSC's defenses mirrored its arguments in the past. *See* Final I&D Memo, Appx2471–2472 (noting arguments that NSC does not have the power to induce affiliates to cooperate; Japanese law prohibits the use of commercial threats to induce cooperation; NSC's small ownership interest in certain affiliates; etc.). But, for all the reasons previously stated, Commerce again found the application of AFA warranted. Commerce reiterated that NSC has a choice—and continues to make the choice—to sell to affiliates who will not cooperate. *Id.*, Appx2473. And, regardless of Japanese law on inducement, "NSC makes the choice of structuring its home market sales such that it sells at non-arm's length

---

[5]     Separately, Judge Reif also affirmed Commerce's selection of AFA (which NSC argued was overly punitive), noting that the lower AFA rate applied in the original investigation apparently had not sufficed to induce NSC's cooperation. *NSC I*, 483 F. Supp. 3d at 1231–32.

prices." *Id.*, Appx2474.  It is NSC, in other words, that continually places itself in this position, knowing well what data Commerce will require and the consequences of failing to provide it.

### C.      NSC's Claim to a Revenue-for-Extra-Services Price Adjustment

In the proceedings below, NSC claimed that its U.S. affiliate, Steelscape LLC ("Steelscape"), separately invoiced for extra services that Commerce failed to take into account in its calculation of net U.S. price.  NSC's Case Br., Appx83038.  In response, Nucor argued that the party seeking a direct price adjustment bears the burden of proving entitlement to such an adjustment, and that NSC had not met that threshold burden.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Hot-Rolled Steel Flat Products from Japan: Petitioner's Rebuttal Brief* (Apr. 1, 2021), Appx83090 ("Nucor's Rebuttal Br.") (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1040 (Fed. Cir. 1996)).  In the Final Results, Commerce made no changes to its calculations, and thus did not address Nucor's arguments.  *See* Final I&D Memo, Appx2480–2481.

Commerce now seeks a partial remand, explaining that it mistakenly believed that its calculations accounted for the at-issue revenues.  *See* Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R. at 31–32 (Apr. 29, 2022), ECF No. 33 ("DOJ's Br.").  Nucor does not oppose Commerce's request.  However, on remand, Nucor will renew its arguments that were not addressed in the Final Results regarding NSC's entitlement to the claimed adjustment.

## IV.    STANDARD OF REVIEW

The U.S. Court of International Trade ("CIT") reviews Commerce's decisions in AD investigations to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see Fujitsu*, 88 F.3d at 1038 ("{T}he {CIT} must sustain any determination . . . by Commerce unless it is

unsupported by substantial evidence on the record, or otherwise not in accordance with the law."). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015).

A dissatisfied plaintiff cannot ask the Court to re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec. Indus. Co. v United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Rather, factual findings by Commerce are afforded considerable deference. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The inquiry regarding whether an agency determination is "in accordance with law" is governed by the analysis outlined in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council*, 467 U.S. 837 (1984). "{T}he first step in the *Chevron* analysis asks if the statute in question is ambiguous." *Apex Exps. v. United States*, 777 F.3d 1373, 1378 (Fed. Cir. 2015). If the

unambiguous intent of Congress is discernible from the statutory language and its legislative history, then the inquiry is at an end, and the intent of Congress must prevail.  *Id.*; *see also Maclean-Fogg Co. v. United States*, 753 F.3d 1237, 1243–44 (Fed. Cir. 2014).

However, if Congressional intent is not clear, or if Congress appears intentionally to have left a gap to be filled by agency expertise, then the court must ask whether the agency's interpretation is based on a "permissible construction" of the statute.  *Apex*, 777 F.3d at 1379.  In determining whether an agency's construction is permissible, U.S. courts have considered whether the construction is consistent with statutory goals, prior precedent, and agency practice. *Id.*; *see also Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014).  "If {the agency's} interpretation is reasonable, *Chevron* requires us to accept the agency's construction, 'even if the agency's reading differs from what the court believes is the best statutory interpretation.'"  *Marvin Furniture (Shanghai) Co. v. United States*, 744 F.3d 1319, 1324 (Fed. Cir. 2014) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

## V.   ARGUMENT

### A.    Commerce Properly Deducted Section 232 Duties from NSC's U.S. Prices

In calculating NSC's AD liability for the review period, Commerce deducted the Section 232 duties that NSC paid from the company's U.S. prices, treating them as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).  *See Final I&D Memo, Appx2468–2471; Preliminary Memo, Appx2447–2450; 19 U.S.C. § 1677a(c)(2)(A).  NSC concedes that the Act does not define the term "United States import duties," such that Commerce may give the phrase any reasonable interpretation pursuant to *Chevron*.  NSC's Br. at 10; *see also Wheatland Tube*, 495 F.3d at 1359–60 (finding that the statutory phrase "United States import duties" is ambiguous).

16

NSC, however, argues that despite decisions of this court to the contrary, Commerce's interpretation of "United States import duties" to include Section 232 duties is unreasonable and deserves no deference.  *See* NSC's Br. at 10–11.  Rather, NSC claims that the phrase "United States import duties" can only be  construed to cover duties that NSC describes as having the singular "purpose and function of raising general revenue," and that, as such, do not address concerns such as national security threats.  *Id.* at 11–13.

NSC makes four main arguments in this regard.  *First*, NSC argues that Section 232 duties serve a "special remedial purpose," a factor that makes them more similar to antidumping Section 201 duties than "ordinary" customs duties.  *Id.* at 13–23.  *Second*, NSC argues that Section 232 duties are temporary in a manner distinct from "ordinary" customs duties, and which makes them similar to antidumping and Section 201 duties.  *Id.* at 23–24.  *Third*, NSC argues that the deduction of Section 232 duties from its U.S. prices imposes an impermissible double remedy.  *Id.* at 24–30.  *Fourth*, NSC argues that treating Section 232 duties as deductible from U.S. prices violates U.S. obligations under the GATT 1994 and is therefore inconsistent with the *Charming Betsy* canon.  *Id.* at 30–33.

For the reasons discussed below, this court should reject NSC's claims.

1.    **NSC's Argument that the "Remedial" Purpose of Section 232 Duties Requires Their Inclusion in U.S. Prices Fails**

NSC's first argument is that Section 232 duties may not reasonably be treated as "United States import duties" because they serve a "special remedial purpose" rather than a "general revenue purpose."  NSC's Br. at 13.  NSC argues that the *Borusan* court erred in its assessment of whether the purpose of Section 232 duties supports their treatment as "United States import duties."  *Id.* at 14.  NSC argues that rather than focus on comparing Section 232 and 201 duties, the court should have compared Section 232 duties with "ordinary customs duties."  *Id.* at 15.

NSC points to the CAFC's observation in *Wheatland Tube* that "{n}ormal customs duties . . . have no remedial purpose." *Id.* at 15–16 (emphasis omitted).  NSC infers from this that any duty with a remedial purpose may not be treated as a "United States import dut{y}" for purposes of 19 U.S.C. § 1677a(c)(2)(A).  *Id.* at 16.  To this, NSC adds that only duties that are "enacted by Congress and {that} are permanent unless modified by Congress" qualify as "United States import duties." *Id.* at 24.

NSC's claim is at odds with the CAFC's finding that the term "United States import duties" is ambiguous, *Wheatland Tube*, 495 F.3d at 1359–60, in that NSC asserts that the term only covers duties that meet a narrow set of criteria.  These criteria are identified nowhere in the statute itself.  19 U.S.C. § 1677a(c)(2)(A).  Nor are the limitations that NSC would impose on the statutory phrase "United States import duties" required by the legislative history of that phrase.  S. Rep. 67-16 at 4.  While Congress has indicated that "United States import duties" are distinct from "special dumping duties," it has made no further direction as to how the phrase "United States import duties" should be interpreted.  *See generally id.*

NSC cannot prevail here unless it shows that no tenable interpretation of the phrase "United States import duties" includes Section 232 duties.  NSC cannot achieve this goal simply by stating that, as the *Borusan* court found, Section 232 duties are "remedial in a broad sense." NSC's Br. at 16 (emphasis omitted); *Borusan*, 494 F. Supp. 3d at 1374.  Nor can NSC prevail by quibbling with the *Borusan* court regarding whether "nascent" industries can be the object of AD investigations, or with the court's use of the word "particular" in describing the predicate injury necessary to support Section 201 duties.  NSC's Br. at 23.  Instead, it must show that the deduction of Section 232 duties would be manifestly at odds with the statutory purpose of 19 U.S.C. § 1677a(c)(2)(A).  As such, and as the *Borusan* court recognized, the salient question

is not whether Section 232 duties are "remedial," but "what is the purpose of the deduction for 'import duties' in the dumping margin calculation, and does reduction of price by Section 232 duties serve that purpose." *Borusan*, 494 F. Supp. 3d at 1373–74.

To the extent that NSC attempts to answer this question by arguing that what it terms "ordinary customs duties" exist solely for the function of raising revenue, while Section 232 duties have the "overarching purpose" of "protecting the bottom line of domestic producers," NSC fails.  NSC's Br. at 16 (emphasis omitted).  As an initial matter, while the CAFC in *Wheatland Tube* observed that "normal customs duties" have no remedial purpose, 495 F.3d at 1362, NSC's assumption that what it terms "ordinary" customs duties have ***no*** purpose beyond the raising of revenue is simply that—NSC's assumption.  Indeed, in imposing duties of just the type that NSC appears to recognize as "ordinary customs duties," the first Congress of the United States stated that they had a purpose beyond the raising of revenue—specifically, providing "encouragement and protection of manufacturers."  *See* Acts of the First Congress of the United States, ch. 2, 1 Stat. 23, 24 (1789).[6]

---

[6]  Similarly, the Smoot-Hawley tariffs of the 1930s exhibited characteristics that NSC describes as emblematic of "ordinary" customs duties, *i.e.*, they were "enacted by Congress and {we}re permanent unless modified by Congress."  *See* NSC's Br. at 24; Smoot-Hawley Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590.  Nonetheless, they are widely understood to have been motivated by goals beyond raising revenue.  Even today, the premise that the most "ordinary" duties have purposes beyond revenue-raising is so well accepted that U.S. Customs & Border Protection's ("CBP") website acknowledges it:

> Customs Duty is a tariff or tax imposed on goods when transported across international borders.  The purpose of Customs Duty is to protect each country's economy, residents, jobs, environment, etc., by controlling the flow of goods, especially restrictive and prohibited goods, into and out of the country.

*See Customs Duty Information*, U.S. Customs & Border Protection, https://www.cbp.gov/travel/international-visitors/kbyg/customs-duty-info (last modified Jan. 27, 2021).

Nor is NSC correct that Section 232 duties may not be imposed without "some finding of adverse effects of imports" on a U.S. industry. NSC's Br. at 17. Section 232 directs Commerce and the President to consider various factors in assessing the need for action to protect the national security, including "domestic production needed for projected national defense requirements," as well as "the impact of foreign competition on the economic welfare of individual domestic industries." 19 U.S.C. § 1862(d). But the statute does not predicate the imposition of Section 232 duties on a finding of injury to a domestic industry. *Id.* By way of example, the statute clearly permits imposition of Section 232 duties where a U.S. industry is profitable and fully utilizing its capacity, but is simply not large enough to meet a critical defense need. *Id.* § 1862. In such a circumstance, it would be difficult to argue that imports had injured a U.S. industry in any meaningful sense, while it would be rational to conclude that the imports nonetheless "threaten to impair the national security." *Id.* Antidumping and Section 201 duties, however, cannot be imposed without a specific, direct finding of "material" or "serious" injury to a domestic industry. *Id.* § 1673; *id.* § 2251.

Section 232 also makes clear that imports' impact on domestic industries is only relevant in relation to national security—and not in relation to the viability or success of a domestic industry in its own right. *Id.* § 1862(d). Moreover, while "the country's national security is tied closely to its internal economic welfare," S. Rep. 1838 at 12, Section 232 is "not an alternative {} means" for providing relief to "industries which believe themselves injured." H.R. Rep. 1761 at 13. This is because "the avoidance or remedy of injury to industries is not the object per se" of Section 232 duties. *Id.* Rather, "{t}he interest to be safeguarded is the security of the Nation," rather than the "output or profitability of any plant or industry." *Id.* at 14.

NSC's quotation of individual statements made on the Congressional Record does not establish either that Section 232 duties require a predicate finding of injury to a U.S. industry or that their purpose is to "protect the bottom line of domestic producers" *per se*.  NSC's Br. at 19.[7] Nor do NSC's cherry-picked quotations from Commerce's Section 232 report and other documents change the fact that Section 232 duties have a national security function that is not present in the case of antidumping or Section 201 duties.  *Id.* at 19–22; *compare* 19 U.S.C. § 1862, *with id.* § 1673, and *id.* § 2251.[8]  Crucially, NSC's quotations do not assist in addressing the question at the heart of the matter: that of whether Commerce's deduction of Section 232 duties under 19 U.S.C. § 1677a(c)(2)(A) reasonably serves the purpose for which Congress called for "United States import duties" to be deducted from U.S. prices.

As noted above, antidumping duties equal the difference between home market prices and U.S. prices, *i.e.*, the degree to which U.S. prices reflect less than fair value.  *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b).  The purpose of antidumping duties is therefore to bring U.S. prices to the same, presumptively fair basis as home market

---

[7]      Indeed, certain of these statements, when read in context, highlight the national security purposes of Section 232.  104 Cong. Rec. 16299 (1958) (statement of Rep. Simpson) (connecting Section 232 duties to the defense "mobilization base"); 108 Cong. Rec. 18766–67 (1962) (statement of Sen. McCarthy) (recognizing the "national security" focus of Section 232).

[8]      NSC also construes these cherry-picked quotations in its favor where they can easily— and more plausibly—be read another way.  For example, it points to Commerce's observation that the 2018 Section 232 investigation into steel articles covered goods not subject to an earlier 2001 investigation into iron ore and semi-finished steel.  NSC's Br. at 20.  NSC appears to read the statement as indicating that the focus of the later investigation was not national security, but on protecting the U.S. steel industry in its own right.  *Id.* at 20–21.  Nucor submits that this is not a fair, or necessary, reading of the relevant language.  *Compare* U.S. Department of Commerce, The Effects of Imports of Steel on the National Security (Jan. 11, 2018) at 17 n.22, https://www.bis.doc.gov/index.php/documents/steel/2224-the-effect-of-imports-of-steel-on-the-national-security-with-redactions-20180111/file, *with* U.S. Department of Commerce, The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security (Oct. 2001) at 37, https://www.bis.doc.gov/index.php/documents/section-232-investigations/81-iron-ore-and-semi-finished-steel-2001/file.

prices. *See, e.g.*, *Hoogovens*, 22 CIT at 146, 4 F. Supp. 2d at 1220. The Act requires Commerce to make certain adjustments to a respondent's home market prices and U.S. prices before comparing them. 19 U.S.C. § 1677a(c); *id.* § 1677b(a)(6). These adjustments ensure that the home market prices and the U.S. prices are expressed on a comparable basis, so that the comparison truly reflects the degree to which the U.S. prices are made at less than fair value. *See, e.g.*, *Borusan*, 494 F. Supp. 3d at 1373.

For example, the United States does not impose duties on goods that are not imported into the United States, but are instead sold in a respondent's home market. The statutory reduction of a respondent's U.S. prices by the amount of any "United States import duties" that are included in those prices accordingly brings a respondent's duty-inclusive U.S. prices to the same duty-exclusive basis as home market prices. *See, e.g.*, *Borusan*, 494 F. Supp. 3d at 1373. Given this purpose—and consistent with the legislative history of the '21 Act, Commerce has long treated antidumping duties themselves as outside the scope of the phrase "United States import duties." As Commerce has explained, "to deduct the dumping duty from the U.S. price in calculating the dumping margin essentially would be to deduct the dumping margin itself from the U.S. price in calculating the margin—a circular calculation." *SSWR Korea* Final Results, 69 Fed. Reg. at 19,159 n.22.

Deduction of Section 232 duties does not result in such circularity. Rather, the deduction of Section 232 duties appropriately places U.S. prices and home-market prices on a comparable basis, allowing a fair measurement of the degree to which the U.S. prices are being made at less than fair value. The deduction also puts NSC in no worse position—indeed, in no different position—than if the Section 232 duties were never imposed. If Section 232 duties had never been imposed, they would not have been paid, and NSC's U.S. prices would not have reflected

them.  Commerce's deduction of Section 232 duties from NSC's U.S. prices did no more than place those prices on the same basis that they would have been had the Section 232 duties not existed at all.    Indeed, failure to deduct Section 232 duties pursuant to 19 U.S.C. § 1677a(c)(2)(A) would essentially refund an importer the Section 232 duties, or alternatively, fail to fully offset dumping.  *See* Elizabeth J. Drake, *Treatment of Section 232 Duties in Commerce Antidumping Proceedings*, 28 U. Miami Int'l & Comp. L. Rev. 1, 13–14 (2021).

For these reasons, NSC's argument that Section 232 duties may not reasonably be treated as "United States import duties" because of their "remedial" nature must fail.

> **2.    NSC Does Not Persuade in its Claim that Section 232 Duties are Only Reasonably Viewed as Temporary in the Manner of Antidumping and Section 201 Duties**

NSC next argues, briefly, that Section 232 duties cannot reasonably be distinguished from Section 201 or antidumping duties on the basis of their duration.  NSC's Br. at 23–24. NSC relies on the court's decision in *Borusan.  Id.*  There, the court upheld Commerce's treatment of Section 232 duties as deductible from U.S. prices.  *See generally Borusan*, 494 F. Supp. 3d at 1365.  However, the Court treated the lack of any statutory provision requiring termination of Section 232 duties after a specific period of time (unlike Section 201 duties, which must terminate by operation of law after a specific period) as a weak reed in terms of justifying Commerce's treatment of Section 232 duties, but not Section 201 duties, as "United States import duties." *Id.* at 1374–75.

Nonetheless, there is a clear distinction between Section 232 duties and Section 201 duties (and antidumping duties, for that matter) in terms of the conditions attending their termination.  In the *SSWR Korea* Final Results, Commerce noted that Section 201 duties provide domestic industries with "temporary" relief from injury.  *Id.*  The CAFC in *Wheatland Tube*

elaborated on this observation, noting that the statutes providing for antidumping and 201 duties place specific limits on these duties' duration.   495 F.3d at 1362.   By contrast, the CAFC reasoned that "normal customs duties" do not have a statutory termination provision and are permanent unless modified.   *Id.*   Section 232 duties are likewise not subject to a statutory termination provision and are permanent until modified.   19 U.S.C. § 1862.   NSC does not persuade that these facts do not distinguish Section 232 duties from antidumping or Section 201 duties.

**3.     NSC Fails to Show that the Deduction of Section 232 Duties Imposes a Double Remedy**

NSC next argues that Commerce's treatment of Section 232 duties as "United States import duties" is unreasonable because it results in a double remedy for substantially overlapping injuries.   NSC's Br. at 24–30. NSC acknowledges that the court has repeatedly found otherwise, but argues that the court's prior analyses were incomplete and, ultimately, incorrect.   *Id.*   In particular, NSC argues that while the court in *Borusan* and other cases has found that there is no clear "statutory interplay" between Section 232 duties and antidumping duties, such an interplay exists.   *Id.*   NSC argues that the interplay renders Section 232 duties so akin to Section 201 duties (and antidumping duties) as to make it unreasonable for Commerce to deduct Section 232 duties from U.S. prices under 19 U.S.C. § 1677a(c)(2)(A).   *Id.*

NSC first argues that the *Borusan* court's observation that Section 232 duties, unlike Section 201 or antidumping duties, require no predicate ITC finding of injury, is a "distinction without a difference."   *Id.* at 25.   NSC reasons that while Section 232 does not contemplate any role for the ITC, it requires Commerce and the President to consider factors similar to those considered by the ITC in antidumping/Section 201 proceedings.   *Id.*   NSC concludes that the Section 232 statute "{v}ery clearly" requires a determination of injury to a domestic industry

before Section 232 duties may be imposed, and also prohibits Section 232 duties where any injury is already being remediated by antidumping duties. *Id.* at 24–25. NSC also argues that Commerce's regulations underscore the "statutory interplay" between antidumping, Section 201, and Section 232 duties. *Id.* at 25.

NSC is wrong. Despite NSC's characterizations, the statute does not predicate the imposition of Section 232 duties on a finding of injury to a domestic industry. 19 U.S.C. § 1862; *see also* discussion *supra* at 19–20. Moreover, Section 232 makes clear that any impact that investigated imports have on domestic industries is only relevant in relation to national security. 19 U.S.C. § 1862(d); *see also* discussion *supra* at 21. Pursuant to Section 232, "{t}he interest to be safeguarded is the security of the Nation," rather than the "output or profitability of any plant or industry" in its own right, or for its own sake. H.R. Rep. 1761 at 14.

By contrast, the "statutory interplay" between Section 201 and antidumping duties is clear—and goes beyond the predicate ITC injury determination that both of these types of duties require. The statutory provisions authorizing Section 201 duties expressly require the ITC to consider whether dumping and/or subsidization is taking place when conducting a Section 201 investigation. 19 U.S.C. § 2252(c)(5). Further, pre-existing antidumping duties must be taken into account when setting the level of Section 201 duties. *See* SAA at 964, 1994 U.S.C.C.A.N. at 4267. Neither Section 232 nor its legislative history impose similar requirements. *Borusan*, 494 F. Supp. 3d at 1375.

NSC points out that Commerce requires parties filing AD petitions to indicate whether they have separately petitioned for imposition of Section 232 duties, arguing that this requirement complements and reflects the "statutory interplay" between Section 232 and antidumping duties. NSC's Br. at 25–26 (citing 19 C.F.R. § 351.202(b)(4)). But there is no such

"statutory interplay." NSC points to nothing in the Act, Section 232, or the even the agency's regulations that requires Commerce to act in any particular way upon receiving an AD petition from a petitioning industry that has also requested a Section 232 investigation. *See id.*

NSC's argument that Section 232 does not authorize the President to impose Section 232 duties if injury to a domestic industry is already remedied by antidumping duties also misses the mark. *Id.* at 26. Again, while Commerce and the President are directed to consider U.S. economic interests in Section 232 investigations and related actions, Section 232 does not require a predicate finding of injury to a particular industry, and the purpose of Section 232 duties is inextricably and uniquely related to national security. Moreover, as the *Borusan* court recognized, "antidumping duties are simply to continue after the President imposes Section 232 duties." *Borusan*, 494 F. Supp. 3d at 1375. The President's direction that Section 232 duties be levied in addition to antidumping duties, rather than in place of them, reflects the lack of interplay and overlap between Section 232 and antidumping duties. *See id.*; Proclamation 9705, 83 Fed. Reg. at 11,627, 11,630.

NSC argues that the President viewed the Section 232 duties as an "alternative means to remedy {the} injury" addressed by antidumping duties. NSC's Br. at 26–27. This argument makes no sense, and not just because the legislative history of Section 232 is to the contrary. H.R. Rep. 1761 at 13–14. Again, the injury remedied by antidumping duties is sales at less than fair value. The objective of antidumping duties is accordingly to bring the U.S. prices to the same, presumptively fair basis as home market prices. But nothing in Section 232 requires the President to consider fair value in setting Section 232 duties, or to consider the existence of pre-existing antidumping duties. Rather, the focus of the Section 232 duties, even if they have the impact of benefitting a U.S. industry, is on protecting the national security, and not the industry

in its own right.  19 U.S.C. § 1862; Proclamation 9705, 83 Fed. Reg. at 11,625, 11,627 (linking duties to ability of the United States to meet "steel demand{} for national defense and critical industries in a national emergency" and also authorizing exceptions to the duties "for specific national security-based considerations.").

NSC claims that the deduction of Section 232 duties creates "an artificial dumping margin."  NSC's Br. at 27–28.  But this is not the case.  Again, the statutory reduction of a respondent's U.S. prices by the amount of any "United States import duties" included in those prices brings a respondent's duty-inclusive U.S. prices to the same duty-exclusive basis as home market prices.  *See, e.g.*, *Borusan*, 494 F. Supp. 3d at 1373.  Rather than create an artificial margin or imperil the accurate calculation of dumping duties, Commerce's deduction of the section 232 duties supports the goal of an accurate margin calculation.  *See* discussion *supra* at 21–23.

Finally, NSC argues that Commerce could not reasonably treat Section 232 duties as "ordinary customs duties"—a phrase not used in the Act—because in imposing/adjusting the Section 232 duties, the President excluded affected steel articles from duty drawback.  NSC's Br. at 29.  NSC argues that this action was inconsistent with a CBP regulation permitting drawback of "ordinary customs duties," and accordingly impugns the reasonableness of Commerce's observation that the President intended Section 232 duties to be "treated as any other duties."  *Id.*

NSC again misses the mark.  The President specified that "{a}ll anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed."  Proclamation 9705, 83 Fed. Reg. at 11,629; *see also Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683, 20,687 (May 7, 2018).  Rather than indicate that Section 232 duties and antidumping duties have overlapping

remedial purposes, this language indicated that the President viewed Section 232 duties and antidumping duties as having separate purposes that did not overlap, such that no double-remedy existed.  NSC's Br. at 12–13.

Further, the question here is not whether the President took action inconsistent with CBP regulations.  It is whether Commerce may reasonably interpret the phrase "United States import duties," as it appears in 19 U.S.C. § 1677a(c)(2)(A), to include Section 232 duties.  The answer to that question, as found by the *Borusan* court, is yes.  Section 232 duties have a purpose distinct from that of antidumping duties or Section 201 duties; their deduction does not implicate the circularity concerns that have led Commerce to include antidumping duties themselves within U.S. prices.  *See SSWR Korea* Final Results, 69 Fed. Reg. at 19,159 n.22.  Nor are Section 232 duties complementary with antidumping duties in the manner of Section 201 duties.  *See* discussion *supra* at 25–27; *see also SSWR Korea* Final Results, 69 Fed. Reg. at 19,160; *Borusan*, 494 F. Supp. 3d at 1375–76.  And crucially, the deduction of Section 232 duties serves the aims of 19 U.S.C. § 1677a(c)(2)(A).

4.   **NSC Does Not Persuade that the WTO Agreements or Charming Betsy Canon Render Commerce's Interpretation of the Act Unreasonable**

Finally, NSC argues that Commerce's interpretation of the statutory phrase "United States import duties" is unreasonable because it is inconsistent with the United States' commitments under the GATT 1994, and thus violates the *Charming Betsy* canon.  NSC's Br. at 30–33.

There are a number of problems with NSC's argument. As an initial matter, to the extent that Section 232 duties are "ordinary customs duties" within the meaning of the GATT 1994,[9] any violation of the United States' bound tariff commitments stems first and foremost not from the duties' deduction from U.S. prices in an antidumping calculation, but from the duties' imposition. After all, it was that imposition that resulted in duties of 25%, rather than the bound tariff rate of zero percent, being levied on Japanese hot-rolled steel. Commerce, however, was not the entity that imposed the duties. Rather, the President imposed them. NSC's suit to challenge a Commerce AD administrative review under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a is not an appropriate vehicle for challenging harms stemming from Presidential action.

Beyond this, the GATT 1994 expressly exempts "any anti-dumping or countervailing duty applied consistently with the provisions of Article VI {of the GATT 1994}" from the ambit of signatories' bound tariff rates. GATT 1994 art. II, 2(b). Commerce's deduction of Section 232 duties from NSC's U.S. prices formed part of the calculation of an AD. NSC has not argued otherwise, or that the AD is inconsistent with Article VI. NSC's Br. at 30–33.

It would not matter, of course, if NSC had made such an argument. As explained above, 19 U.S.C. § 3512(c)(l)(B) forecloses NSC's challenge to the deduction of Section 232 duties as inconsistent with the *Charming Betsy* canon. 19 U.S.C. § 3512(c)(l)(B); *see also id.* § 3511(d)(1) (identifying the GATT 1994 as one of the agreements subject to, *inter alia*, 19 U.S.C. § 3512(c)(l)(B)); *Corus Staal*, 395 F.3d at 1343 (finding the *Charming Betsy* doctrine cannot be used to force a GATT-compliant interpretation of ambiguous statutory language upon

---

[9]     While the GATT 1994 uses the phrase "ordinary customs duties," this phrase is not used in the Act, which refers to "United States import duties." GATT 1994 art. II, 1(b); 19 U.S.C. § 1677a(c)(2)(A).

Commerce).  As such, NSC's challenge to Commerce's actions as inconsistent with the United States' GATT obligations is non-cognizable under U.S. law.

**5.      Conclusion**

NSC does not persuade that Commerce's deduction of Section 232 duties from the company's U.S. prices is unlawful.  Rather, Commerce has advanced a permissible and reasonable interpretation of the statutory phrase "United States import duties."  Commerce's interpretation serves the aims of the statute, promotes accurate AD calculations, and is consistent with prior judicial and agency precedent.  This court should therefore affirm Commerce's interpretation.

**B.      Commerce Properly Applied Partial AFA to NSC**

For the fourth consecutive segment of the proceeding, NSC failed to provide Commerce with necessary information regarding its downstream sales through affiliated resellers—despite clear notice that failure to provide such information would impede Commerce's investigation and result in the application of AFA.  NSC contends that it was powerless to induce cooperation from its affiliates.  But Commerce correctly determined that NSC fell short of maximum efforts to comply.  Because substantial evidence on the administrative record supports Commerce's findings, Commerce's application of AFA should be affirmed.

**1.      Commerce's Application of AFA Was Consistent With The Statute**

Where information is missing from the record or an interested party has failed to provide information in the form or manner requested, Commerce may rely on facts otherwise available. 19 U.S.C. § 1677e(a).  If Commerce further determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may rely on an adverse inference in selecting among the facts available.  *Id.*

§ 1677e(b). The CAFC has explained that, although the statute does not require perfection from a respondent, it does demand that a respondent "do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Thus, AFA is warranted when Commerce determines (1) a reasonable respondent "would have known that the requested information was required to be kept and maintained," *id.* (referred to as the statute's "objective" element), and (2) the respondent's failure to produce the requested information "is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth maximum efforts to" obtain them, *id.* at 1382–83 (referred to as the statute's "subjective" element).

The AFA standard has frequently been examined in the context of a respondent who fails to provide information on behalf of affiliated companies. Because the burden to create an adequate record lies with interested parties, the Court has recognized that an "assessment of whether {a respondent} put forth its maximum efforts . . . necessarily must assess whether {it} could or should have been able to obtain the information in its affiliate's possession." *Hyundai Steel*, 319 F. Supp. 3d at 1345; *accord Ta Chen Stainless Steel Pipe, Inc. v. United States*, 24 CIT 841, 845 (2000) (noting, in affirming application of AFA, that "the burden was on {respondent} to show that it could not compel {its affiliate} to provide the information").

Accordingly, this Court has routinely upheld Commerce's application of AFA to a respondent who fails to put forth maximum efforts to obtain necessary information from its affiliates—including in NSC's appeal from the first administrative review of this AD order. *See NSC I*, 483 F. Supp. 3d at 1227; *see also Hyundai Steel*, 319 F. Supp. 3d at 1345 ("Given the nature of the affiliation between Hyundai Steel and its affiliate, the agency reasonably expected that Hyundai Steel would be able to access its affiliate's documentation"); *Haixing Jingmei*

*Chem. Prods. Sales Co. v. United States*, 357 F. Supp. 3d 1337, 1349 (Ct. Int'l Trade 2018) (affirming AFA in light of respondent and affiliate's "buyer-seller relationship, and the agency's need for accurate and reliable information"); *Ta Chen*, 24 CIT at 845–46 (affirming AFA where respondent "could have done more" to preserve affiliate's information); *Kawasaki Steel*, 24 CIT at 692–93, 110 F. Supp. 2d at 1037 (affirming AFA where respondent "possessed the ability to obtain the information requested but, instead, took a 'hands-off' approach with respect to {affiliate's} decision not to provide the data").  Indeed, the CAFC has recognized that even a cooperating party may be collaterally impacted by an adverse inference if necessary to induce a non-party's cooperation.  *See Mueller*, 753 F.3d at 1233 (affirming AFA where "Commerce found that Mueller could and should have induced Ternium's cooperation by refusing to do business with Ternium").

### 2.   NSC Did Not Put Forth Maximum Efforts To Obtain Its Affiliates' Data

Consistent with the above principles, and this Court's holding in *NSC I*, Commerce appropriately determined AFA was warranted.

*First*, Commerce rightly found that a four-time respondent in NSC's position "would have known that the requested information was required to be kept and maintained."  *Nippon Steel*, 337 F.3d at 1382.  As the Court explained in *NSC I*, "***this*** respondent . . . had specific notice that Commerce would request its affiliated resellers' downstream sales in a review." 483 F. Supp. 3d at 1224.  Heading into this third administrative review, Commerce thus continued to reasonably expect NSC either to (1) obtain the necessary information from its affiliated resellers, or (2) discontinue its own business choice to sell "at non-arm's length prices to affiliates who refuse to provide their downstream sales information."  Final I&D Memo, Appx2474.  As Commerce has explained to NSC before:

Business Proprietary Information
Has Been Deleted

> Respondents have the ability to cease selling to, or continuing to do business with, an affiliate if that party declines to provide the necessary information requested by Commerce.  Further, it is NSC's own business decisions that determine whether the requirement to report downstream sales applies, as it is the one that establishes the prices to its affiliates, and is thus in a position to make them at arm's-length prices or not.

Preliminary Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from Japan*, 84 Fed. Reg. 68,402 (Dep't Commerce Dec. 16, 2019) (prelim. results of AD admin. rev. and prelim. deter. of no shipments; 2017–2018) at 10.  Here, it was therefore objectively reasonable for Commerce to find that NSC ***still*** "has the choice of to whom it sells its products" and whether to sell to those affiliates "at prices that are not at arm's length," and to conclude that a repeat respondent in NSC's position should not be permitted to potentially "manipulate the dumping calculations by shielding high priced home market sales behind a wall of uncooperative affiliates."  Final I&D Memo, Appx2473.  The "objective showing that a reasonable and responsible {respondent} would have known that the information was required to be kept and maintained" is plainly met.  *Nippon Steel*, 337 F.3d at 1382.

NSC contends Commerce's expectations were objectively unreasonable because NSC "could not have possibly known that [            ] would fail to provide the requested information until . . . the course of this review (throughout 2020)."  NSC's Br. at 38–39.  That is not true, given NSC's affiliates' history of noncompliance, [

].  *See, e.g.*, Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Hot-Rolled Steel Flat Products from Japan: NSC's Response to the Department's Supplemental Questionnaire* (Feb. 1, 2021), Appx81731 ("NSC's SQR") ([

]).  It is also unpersuasive.  NSC's argument would absolve respondents of any responsibility to provide their affiliates' data, simply by asserting that, [          ], they believed the affiliate would come through.  *See, e.g.*, NSC's Br. at

**Business Proprietary Information
Has Been Deleted**

39 (arguing "NSC had every reason to believe that [                    ] would cooperate *in AR3*").

But respondents do bear such a responsibility.  *See Kawasaki Steel*, 24 CIT at 693–94, 110 F.

Supp. 2d at 1038; *see also Ta Chen*, 24 CIT at 846.  And it is especially disingenuous for NSC to

claim surprise when it has taken no apparent steps, after four segments of this proceeding, to

make compliance with U.S. trade reporting requirements a condition of doing business.

NSC contends it could not have required its affiliates to cooperate with Commerce's

reporting requirements without violating Japanese law.  NSC's Br. at 36–37, 39 (arguing "it is

illegal in Japan to use commercial threats to induce" affiliates' cooperation).  But Commerce has

repeatedly, and justifiably, rejected that defense.  As Commerce has explained for three

consecutive reviews, "Commerce is not directing NSC to violate Japanese law"; rather,

"Commerce is finding, under the U.S. AD law, that if NSC makes the *choice* of structuring its

home market sales such that it sells at non-arm's length prices to affiliates who refuse to provide

their downstream sales information, Commerce will find it necessary to resort to AFA."  Final

I&D Memo, Appx2474; *accord* 2AD Final I&D Memo at 14 (same); 1AD Final I&D Memo at

16 (same).  The Court should likewise reject NSC's justification, which amounts to an untenable

contention that Japanese respondents are powerless to choose whom to partner with *or* to cease

doing business with uncooperative affiliates *or* to make cooperation with U.S. law a condition of

doing business in the first place.  *Cf. SolarWorld Ams., Inc. v. United States*, 273 F. Supp. 3d

1254, 1278 (Ct. Int'l Trade 2017) (affirming AFA where Commerce reasonably explained

respondents "may choose not to do business with {uncooperative affiliates} in the future due to

their cooperation and/or select suppliers that are willing to {cooperate}").

**Business Proprietary Information**
**Has Been Deleted**

*Second*, Commerce rightly determined that NSC failed to cooperate to the best of its ability.  NSC's attempt to distinguish this record from the original investigation and prior reviews is unpersuasive.  *See* NSC's Br. at 36–38.

In the first administrative review, NSC failed to provide downstream sales data from affiliates that failed the arm's-length test.  As it does here, NSC argued that it put forth maximum efforts to secure the missing data because it "contacted the affiliated resellers before Commerce initiated th{e} review; hired Japanese counsel to manage the data collection efforts; made repeated written requests, as well as numerous telephone calls, to each of the affiliated resellers and sent each affiliated reseller a database containing the relevant sales."  *NSC I*, 483 F. Supp. 3d at 1225; *cf.* NSC's Br. at 36 (describing virtually identical conduct).  But the record did not substantiate NSC's purported efforts.  *NSC I*, 483 F. Supp. 3d at 1225.  Regardless of NSC's failure of documentation, however, Commerce found, and the Court agreed, that NSC failed to put forth maximum efforts because, while "there may have been some additional outreach by {NSC}, the record is devoid of any information that {NSC} exerted any leverage to induce, or attempt to induce, the affiliated resellers to provide their downstream sales."  *Id.* at 1226 (noting also that NSC had not "made any efforts to address its affiliated resellers' concern over the financial and labor burden to produce the information").

NSC contends this review stands apart because "{u}nlike in prior reviews, NSC provided documentation" demonstrating its efforts, including "emails, letters, and communications logs" with its affiliates.  NSC's Br. at 36.  And, [                    ] suggested it would "try to cooperate."  *Id.* at 39.  NSC misses the point.  After three consecutive applications of AFA for failing to provide exactly the same information, NSC continued to do business with uncooperative affiliates, including [                ], continued to sell to them at non-arm's-length

Business Proprietary Information
Has Been Deleted

prices, and failed again to obtain data it knew Commerce would need.  As Commerce noted, these are NSC's choices—not its affiliates'.  *See* Final I&D Memo, Appx2473 ("NSC had the choice of selling to affiliates which would cooperate and those that will not"); Preliminary Memo, Appx2442 ("Further, it is NSC's own business decisions that determine whether the requirement to report downstream sales applies, as {NSC} is the one that establishes the prices to its affiliates, and is thus in a position to make them at arm's-length prices or not.").

That NSC *asked* for the required information—however frequently—does not make up for its own shortcomings, particularly where NSC simply acquiesced again to [          ] failure to comply.  *See* NSC's SQR, Appx81727 ([

]), Appx81729 ([

]); Appx81731 ([

]); *cf. An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2018) ("Commerce recognizes {respondent's} efforts to contact the {affiliates} and obtain their cooperation.  However, Commerce notes, {respondent} could have done more to induce cooperation, for example, by refusing to do business with {the affiliates.}"); *Kawasaki Steel*, 24 CIT at 689–90, 110 F. Supp. 2d at 1034–35 (affirming AFA where respondent "could have been much more active in obtaining the cooperation of {affiliate} in this investigation, {but} limited its efforts to merely requesting the required data").

At bottom, NSC has proceeded from segment to segment, continuing to do business with uncooperative affiliates, continuing to sell to them at non-arm's length prices, and continuing to accept their poor excuses for failing to comply with U.S. reporting requirements.  The question

**Business Proprietary Information
Has Been Deleted**

for Commerce, in filling the resulting gaps in the record, is whether NSC could have exerted greater effort to provide "full and complete answers" to its requests. *Nippon Steel*, 337 F.3d at 1382. The answer was yes. Finding otherwise, in this fourth consecutive proceeding, would undermine the purpose of the AFA statute, which is "'to provide respondents with an incentive to cooperate' with Commerce's investigation." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017); *see also PSC VSMPO-AVISMA Corp. v. United States*, 35 CIT 283, 290–91, 755 F. Supp. 2d 1330, 1339 (2011) (finding, where prior application of AFA did not induce respondent's cooperation, that a higher AFA rate was likely warranted).

C.   **NSC Must Demonstrate Entitlement to a Revenue-for-Extra-Services Price Adjustment**

As Nucor explained below, what NSC seeks with regard to its revenue-for-extra-services argument is effectively a direct price adjustment to select transactions. *See* Final I&D Memo, Appx2480–2481; *see also SKF USA Inc. v. United States*, 19 CIT 625, 632–33, 888 F. Supp. 152, 158 (1995) (explaining that a direct price adjustment is one sought on either "a transaction-specific basis" or "as a fixed and constant percentage of sales {price} on all transactions for which {it was} reported"). "The party seeking a direct price adjustment bears the burden of proving entitlement to such an adjustment." *SKF USA Inc. v. Ina Walzlager Schaεfler KG*, 180 F.3d 1370, 1377 (Fed. Cir. 1999). Consequently, the burden was on NSC to substantiate the "extra services" revenues that its U.S. affiliate, Steelscape, allegedly received.

Nucor explained below that NSC did not meet that burden because it did not explain (1) how the supposedly "extra" [                                                    ] charges differ from the same types of charges that were not considered extra, (2) why these transactions were not reported in NSC's gross price while others were, or (3) where exactly these extra services were performed. *See* Nucor's Rebuttal Br., Appx83089–83090. Commerce did not reach these issues

in the Final Results because it mistakenly assumed its calculation of net U.S. price had already

taken these revenues into account, and Commerce thus denied NSC's requested adjustment. *Id.*

Commerce now acknowledges its misapprehension and seeks a partial remand to correct

its "programming error." DOJ's Br. at 31–32. Nucor does not object to Commerce's request.

On remand, however, Nucor will reiterate its argument that, before adjusting NSC's net U.S.

price, Commerce must make the threshold determination that NSC has demonstrated entitlement

to the requested adjustment. *See, e.g.*, *Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354,

1361–62 (Fed. Cir. 2017) (affirming denial of requested offset where respondent "simply failed

to satisfy its evidentiary burden of establishing" its entitlement); *SKF*, 180 F.3d at 1377

("Commerce applied the correct legal standard in requiring SKF to show {at the outset} that the

claimed adjustments pertained to subject merchandise only.").

## VI.   <u>CONCLUSION</u>

For the reasons above, Nucor respectfully requests that the Court reject the arguments

raised by NSC and affirm Commerce's final determination as supported by substantial evidence

and otherwise in accordance with law.

Respectfully submitted,

*/s/ Christopher B. Weld*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Enbar Toledano, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: May 13, 2022

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Nucor Corporation's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 12,140 words.


*/s/ Christopher B. Weld*
(Signature of Attorney)

Christopher B. Weld
(Name of Attorney)

Nucor Corporation
(Representative Of)

May 13, 2022
(Date)