

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8790
RWEINER@SIDLEY.COM

June 13, 2022

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

      Re:    <u>Nippon Steel Corporation v. United States, Court No. 21-00533</u>

Dear Mr. Toscano:

      On behalf of Nippon Steel Corporation ("NSC"), plaintiff in the above-captioned proceeding, we hereby file NSC's Reply in Support of Motion for Judgment on the Agency Record.

      Copies of the attached documents have been served on the parties listed in the attached certificate of service.

      Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

      Respectfully submitted,

      Richard L.A. Weiner
      Rajib Pal
      Shawn M. Higgins
      Justin R. Becker
      Alex L. Young

      Counsel to Nippon Steel Corporation

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NIPPON STEEL CORPORATION,

               Plaintiff,

       v.

UNITED STATES,

               Defendant,

NUCOR CORPORATION, STEEL
DYNAMICS, INC. AND SSAB
ENTERPRISES, LLC,

          Defendant-Intervenors.

Court No. 21-00533

**REPLY OF PLAINTIFF IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Nippon Steel Corporation

June 13, 2022

## TABLE OF CONTENTS

**Page No**

**ARGUMENT** ................................................................................................................ 2

I.   The Section 232 Steel Duties ..................................................................................... 2

   A.   *Chevron* Sets the Relevant Standard of Review and Permits a *De Facto* Finding ............. 2

   B.   The Section 232 Steel Duties Are Unlike OCDs ............................................. 6

      1.   The Section 232 Steel Duties Are Remedial ............................................ 6

      2.   The Section 232 Steel Duties Are Temporary ......................................... 11

      3.   Deducting the Section 232 Steel Duties from U.S. Price Results in Double Remedy . 11

   C.   Treating the Section 232 Steel Duties as OCDs Violates U.S. WTO Obligations ........... 16

II.   Adverse Facts Available ("AFA") for Unreported Downstream Sales ................................. 19

III. U.S. Revenue for Extra Services ................................................................................. 23

**CONCLUSION** ........................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apex Exps. v. United States*,
    777 F.3d 1373 (Fed. Cir. 2015).................................................................2

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ................................................. *passim*

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)...............................................................................2

*Deacero S.A.P.I de C.V. v. United States*,
    No. 20-03924, 2021 Ct. Intl. Trade LEXIS 174 (Ct. Int'l Trade Dec. 20, 2021) .....................2

*Federal Mogul Corp. v. United States*,
    63 F.3d 1572 (Fed. Cir. 1995)....................................................................3

*Guizhou Tyre Co. v. United States*,
    348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) .........................................................21

*Hyundai Steel Co. v. United States*,
    518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) .........................................................21

*King Broad. Co. v. FCC*,
    860 F.2d 465 (D.C. Cir. 1988)....................................................................2

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804).......................................................................3

*Ohio v. United States DOI*,
    880 F.2d 432 (D.C. Cir. 1989)....................................................................5

*Power Steel Co. v. United States*,
    No. 20-03771, Ct. Intl. Trade LEXIS 175 (Ct. Int'l Trade Dec. 23, 2021) ............................2

*Seah Steel Vina Corp. v. United States*,
    182 F. Supp. 3d 1316 (Ct. Int'l Trade 2016) ........................................................20

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007)...................................................................14

**Statutes**

19 U.S.C. § 1677a(c)(2)(A) ..................................................................... *passim*

19 U.S.C. § 1677e(a).................................................................................................19, 23

19 U.S.C. § 1677e(b) ...............................................................................................19, 23

Acts of the First Congress of the United States, ch. 2, 1 Stat. 24, 24 (1789) ...................9

Tariff Act of 1930 (Smoot-Hawley Tariff Act), Pub. L. No. 71-361, 46 Stat. 590, 590 ..............10

Trade Expansion Act of 1962, P.L. 87-794, § 232, 76 Stat. 872, 877 (1962) ..............10

**Regulations**

19 C.F.R. § 190.3(a)...................................................................................................7

**Administrative Decisions**

*Certain Hot-Rolled Steel Flat Products From Japan: Final Results of
    Antidumping Duty Administrative Review and Final Determination of No
    Shipments; 2017-2018*, 85 FR 57821 (Sep. 16, 2020)........................................14

*Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping
    Duty Administrative Review and Final Determination of No Shipments; 2019-
    2020*, 87 FR 31521 (May 24, 2022)........................................................23

*Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United States*,
    83 FR 11625 (Mar. 15, 2018) ..........................................................13, 14

*Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United States*,
    83 FR 20683 (May 7, 2018).....................................................................7

*Publication of a Report on the Effect of Imports of Steel on the National Security:
    An Investigation Conducted Under Section 232 of the Trade Expansion Act of
    1962, as Amended*, 85 FR 40202 (July 6, 2020).......................................12

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of
    Antidumping Duty Administrative Review*,
    69 FR 19153 (Apr. 12, 2004)................................................................7, 11

**Other Authorities**

General Agreement on Tariffs and Trade 1994, Articles II:1(a) and (b).....................16, 17, 18, 19

Panel Report, *Russia – Measures Concerning Traffic in Transit*, WTO Doc.
    WT/DS512/R and Add.1 (adopted 26 April 2019)................................17, 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Court No. 21-00533 |
| Defendant, | |
| NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC, | |
| Defendant-Intervenors. | |

**REPLY OF PLAINTIFF IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Nippon Steel Corporation ("NSC") replies to responses by Defendant, United States, on April 29, 2022 ("U.S. Brief") and Defendant-Intervenor, Nucor Corporation ("Nucor"),[1] on May 13, 2022 ("Nucor Brief") (collectively "Defendants"), to NSC's Memorandum dated February 24, 2022 ("NSC Brief").[2]  NSC respectfully requests the Court reverse the final results of the U.S. Department of Commerce ("Commerce") in the third administrative review ("AR3") of the antidumping ("AD") duty order covering Certain Hot-Rolled Steel Flat Products from Japan ("HR Steel from Japan"), and remand with instructions to recalculate NSC's dumping margin.

---

[1]      The other Defendant-Intervenors supported Nucor on May 16, 2022.
[2]      Short citations used herein are the same as in the NSC Brief.

# ARGUMENT

## I.      The Section 232 Steel Duties

Commerce's interpretation that the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) is not supported by substantial evidence and not in accordance with law.  Defendants have not rebutted NSC's argument that Commerce's interpretation does not deserve deference under step two of *Chevron*, 467 U.S. at 842-43.

### A.      *Chevron* **Sets the Relevant Standard of Review and Permits a** *De Facto* **Finding**

The question here is whether, under step two of *Chevron*, Commerce's interpretation that "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) includes *the Section 232 steel duties at issue in this case* is reasonable and deserves deference.  *See* NSC Brief at 10, *citing Borusan*, 494 F. Supp. 3d at 1371; *Deacero* 2021 Ct. Intl. Trade LEXIS 174, at *6; *Power Steel*, 2021 Ct. Intl. Trade LEXIS 175, at *5.

The Court may defer to Commerce's interpretation only if it is reasonable and consistent with the goals of the statute and Commerce's past practice.  *See, e.g.*, *Apex Exps. v. United States*, 777 F.3d 1373, 1379-80 (Fed. Cir. 2015) (giving Commerce's statutory interpretation deference because it was "reasonable, consistent with the goals of the statute, and reflect{ed} Commerce's long-standing practice").  Courts have rejected agencies' statutory interpretations under *Chevron* step two where the "interpretation is inconsistent with {the agency's} prior analysis in similar situations without any acknowledgement of the fact, or *cogent explanation* as to why."  *King Broad. Co. v. FCC*, 860 F.2d 465, 470 (D.C. Cir. 1988) (emphasis added).

Moreover, the Court may not accord *Chevron* step two deference to an agency interpretation that is inconsistent with U.S. international obligations, pursuant to the canon

2

articulated in *Charming Betsy*, 6 U.S. (2 Cranch) at 118. *See* NSC Brief at 30, *citing Federal Mogul*, 63 F.3d at 1581-82.

Nucor articulates a different standard without justification. Nucor writes: "NSC cannot prevail here unless it shows that no tenable interpretation of the phrase 'United States import duties' includes Section 232 duties." Nucor Brief at 18. Plainly, that is not the relevant standard, as this Court understood in *Borusan*, *Deacero*, and *Power Steel*.

Nucor also writes:

> {NSC} must show that the deduction of Section 232 duties would be manifestly at odds with the statutory purpose of 19 U.S.C. § 1677a(c)(2)(A). As such, … the salient question is not whether Section 232 duties are "remedial," but "what is the purpose of the deduction for 'import duties' in the dumping margin calculation, and does reduction of price by Section 232 duties serve that purpose."

Nucor Brief at 18-19, *quoting Borusan*, 494 F. Supp. 3d at 1373-74; *see also* Nucor Brief at 21.

However, the Court in *Borusan*, just as Commerce, analyzed whether the reduction of U.S. price by the Section 232 steel duties serves the purpose of 19 U.S.C. § 1677a(c)(2)(A) by evaluating three questions: "(1) whether the duties are remedial, (2) whether they are temporary, and (3) whether deducting them from {U.S. price} would result in an impermissible double remedy." *Borusan*, 494 F. Supp. 3d at 1373-74. So *each* of these questions, including whether the Section 232 duties are "remedial," is salient. If the answer to each question is reasonably "yes" for the Section 232 steel duties, as NSC has shown previously and below, those duties do not serve the purpose for which Congress called for "United States import duties" to be deducted from U.S. prices. Therefore, Commerce's interpretation at issue cannot be accorded *Chevron* step two deference. That is the only result that is reasonable and consistent both with the

statutory goals and Commerce's practice with respect to AD, countervailing ("CV"), and Section 201 safeguard ("SG") duties.[3]

NSC respectfully submits that while the Court articulated the correct legal standard in *Borusan*, it mis-analyzed the issue there because it focused on what it perceived (incorrectly[4]) to be minor differences between Section 232 and SG duties, rather than on major differences between Section 232 duties and the ordinary customs duties ("OCDs") that are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A). Indeed, the Court in *Borusan* understood the analysis should *not* focus on the similarities/differences between Section 232 and SG duties, writing: "{T}he threshold question should not be … whether Section 201 duties and Section 232 duties are so similar that Commerce acts unreasonably if it does not give them identical treatment." *Id.* at 1373. However, the Court deferred to Commerce based entirely on perceived differences between Section 232 and SG duties. *See id.* at 1374, 1376.

Instead of the foregoing, to properly analyze the issue, the Court must consider whether the Section 232 steel duties are similar enough to OCDs under the framework of the three questions posed above such that it is reasonable for Commerce to consider them "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A); if the Section 232 steel duties are sufficiently different from OCDs under that framework (as they are), notwithstanding whatever differences they may have with AD/CV/SG duties, the Section 232 steel duties should be considered "special" duties that fall outside of 19 U.S.C. § 1677a(c)(2)(A). As explained in the NSC Brief and below, a complete consideration of relevant statutory language, applicable legislative

---

[3] This Court recognized it must "pause" and analyze Commerce's treatment of the Section 232 steel duties in the context of Commerce's treatment of AD, CV, and SG duties. *See Borusan*, 494 F. Supp. 3d at 1375-76.

[4] *See* NSC Brief at 13-29, and Sections I.B.1 and I.B.3 below.

history, the particular factual basis for the Section 232 steel duties, and the purpose/function of OCDs compared with that of the Section 232 steel duties, reveals that Commerce's interpretation that "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) includes the Section 232 steel duties does not deserve deference under *Chevron* step two.  If that were not enough to reach this conclusion, the *Charming Betsy* canon further supports it.

Finally, while NSC submits there are sufficient reasons why Section 232 duties generally should not be considered "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A), the Court need not make such a sweeping finding here.  Rather, the Court may (and should) look carefully at *the particular factual basis for the Section 232 steel duties*, as NSC has requested, and thereupon find that Commerce's decision that *the particular Section 232 steel duties at issue in this case* are "United States import duties" to be deducted from NSC's U.S. prices does not deserve *Chevron* step two deference.  In effect, NSC is asking the Court to make a *de facto* finding regarding *the particular Section 232 steel duties at issue in this case*, not a *de jure* finding as the Court of Appeals for the Federal Circuit ("CAFC") made regarding SG duties generally in *Wheatland Tube*.  While NSC would welcome a similar *de jure* finding regarding Section 232 duties and believes the law supports one, such a finding is not necessary for the relief NSC seeks, so the Court may make a narrower *de facto* finding that *the particular Section 232 steel duties at issue in this case* are not properly considered "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A), while leaving open the possibility that other Section 232 duties based on different factual circumstances may be "United States import duties" under that provision.  Nothing prevents the Court from reaching such a narrower *de facto* conclusion under *Chevron* here.  *See, e.g.*, *Ohio v. United States DOI*, 880 F.2d 432, 443, 443 n.6 (D.C. Cir. 1989) (explaining the *Chevron* analysis should focus on the "precise" or "discrete" or "narrow"

5

question at issue, even if the parties frame the interpretative question more broadly).  As the ensuing discussion shows, neither of the Defendants has rebutted NSC's arguments supporting such a narrower *de facto* conclusion.

### B.     The Section 232 Steel Duties Are Unlike OCDs

Based on the three question framework discussed above, the particular Section 232 steel duties at issue here are nothing like OCDs.  Therefore, Commerce's determination to consider them "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) does not deserve *Chevron* step two deference.  Defendants have not rebutted NSC's argument in this regard for the reasons below.

#### 1.     The Section 232 Steel Duties Are Remedial

As NSC explained in detail, the Section 232 steel duties serve a special remedial purpose unlike OCDs.  *See* NSC Brief at 13-23.  Importantly, the Court already agreed in *Borusan* that unlike OCDs, "the purpose of Section 232 duties *is ... remedial in a broad sense*," *Borusan*, 494 F. Supp. 3d at 1374 (emphasis added), and that should end the inquiry.[5]  Defendants' attempts to rebut NSC's argument are unavailing.

First, the United States repeatedly notes the President referred to the Section 232 steel duties as "ordinary" customs duties, and directed that they "be imposed in addition to other duties" and that "{a}ll anti-dumping, countervailing, or other duties and charges applicable ... shall continue to be imposed."  *See* U.S. Brief at 3, 11-12, 18, *citing Proclamation 9705*, 83 FR at 11625-30 (clause 2 and Annex (U.S. Note 16(a)), and HTSUS, Revision 2, Chapter 99, subheading 9903.80.01 (Mar. 29, 2018).

---

[5]     Moreover, the Court's reasons in *Borusan* for nonetheless deferring to Commerce are both incorrect.  *See* NSC Brief at 22-23.

However, the United States does not explain why the President's mere statement that the Section 232 steel duties are "ordinary" customs duties should control, especially given these duties are recorded in Chapter 99 of the HTSUS, which Commerce itself previously in considering whether SG duties should be "United States import duties" explained "is reserved for special or temporary duties." *Stainless Steel Wire Rod from Korea*, 69 FR at 19160. As discussed above, to be deserving of *Chevron* step two deference, an agency's interpretation must be consistent with its prior determinations.

Moreover, the United States does not address NSC's explanation that the President's unilateral characterization of the Section 232 steel duties as "ordinary" customs duties in the instance cited by the United States is inconsistent with the regular treatment of OCDs under U.S. law, as duty drawback is allowable for OCDs but the President disallowed duty drawback for the Section 232 steel duties. *See* NSC's Brief at 29, *citing Proclamation 9740*, 83 FR at 20685 and 19 C.F.R. § 190.3(a). This demonstrates the Section 232 steel duties are different from OCDs, despite the President's unilateral characterization.

The United States also does not address NSC's point that the President's directive that other duties, including AD/CV duties, should continue to be imposed in addition to the Section 232 steel duties retains meaning (*i.e.*, is not rendered useless) if the Section 232 steel duties are not considered "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A); rather, that directive retains meaning because it makes clear that an accurate and non-punitive level of AD duties (as well as other duties) should continue to be imposed in addition to the Section 232 steel duties. *See* NSC's Brief at 28.

Second, Defendants repeat the mantra that the Section 232 steel duties have the objective of protecting U.S. national security. *See* U.S. Brief at 15-19; Nucor Brief at 20-21 and n.7-8.

7

However, NSC has explained this is a complete red herring and false pretense, because the underlying national security interest being protected here is precisely the bottom lines of U.S. steel producers.  *See* NSC Brief at 17-22.  In fact, the United States concedes as much, writing, *inter alia*: "an *effect* of the Section 232 duties may be to assist a weakened domestic injury"; "the viability of the domestic steel industry for defense capabilities *is the very national security interest* that the President sought to address"; and "consideration of the overall health of the United States steel industry {wa}s a *precursor* to the President's ultimate finding that there is a threat of impairment to national security."  U.S. Brief at 16, 17, 18-19 (italics in original; underline added).  And Nucor, while criticizing NSC's review of pertinent facts, *see* Nucor Brief at 21 and n.7-8, cannot deny that those facts show that the viability of U.S. steel producers is the very national security interest being protected in this instance by the Section 232 steel duties.

Third, Defendants stress that Section 232 duties "*may*" be imposed without finding a domestic industry is suffering injury, including reference to the Section 232 embargo on Libyan oil imports.  *See* U.S. Brief at 17 and n.4; Nucor Brief at 20 (emphasis added).  However, none of this addresses *the particular factual basis for the Section 232 steel duties at issue in this case*, which show beyond doubt that the President and Commerce itself viewed *these particular Section 232 steel duties* as an alternative means to remedy injury to the domestic steel industry.  *See* NSC Brief at 19-22.  Thus, even if Defendants' point may weigh against a *de jure* finding that Section 232 duties generally are not "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A), it does nothing to rebut such a *de facto* finding regarding *the particular Section 232 steel duties at issue in this case*.

Finally, Defendants take issue with NSC's comparison of the purpose/function of OCDs with that of the Section 232 steel duties.  To begin, Defendants mis-characterize NSC's argument

as saying that the "*only*" or "*sole{}*" purpose of OCDs is revenue generation.  *See* U.S. Brief at 23; Nucor Brief at 17, 19 (emphases added).  NSC never made that argument.  Rather, NSC argued: "OCDs are *aimed at* raising general revenue for the U.S. government, and as such require no findings or specialized purpose at all," while "Section 232 duties require some finding of adverse effects of imports on the industry concerned before they are imposed, just like AD/CV duties and Section 201 duties."  NSC Brief at 16-17 (emphasis added).

Thus, NSC submitted that OCDs have the *principal aim* (not sole purpose) of raising general revenue, which is unlike AD, CV, SG, *and* Section 232 duties.  In fact, while mis-characterizing NSC's argument, elsewhere the United States concedes "Nippon Steel's assertion that ordinary tariffs were originally imposed *primarily* to raise general revenue {is} correct."  U.S. Brief at 23 (emphasis added).  The fact that OCDs may have purposes in addition to raising general revenue does not negate the point, conceded by the United States, that their principal aim is raising general revenue.  Defendants' making note of the non-revenue generating purposes behind certain OCDs – including those imposed by the First Congress, the Smoot-Hawley tariffs, and presently by U.S. Customs and Border Protection – is therefore beside the point.  *See* U.S. Brief at 23; Nucor Brief at 19 and n.6.  The point is, as a general matter, the principal purpose/function of OCDs is raising general revenue, while it is indisputable that AD, CV, SG, *and* Section 232 duties do not have raising general revenue as their principal purpose/function.

Moreover, as a factual matter, the historical tariffs cited by Nucor identify revenue generation as their primary purpose, listing this purpose *first* among the tariffs' various purposes.  *See* Acts of the First Congress of the United States, ch. 2, 1 Stat. 24, 24 (1789) (stating duties may be laid "{w}hereas it is necessary for the *support of government, for the discharge of the debts of the United States*, and the encouragement and protection of manufactures" (emphasis

added)); Tariff Act of 1930 (Smoot-Hawley Tariff Act), Pub. L. No. 71-361, 46 Stat. 590, 590

(describing "{a}n Act {t}o *provide revenue,* to regulate commerce with foreign countries, to

encourage the industries of the United States, to protect American labor, and for other purposes"

(emphasis added)).  This structure is in stark contrast to the Trade Expansion Act of 1962, the

source of Section 232 duties, which does not list revenue-generation among any of its

enumerated purposes.

Even if the principal purpose/function of OCDs were not raising general revenue,

importantly, OCDs may be imposed *for any reason at all*, without any particular findings or

specialized purpose.  That is not so for AD, CV, SG, *and* Section 232 duties.  Each of these four

types of duties requires *some* finding of adverse effects of imports by the Executive Branch

before they may be imposed.  This is another critical distinction between: OCDs on the one hand,

which need not remedy any harm caused by imports; and AD, CV, SG, *and* Section 232 duties

on the other hand, which must remedy some harm caused by imports, and as such, are "trade

remedies."

The United States evinces yet another critical distinction between OCDs on the one hand,

and AD, CV, SG, *and* Section 232 duties on the other hand, when it points out "current tariff

rates were negotiated between countries, and thus based on more than raising general revenue

concerns."  U.S. Brief at 23.  This point actually supports NSC.  That is, this point shows that

OCDs may be negotiated between countries.  By contrast, AD, CV, SG, *and* Section 232 duties

are not negotiated between countries; rather, they are each imposed unilaterally by a country

following a finding of some harm of imports to be remedied by an investigating authority of that

country.

For all of these reasons, an analysis of the purpose/function of the various forms of duties at issue, in conjunction with everything else discussed above, reveals that AD, CV, SG, *and* Section 232 duties are far more similar to one another than they are to OCDs, and more importantly, each are vastly distinct from OCDs. In these circumstances, there is no reasonable basis to conclude that the Section 232 steel duties are "United States import duties" like OCDs, rather than special remedial duties like AD, CV, and SG duties.[6]

2.   The Section 232 Steel Duties Are Temporary

On whether the Section 232 steel duties are temporary, NSC explained this Court in *Borusan* already concluded that they are, because no Congressional action is needed to end them. *See* NSC Brief at 23-24, *citing Borusan*, 494 F. Supp. 3d at 1374-75. Defendants merely repeat the point that Section 232 duties should not be considered temporary because they do not have a statutory termination provision, *see* U.S. Brief at 19-20; Nucor Brief at 23-24, but the Court in *Borusan* already rejected the notion that this feature makes Section 232 duties permanent like OCDs. Further undermining Defendants' position is the fact that, as noted above, Commerce itself previously indicated that duties recorded in Chapter 99 of the HTSUS (as the Section 232 steel duties are) are "special or temporary duties." *Stainless Steel Wire Rod from Korea*, 69 FR at 19160.

3.   Deducting the Section 232 Steel Duties from U.S. Price Results in Double
      Remedy

Finally, NSC explained that deducting the Section 232 steel duties from NSC's U.S. prices imposes an impermissible double remedy because there *is* an interplay between Section 232 and AD duties under the statute and Commerce's regulations, and in this particular instance,

---

[6]   Nucor's point that Section 232 duties "would not have been paid" if they "had never been imposed," Nucor Brief at 22-23, is irrelevant, because the same could be said for SG duties, which are not "United States import duties."

11

the President and Commerce established the Section 232 steel duties precisely based on that

interplay.  *See* NSC's Brief at 24-29.  Thus, the Section 232 steel duties and AD duties *are*

complementary here.  Defendants do not dispute any of this, but rather make arguments that miss

the mark or are repetitive.

First, Defendants assert that if the Section 232 steel duties were not deducted from NSC's

U.S. prices, NSC's constructed export prices would be "inflated" and not "at a common point" or

"same … basis" as NSC's home market prices/normal value, and therefore result in an improper

comparison and circumvention of the Section 232 duties.  *See* U.S. Brief at 11-12, 22; Nucor

Brief at 26-27.

However, in making these points, Defendants simply assume, without any basis, the

conclusion that they must prove.  That is, NSC established with citation to record evidence that

the President and Commerce viewed the Section 232 steel duties precisely as an alternative

means to remedy injury to the domestic steel industry (*i.e.*, an alternative to AD/CV duties), and

took that into account in setting the level of Section 232 steel duties to be applied.  *See* NSC

Brief at 19-22, 26-27.  Of note, the *Section 232 Report* indicates that among the reasons

Commerce recommended that the President take action under Section 232 with respect to steel

imports were because: although "{AD/CV} duty actions can address specific instances of

unfairly traded steel products …, it could take years to identify and investigate every instance of

unfairly traded steel"; and the "U.S. industry has already spent hundreds of millions of dollars in

recent years on AD/CV{} cases, {but} {s}maller steel manufacturers are financially unable to

afford these type{s} of cases, or are hesitant to file cases."  *Section 232 Report*, 85 FR at 40211.

The President then took action to impose a 25 percent ad valorem tariff on steel imports

explicitly "in light of the many factors I have considered, including the Secretary's {Section 232

12

Report},” which he noted “considered the previous U.S. Government measures and actions on steel articles imports and excess capacity.” *Proclamation 9705*, 83 FR at 11625-26.  As made clear above, those previous U.S. Government measures on imported steel articles of course include the existing AD duty order on HR Steel from Japan.  The President also made clear his 25 percent ad valorem tariff on steel imports was for the explicit purpose of protecting domestic steel producers from “the increased level of global excess capacity” and the “increased level of imports,” and to “enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production,” *id.* at 11625, all of which are analogous to the remedial aims of AD/CV duties.

Thus, these facts illustrate that the Section 232 steel duties are remedying precisely the same kind of injury as AD/CV duties.  That is, the President used the Section 232 steel duties to accomplish on a sweeping across-the-board basis the same result that AD/CV duties would accomplish on a targeted basis, but the President used Section 232 because that was the faster and simpler approach in this case to achieving the same ends.  The foregoing makes clear that the President intended to ensure that imported steel articles not already subject to AD/CV duties were subjected to Section 232 tariffs at a level that remedied the adverse effects the President found the U.S. industry to be suffering; it does not indicate the President intended steel products that were already subject to AD duties at the time the President imposed the Section 232 steel duties, as is the case for HR Steel from Japan, to be subjected to duties that have the same remedial effect a second time.

On this basis, NSC established with citation to specific record evidence that *in this particular case*, in light of the already existing AD duty order on HR Steel from Japan, the

*Section 232 Report*, and *Proclamation 9705*, deduction of the Section 232 steel duties from NSC's U.S. prices would result in an impermissible double remedy, just as the deduction of SG duties did in *Wheatland Tube*.[7]  *See* NSC Brief at 26-28.  The burden is then on Defendants to rebut this argument, but they have not done so.  Rather, they have simply assumed the opposite conclusion that deduction of the Section 232 steel duties from NSC's U.S. prices would improperly inflate NSC's constructed export price and result in circumvention of the Section 232 steel duties.  Assuming the desired conclusion is not a rebuttal, and neither are the remaining points made by Defendants as discussed below.

In this regard, <u>second</u>, Defendants repeat the point that the President indicated the Section 232 steel duties are to apply "in addition to" or "on top of" AD duties, and suggest this statement by the President indicates a lack of interplay and overlap between the two.  U.S. Brief at 21; Nucor Brief at 26-28.  However, as NSC explained above and previously, *see* NSC Brief at 28, this statement by the President does no such thing, because it merely indicates that an accurate and non-punitive amount of AD duties would continue to apply in addition to the Section 232 steel duties.  Especially in the context of the facts at hand where the President and Commerce viewed the Section 232 steel duties as an alternative means to remedy injury to the domestic steel industry, *see id.* at 19-22, this statement by the President cannot be read to direct the U.S. Government to remedy again through AD duties injury to the domestic industry that is already

---

[7]     The "creat{ion of} an artificial dumping margin" for NSC, which the CAFC exhorted against in *Wheatland Tube*, 495 F.3d at 1365, should also be apparent from NSC's 11.70% dumping margin in AR3 (the highest to date), following NSC's 0% dumping margin in the second administrative review, where Commerce did not deduct the Section 232 steel duties paid for part of that period of review ("POR") in calculating NSC's dumping margin.  *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 57821 (Sep. 16, 2020).

remedied through the Section 232 steel duties.  Importantly, the President does *not* state that dumping margin calculations should be modified in a way that increases the dumping margin by the amount of the Section 232 duties.

Third, as under the first question above, Defendants repeat that the statute does not "intend{}," "predicate," or "require{}" that the President make an injury finding or take into account overlap between Section 232 and AD duties.  *See* U.S. Brief at 20-21; Nucor Brief at 25-27.  However, Defendants again ignore *the particular factual basis for the Section 232 steel duties at issue in this case*, which show the President and Commerce *did* view *these particular Section 232 steel duties* as an alternative means to remedy injury to the domestic steel industry and *did* take that into account in setting the level of Section 232 steel duties.  *See* NSC Brief at 19-22, 26-27.  Thus, even if Defendants' point may weigh against a *de jure* finding that Section 232 duties generally are not "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A), it does nothing to rebut such a *de facto* finding regarding *the particular Section 232 steel duties at issue in this case*.

Finally, the United States argues that if NSC prevails, "Commerce would be prevented from deducting any United States import duty from constructed export price, contrary to the clear requirements of section 1677a(c)(2)(A)."  U.S. Brief at 22.  This is plainly an exaggeration and incorrect, because there is no dispute that OCDs remain deductible "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).  Moreover, if the Court issues a narrow *de facto* ruling, Commerce would be prevented from deducting only the Section 232 steel duties at issue here.

Accordingly, the Court should find NSC's argument that deducting the Section 232 steel duties from NSC's U.S. prices results in an impermissible double remedy prevails.

* * *

For the foregoing reasons, Commerce's interpretation that the Section 232 steel duties are "United States import duties" to be deducted from NSC's U.S. prices when calculating NSC's dumping margin does not deserve deference by this Court under *Chevron* step two.

### C.     Treating the Section 232 Steel Duties as OCDs Violates U.S. WTO Obligations

NSC submits the foregoing is sufficient for the Court to conclude that Commerce's interpretation that the Section 232 steel duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) is unreasonable and does not deserve *Chevron* step two deference, so the Court need not reach the *Charming Betsy* issue at all.  However, if the Court does not find for NSC based on the foregoing, it should do so based on the *Charming Betsy* canon that provides a reading of a statute inconsistent with U.S. international obligations is implausible and does not deserve *Chevron* deference.  *See* NSC Brief at 30-33.

NSC demonstrated that Commerce's interpretation that the Section 232 steel duties are "United States import duties" causes the United States to exceed its bound rate of 0 percent for the steel articles at issue, and thereby results in a breach of U.S. obligations under Articles II:1(a) and (b) of the GATT 1994.  *Id.*  The United States, while conceding the *Charming Betsy* doctrine may apply, argues Commerce's interpretation does not result in a violation of U.S. GATT 1994 obligations because of the national security exception in Article XXI(b)(iii).  *See* U.S. Brief at 23-24.

However, the United States' mere assertion that the national security exception in Article XXI(b)(iii) applies here does not make it so.  Other than simply quoting Article XXI(b)(iii), the United States makes no effort to establish its elements are satisfied, so the United States has not

rebutted NSC's argument that a violation of Articles II:1(a) and (b) of the GATT 1994 results from Commerce's interpretation of the Section 232 steel duties as "United States import duties."

Moreover, the elements of Article XXI(b)(iii) are not satisfied here. As the United States recognizes, *see id.* at 23, Article XXI(b)(iii) provides:

> Nothing in this Agreement shall be construed
>
> …
>
> b) to prevent any Member from taking any action which it considers necessary for the protection of its essential security interests
>
> …
>
> (iii) taken in time of war or other emergency in international relations ….

The United States certainly was not at war when the President imposed the Section 232 steel duties, nor has the United States identified what "other emergency in international relations" existed that may have justified the Section 232 steel duties under Article XXI(b)(iii). The WTO panel in *Russia – Traffic in Transit* explained that "political or economic differences between Members are not sufficient, of themselves, to constitute an emergency in international relations for purposes of subparagraph (iii)"; rather, an "emergency in international relations" "refer{s} generally to a situation of armed conflict, or of latent armed conflict, or of heightened tension or crisis, or of general instability engulfing or surrounding a state." *See* Panel Report, *Russia – Measures Concerning Traffic in Transit*, WTO Doc. WT/DS512/R and Add.1 (adopted 26 April 2019) ("*Russia – Traffic in Transit*") at paras. 7.75-7.76. Nothing of that sort existed at the time the President imposed the Section 232 steel duties that may have justified them under Article XXI(b)(iii).

Moreover, the condition in the *chapeau* that the Member's action must be "necessary for the protection of its essential security interests" is also not satisfied with respect to the Section 232 steel duties.  Again, the WTO panel in *Russia – Traffic in Transit* explained that an obligation of "good faith" applies for purpose of a Member identifying an "essential security interest," and in this regard:

> The obligation of good faith requires that Members not use the exceptions in Article XXI as a means to circumvent their obligations under the GATT 1994.  A glaring example of this would be where a Member sought to release itself from the structure of "reciprocal and mutually advantageous arrangements" that constitutes the multilateral trading system simply by re-labelling trade interests that it had agreed to protect and promote within the system, as "essential security interests", falling outside the reach of that system.

*Id.* at 7.133 (citation omitted).  However, the United States justifying OCDs on imported steel articles in excess of its bound rates under the guise of an "essential security interest" would amount precisely to such circumvention prohibited by the *chapeau* of Article XXI(b)(iii).

For these reasons, the United States' argument based on the national security exception in Article XXI(b)(iii) of the GATT 1994 is inapposite.

Nucor's various arguments asserting NSC has not made proper claims, *see* Nucor Brief at 10, 29-30, are also inapposite because NSC is not attempting to litigate a claim in this case that Commerce violated Articles II:1(a) and (b) of the GATT 1994, nor for that matter any other provision of an international agreement.  Rather, NSC is arguing that Commerce's interpretation of an ambiguous statute in a manner that conflicts with the GATT 1994 does not deserve *Chevron* step two deference when an alternative interpretation wholly consistent with the GATT 1994 exists, and as noted above, the United States concedes the *Charming Betsy* doctrine may apply in this fashion.

18

In sum, because Commerce's interpretation that the Section 232 steel duties are "United States import duties" to be deducted from NSC's U.S. prices when calculating NSC's dumping margin results in a violation of U.S. obligations under Articles II:1(a) and (b) of the GATT 1994, that is another reason Commerce's interpretation is not a plausible interpretation of the statute.

## II.    Adverse Facts Available ("AFA") for Unreported Downstream Sales

NSC previously explained that Commerce's application of AFA to certain unreported downstream sales,[8] comprising less than 1% of NSC's home market sales, *see* NSC's Supp_QR at Revised Exhibit SB-1 (APPX81705), is not supported by substantial evidence and not in accordance with law.  *See* NSC Brief at 33-41.  As discussed below, Defendants' arguments in response are meritless because they: (1) ignore the statute; (2) attempt to *post hoc* rationalize; (3) ignore that AR3 is a distinct segment; and (4) ignore the record evidence.

First, the United States focuses much of its argument on the unremarkable point that Commerce is "entitled to" (and did) request information on NSC's downstream sales, and NSC failed to provide some of that information.  *See* U.S. Brief at 25-31.  While this may demonstrate "necessary information is not available on the record" under 19 U.S.C. § 1677e(a), it ignores the *separate and distinct* requirement in 19 U.S.C. § 1677e(b) that Commerce determine NSC "failed to cooperate by not acting to the best of its ability," before the statute permits Commerce to apply AFA.  As NSC explained, this latter provision requires Commerce, before applying AFA, to both: (i) objectively explain why the respondent could reasonably be expected to obtain and provide the requested information; and (ii) subjectively show the respondent's failure to provide the requested information was the result of lack of maximum efforts.  *See* NSC Brief at 34-35.

---

[8]    NSC's particular affiliated home market reseller at issue is addressed in the NSC Brief at 33 n.3.

Second, Defendants ignore that the requisite objective and subjective showings must have been made *by Commerce in AR3*, and not *post hoc* to this Court.  *See, e.g.*, *Seah Steel Vina Corp. v. United States*, 182 F. Supp. 3d 1316, 1337 n.12 (Ct. Int'l Trade 2016) (declining to consider an argument that Commerce never discussed in the administrative proceeding).  In this regard, Defendants argue NSC could have made providing downstream sales information "part of its contractual agreement" or "a condition of doing business" with downstream affiliates.  U.S. Brief at 29; Nucor Brief at 34.  However, Commerce made no such point in its AR3 *Final Results* (APPX2483-2485) or IDM (APPX2461-2482).  Commerce's reference to NSC's "choice of selling to affiliates {that} would cooperate and those that will not," IDM at 13 (APPX2473), does not mention possible contractual provisions or conditions of doing business, so this point cannot now serve as justification for applying AFA to NSC in AR3.

Even if that were not the case, the AR3 record (which Defendants completely ignore as discussed further below) shows that, for an entity like NSC with a superior bargaining position, such contractual provisions or conditions, or even just choosing not to sell when it otherwise makes commercial sense, would be inconsistent with Japanese law and therefore not an option. Of note, the Japanese law firm memorandum provided by NSC indicates that, when a transaction would be otherwise "commercially justifiable," as is the case with NSC's transactions with its affiliated home market reseller at issue here, if NSC refused to trade "on the grounds that {the reseller} does not provide the downstream sales data," which could be for any reason including refusal to accept a contractual provision or condition like the one suggested by Defendants *post hoc*, it would be considered an "abuse of dominant bargaining position" and therefore "illegal under the Antimonopoly Act."  NSC's B_QR at Exhibit B-23, pp. 4-6 (APPX80637-80639). Thus, NSC *did* provide support for its position that it had no other options under Japanese law to

compel the reseller at issue.  However, contrary to Defendants' wishes, *see, e.g.*, U.S. Brief at 29, Commerce never grappled with any of that evidence—as it was required to, *see, e.g.*, *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1276 (Ct. Int'l Trade 2018) ("the Department is required by the 'substantial evidence' analysis to consider all of the evidence in the record")— but merely concluded out of thin air that NSC had not supported its argument.

Third, Defendants ignore that AR3 is a *distinct segment* with its own administrative record, and AFA for NSC in AR3 cannot be justified based on what happened in prior segments. *See Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2021) ("to the extent Commerce argues that its use of adverse facts available in a prior segment (the investigation) … justified its use of adverse facts available in this review, the court is unpersuaded").  Yet, Defendants repeatedly attempt to justify AFA for NSC in AR3 based on the application of AFA to NSC and its predecessor in prior segments.  *See* U.S. Brief at 26-30 (*e.g.*, "Nippon Steel has repeatedly failed to provide that data"); Nucor Brief at 32-37 (*e.g.*, referencing "NSC's affiliates' history of noncompliance").  Defendants' discussion of prior segments should not color the Court's view on whether AFA is justified for NSC in AR3, which must be based solely on the AR3 record.

Moreover, Defendants' characterization of NSC as a repeat offender mischaracterizes the situation.  As an initial matter, the boundaries of NSC's obligations vis-à-vis its affiliated home market resellers in order to avoid AFA were not known until this Court's final judgment in NSC's first administrative review ("AR1") appeal on November 10, 2020, well after the AR3 POR.  Furthermore, as NSC has stressed, the AR3 record (again ignored by Defendants as discussed further below) shows that NSC made significant additional efforts to provide the Department with its requested information beyond what the Department and Court found to be

21

insufficient in AR1.  *See* NSC Brief at 35-38.  Those efforts also indicate NSC did not merely

"acquiesce" or "accept {the reseller's} poor excuses," Nucor Brief at 36-37, but persisted in its

attempts to obtain the information and received responses indicating the reseller would

cooperate, which would have made the drastic action of ceasing sales or threatening to do so

unreasonable.  All of these facts make Defendants' historical arguments inapposite in this case.

Finally, Defendants ignore the AR3 record evidence, including of: (i) NSC's significant

efforts and the reseller's indications of cooperation; (ii) Japanese competition law; and

(iii) NSC's limited ownership of the reseller at issue.  *See* NSC's Brief at 35-38.  Defendants do

not address any of this evidence in their briefs.  Nucor acknowledges "the {AR1} record did not

substantiate NSC's purported efforts" to obtain the requested information from its affiliates,

Nucor Brief at 35, but does not demonstrate how the *AR3* record does not substantiate that NSC

exerted its maximum efforts.

Rather than cite to evidence on the AR3 record to support the application of AFA,

Defendants just offer policy rationales.  For example, the United States argues, quoting

Commerce, that if NSC is not required to provide the requested downstream sales information,

then respondents like NSC could "manipulate the dumping calculations."  *See* U.S. Brief at 27-

28, *quoting* IDM at 13 (APPX2473); *see also* Nucor Brief at 33, 37 (noting NSC's argument

"absolve{s} respondents of any responsibility" and "undermine{s} the purpose of the AFA

statute").  Nobody disputes the reasons why Commerce requests affiliated home market

resellers' downstream sales data, but such policy rationales do not serve as record evidence that

satisfies the statutory requirements for applying AFA, and should therefore be disregarded.

Moreover, Defendants' policy concerns are unfounded and contrary to law.  If NSC

succeeds, respondents that have not provided their affiliates' data and not exerted their maximum

efforts would still face the application of AFA.  Conversely, if Defendants succeed, there would be no circumstance in which AFA would not be applied to a respondent that simply was unable to provide requested information, inappropriately nullifying the "best of its ability" requirement under 19 U.S.C. § 1677e(b) and conflating it with 19 U.S.C. § 1677e(a).

For these reasons, the Court should remand this case to Commerce with instructions to apply facts otherwise available without an adverse inference to the unreported downstream sales by the affiliated reseller at issue.

## III.   U.S. Revenue for Extra Services

NSC welcomes Commerce's request for remand to include the omitted service-related revenues in the calculation of the net U.S. price, *see* U.S. Brief at 31-32, *citing* NSC Brief at 41-46, and asks the Court grant Commerce's request.

Nucor's suggestion that NSC is not entitled to this adjustment is unavailing.  *See* Nucor Brief at 37-38.  NSC already explained its entitlement.  *See* NSC Brief at 41-46.  Moreover, Commerce accepted NSC's entitlement in its AR3 IDM at Comment 4 (APPX2480-2481), now before this Court, and in the recent fourth administrative review.  *See Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 31521 (May 24, 2022), and accompanying Issues and Decision Memorandum at Comment 2.

## CONCLUSION

Thus, NSC requests that the Court grant its Motion for Judgment on the Agency Record and remand with instructions to recalculate NSC's dumping margin.

Respectfully submitted,

Richard L.A. Weiner
Rajib Pal
Shawn M. Higgins
Justin R. Becker
Alex L. Young

Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel for Nippon Steel Corporation

Dated: June 13, 2022

## CERTIFICATE OF COMPLIANCE

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 6,995 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Richard L.A. Weiner
Richard L.A. Weiner

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached document are being served by CM/ECF, on June 13, 2022, addressed to the following parties:

**On Behalf of the United States:**
Kelly Ann Krystyniak
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

**On behalf of Nucor Corporation:**
Alan H. Price
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

**On Behalf of the United States:**
David W. Richardson
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3614
Washington, DC 20230

**On behalf of  Steel Dynamics, Inc. and
SSAB Enterprises, LLC:**
Roger Brian Schagrin
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001

/s/ Richard L.A. Weiner
Richard L.A. Weiner