

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA  •  ASIA PACIFIC  •  EUROPE

+1 202 736 8020
SHAWN.HIGGINS@SIDLEY.COM

September 18, 2023

**PUBLIC DOCUMENT**

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

> Re:   Nippon Steel Corporation v. United States, Court Nos. 21-00533, 22-00183, and
> 23-00112

Dear Mr. Toscano:

On behalf of Nippon Steel Corporation ("NSC"), plaintiff in the above-captioned proceedings, we hereby file NSC's supplemental opening brief as requested by the Court in its Orders in each proceeding dated July 18, 2023.  As per the Court's Orders, we are filing this supplemental opening brief in Court No. 21-00533, but with the understanding that it also applies in Court Nos. 22-00183 and 23-00112.

In addition, because we did not previously file Motions for Judgment on the Agency Record in Court Nos. 22-00183 and 23-00112, as requested by the Court in its e-mail correspondence dated August 21, 2023, we include such Motions herewith (and we maintain our Motion for Judgment on the Agency Record in Court No. 21-00533 as filed on February 24, 2022).  Also as requested by the Court, we include herewith a single proposed Order for the complete disposition of Court Nos. 21-00533, 22-00183, and 23-00112.

Copies of the attached documents have been served on the parties listed in the attached certificate of service.

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Justin R. Becker
Lindsey A. Ricchi

Counsel to Nippon Steel Corporation

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| JFE SHOJI CORPORATION AND JFE SHOJI AMERICA, LLC | |
| Plaintiff-Intervenors, | Court No. 22-00183 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

## MOTION FOR JUDGMENT
## ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Nippon Steel Corporation, hereby submits this Motion for Judgment on the Agency Record with regard to the one Count set forth in its Complaint filed on July 22, 2022.   This action challenges the final results issued by the U.S. Department of Commerce in the fourth administrative review of Certain Hot-Rolled Steel Flat Products from Japan, Case No. A-588-874.   *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2019-2020*, 87 FR 31523 (May 24, 2022).   Pursuant to its order dated July 18, 2023, and subsequent correspondence, the Court directed that dispositive motions be filed with the attached Supplemental Opening Brief on today's date.

For the reasons set forth in the accompanying Supplemental Opening Brief, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Justin R. Becker
Lindsey A. Ricchi


Counsel to Nippon Steel Corporation

September 18, 2023

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| v. | Court No. 23-00112 |
| UNITED STATES, | |
| Defendant, | |
| NUCOR CORPORATION | |
| Defendant-Intervenor. | |

**MOTION FOR JUDGMENT**
**ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Nippon Steel Corporation, hereby submits this Motion for Judgment on the Agency Record with regard to the one Count set forth in its Complaint filed on June 30, 2023.   This action challenges the final results issued by the U.S. Department of Commerce in the fifth administrative review of Certain Hot-Rolled Steel Flat Products from Japan, Case No. A-588-874.   *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review: 2020-2021*, 88 FR 28500 (May 4, 2023).   Pursuant to its order dated July 18, 2023, and subsequent correspondence, the Court directed that dispositive motions be filed with the attached Supplemental Opening Brief on today's date.

For the reasons set forth in the accompanying Supplemental Opening Brief, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Justin R. Becker
Lindsey A. Ricchi

Counsel to Nippon Steel Corporation

September 18, 2023

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

NIPPON STEEL CORPORATION,

        Plaintiff,

  v.

UNITED STATES,

        Defendant,

NUCOR CORPORATION, STEEL
DYNAMICS, INC. AND SSAB
ENTERPRISES, LLC,

        Defendant-Intervenors.

Court No. 21-00533

**PUBLIC DOCUMENT**

NIPPON STEEL CORPORATION,

        Plaintiff,

JFE SHOJI CORPORATION AND JFE
SHOJI AMERICA, LLC

        Plaintiff-Intervenors,

  v.

UNITED STATES,

        Defendant,

NUCOR CORPORATION,

        Defendant-Intervenor.

Court No. 22-00183

NIPPON STEEL CORPORATION,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

NUCOR CORPORATION

           Defendant-Intervenor.

Court No. 23-00112

**PLAINTIFF'S SUPPLEMENTAL OPENING BRIEF**

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Nippon Steel Corporation

September 18, 2023

## TABLE OF CONTENTS

**Page No.**

**RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT** ........................................... 4

I.   Administrative Determinations of Which Review Is Sought ................................... 4

II.  Issues Presented and Summary of the Argument ...................................... 5

**STATEMENT OF FACTS** ........................................................................... 6

**STANDARD OF REVIEW** ......................................................................... 10

**ARGUMENT** ...................................................................................... 11

I.   Notwithstanding *Borusan*, the Department's Deduction of the Section 232 Duties from NSC's U.S. Prices Was Contrary to Law and Unsupported by Substantial Evidence. ................ 11

  A.   The Department Failed to Make Adequate Findings that NSC Included the Section 232 Duties in Its U.S. Prices—Nor Could the Record Support Such Findings. ............................. 11

    1.   The Department Failed to Make Any Findings in AR3, AR4, and AR5 that the Section 232 Duties NSC Paid Were Included in the Price Charged to NSC's First Unaffiliated Customer. .................................................................................... 12

    2.   The AR3, AR4 and AR5 Records Do Not Contain Any Facts that Would Support a Finding that NSC Included the Section 232 Duties Paid in the Price Charged to NSC's First Unaffiliated Customer. .................................................................. 14

  B.   The Department Also Erred by Deducting the Section 232 Duties Where Doing so Would Violate the United States' Treaty Obligations. ...................................................... 20

II.  *Borusan* Was Wrongly Decided. ............................................................ 25

  A.   *Borusan* Conflicts with Federal Circuit Precedent and Violates Basic Principles of Statutory Interpretation and Administrative Law. ....................................................... 26

  B.   *Borusan* Misinterpreted *Proclamation 9705*. ....................................... 29

  C.   The *Borusan* Court Was Not Presented with, and Therefore Did Not Consider, Additional Arguments Establishing that the Section 232 Duties at Issue Here Should Not Be Treated Like "United States Import Duties." ............................................................... 35

**CONCLUSION** .................................................................................. 36

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339 (Fed. Cir. 2004) ................................21

*Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345 (Fed. Cir. 2018) .....................................21

*Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp.
    1114 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir. 1990) .......................................20

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 494 F. Supp.
    3d 1365 (Ct. Int'l Trade 2021) .............................................................................................12

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25
    (Fed. Cir. 2023) .................................................................................................. *passim*

*Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016) ...............................................................28

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...........................................................28

*Federal Mogul Corp. v. United States*, 63 F.3d 1572 (Fed. Cir. 1995) .......................................22

*Houston Indus. Inc. v. United States*, 78 F.3d 564 (Fed. Cir. 1996) .............................................21

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .............................20

*Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) .......................................25

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ........................................34

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir.
    2001) .....................................................................................................................................34

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ......................................................................28

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) ....................21, 26, 27, 28

**Statutes**

19 U.S.C. § 1677a(c)(2)(A) ................................................................................................. *passim*

Trade Expansion Act of 1962, P.L. 87-794 § 232, 76 Stat. 872, 877 (1962) ....................... *passim*

**Rules**

Fed. R. App. P. 35(a) .....................................................................................................................25

**Administrative Materials**

*Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing Duties*, 68 FR 53104 (Sept. 9, 2003) ........................................................................28

*Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review: 2020–2021*, 88 FR 28500 (May 4, 2023) ........................................................................................................4, 10

*Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2019–2020*, 87 FR 31523 (May 24, 2022) .........................................4, 8

*Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Results of Antidumping Duty Administrative Review: 2020-2021*, 87 FR 66130 (Nov. 2, 2022) .........................................................................................................9

*Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 64901 (Nov. 19, 2021) .......................................7

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 78990 (Dec. 8, 2020)..........................................................................6

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 676 (Nov. 29, 2021) ....................................................................8

*Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United States*, 83 FR at 11627 (Mar. 15, 2018)............................................. *passim*

*Report on the Effects of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 FR 40202 (Jul. 6, 2020) ...............................................30, 31

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (Apr. 12, 2004) ............................34

**Other Authorities**

General Agreement on Tariffs and Trade 1994, Articles II:1(a) and (b)................................22, 23

Panel Report, *Russia – Measures Concerning Traffic in Transit*, WTO Doc. WT/DS512/R and Add.1 (adopted Apr. 26, 2019) .................................24

Panel Report, *United States — Certain Measures on Steel and Aluminium Products (Turkey)*, WTO Doc. WT/DS564/R (circulated Dec. 9, 2022) ...............................24

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION, | Court No. 21-00533 |
| Plaintiff, | **PUBLIC DOCUMENT** |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC, | |
| Defendant-Intervenors. | |
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| JFE SHOJI CORPORATION AND JFE SHOJI AMERICA, LLC | |
| Plaintiff-Intervenors, | Court No. 22-00183 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| NUCOR CORPORATION, | |
| Defendant-Intervenor. | |

1

NIPPON STEEL CORPORATION,

          Plaintiff,

      v.

UNITED STATES,

          Defendant,

NUCOR CORPORATION

          Defendant-Intervenor.

Court No. 23-00112

**PLAINTIFF'S SUPPLEMENTAL OPENING BRIEF**

Plaintiff Nippon Steel Corporation ("NSC") submits this Supplemental Opening Brief regarding the single Count common to its Complaints in Court Nos. 21-00533, 22-00183, and 23-00112, in which NSC seeks review of the final results by the U.S. Department of Commerce ("Department") in the third administrative review ("AR3"), fourth administrative review ("AR4"), and fifth administrative review ("AR5"), respectively, of the antidumping ("AD") duty order covering Certain Hot-Rolled Steel Flat Products from Japan ("HR Steel from Japan").[1]  That single common Count pertains to the Department's improper deduction of duties imposed under Section 232 of the Trade Expansion Act of 1962, P.L. 87-794, § 232, 76 Stat. 872, 877 (1962), as amended ("Section 232"), on imports of steel articles (*i.e.*, "the Section 232 duties") from NSC's U.S. prices in the Department's dumping margin calculations in each of the AR3, AR4, and AR5 final

---

[1]     Throughout this brief, NSC uses "AR3," "AR4," and "AR5" to refer to pertinent documents from Court Nos. 21-00533, 22-00183, and 23-00112, respectively.  For example, "AR3_ECF" and "AR3_APPX" refer, respectively, to the electronic case file and joint appendix in Court No. 21-00533.

results.  *See* NSC's AR3_Complaint at Count 1, AR3_ECF No. 9; NSC's AR4_Complaint at Count 1, AR4_ECF No. 9; NSC's AR5_Complaint at Count 1, AR5_ECF No. 9.[2]

NSC files this brief pursuant to the Court's Orders dated July 18, 2023, in each of the above-captioned cases, AR3_ECF No. 62, AR4_ECF No. 45, AR5_ECF No. 14, in which the Court requested NSC file a joint supplemental opening brief addressing the single common Count in these three cases by September 18, 2023, and do so on the record of Court No. 21-00533, but with the understanding that it also applies in Court Nos. 22-00183 and 23-00112.  In light of the Court's approach, NSC also hereby incorporates by reference all portions of NSC's AR3_Opening Brief, AR3_ECF No. 32, and NSC's AR3_Reply Brief, AR3_ECF No. 39, applicable to the common issue of the Department's improper deduction of the Section 232 duties,[3] and requests the Court to consider those submissions applicable in Court Nos. 22-00183 and 23-00112 as well.  For the reasons stated in NSC's AR3_Opening Brief, NSC's AR3_Reply Brief, and below, NSC respectfully requests that the Court reverse the Department's AR3, AR4, and AR5 final results, and remand with instructions to recalculate NSC's dumping margin in each segment.

---

[2]     In Court No. 21-00533, NSC requests the Court to resolve Count 2 on the basis of its previously filed briefs: NSC's AR3_Opening Brief at 33-41, AR3_ECF No. 32, and NSC's AR3_Reply Brief at 19-23, AR3_ECF No. 39.  In addition, Count 3 has been resolved pursuant to the Department's August 1, 2022, Remand Results, AR3_ECF No. 43.  Therefore, this brief does not further address Counts 2 and 3 of NSC's AR3_Complaint.

[3]     This includes the short citations in these submissions, modified with "AR3" as needed.

3

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

**I.** **Administrative Determinations of Which Review Is Sought**

In Court No. 21-00533, the administrative determination of which NSC seeks review is indicated in NSC's AR3_Opening Brief at 1-2, AR3_ECF No. 32, which NSC incorporates by reference.

In Court No. 22-00183, NSC seeks review of the final results of AR4 of the AD duty order on HR Steel from Japan, covering the period of review ("POR") of October 1, 2019, through September 30, 2020.  The Department published these final results in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2019–2020*, 87 FR 31523 (May 24, 2022) ("*AR4_Final Results*") (AR4_APPX003721-3723), in which it calculated the dumping margin for NSC and its affiliated companies Nippon Steel Nisshin Co., Ltd. ("Nisshin") and Nippon Steel Trading Corporation ("NSTC") (collectively, "NSC/Nisshin/NSTC") to be 24.07%.  The Department's associated analysis is contained in, *inter alia*: "Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Certain Hot-Rolled Steel Flat Products from Japan; 2019-2020," May 18, 2022 ("AR4_IDM") (AR4_APPX003704-3717); and Memorandum entitled "Final Results Margin Calculation for Nippon Steel Corporation," May 18, 2022 ("AR4_Final NSC Analysis") (AR4_APPX085264-85266).

In Court No. 23-00112, NSC seeks review of the final results of AR5 of the AD duty order on HR Steel from Japan, covering the POR of October 1, 2020, through September 30, 2021.  The Department published these final results in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review: 2020–2021*, 88 FR

28500 (May 4, 2023) ("*AR5_Final Results*") (AR5_APPX003305-3307), in which it calculated the dumping margin for NSC/Nisshin/NSTC to be 7.72%. The Department's associated analysis is contained in, *inter alia*: "Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Certain Hot-Rolled Steel Flat Products from Japan; 2020-2021," April 28, 2023 ("AR5_IDM") (AR5_APPX003277-3300); and Memorandum entitled "Final Results Margin Calculation for Nippon Steel Corporation," April 28, 2023 ("AR5_Final NSC Analysis") (AR5_APPX085944-85990).

## II.   Issues Presented and Summary of the Argument

This brief addresses one issue common to Court Nos. 21-00533, 22-00183, and 23-00112 regarding the Department's calculation of NSC/Nisshin/NSTC's dumping margin in AR3, AR4, and AR5 of the AD order on HR Steel from Japan. Namely, NSC contends that the Department unlawfully deducted the Section 232 duties from NSC's U.S. prices under 19 U.S.C. § 1677a(c)(2)(A), and that the Federal Circuit's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023) ("*Borusan*") does not dictate otherwise. That is so for two reasons: (i) *Borusan* does not control the outcome here due to two distinguishing factors; and (ii) *Borusan* was wrongly decided.

First, *Borusan* does not control the outcome here for two reasons:

1. *Borusan*—and § 1677a(c)(2)(A) itself—permits deduction of Section 232 duties as "United States import duties" only where the Department finds that those duties were "included in" the relevant prices. *See Borusan*, 63 F.4th at 31. In each determination under review, however, the Department made no record-supported finding to this effect.

2. Although *Borusan* generally sanctions the treatment of Section 232 duties authorized by *Proclamation 9705* as "United States import duties," *see id.* at 37, deducting those duties here would violate the United States' international treaty obligations, which is a unique context that *Borusan* did not address.

Second, even if *Borusan* were interpreted to sanction the Department's deduction of the Section 232 duties in the unique context of this case, the Federal Circuit wrongly decided it. *Borusan* squarely conflicts with prior Federal Circuit precedent and runs contrary to basic principles of statutory interpretation and administrative law. Accordingly, if this Court applies *Borusan* here, NSC reserves the right to challenge it before the *en banc* Federal Circuit.

## STATEMENT OF FACTS

With regard to AR3 and the history of the Section 232 duties, NSC incorporates by reference the Statement of Facts provided in NSC's AR3_Opening Brief at 4-8, AR3_ECF No. 32.

With regard to AR4, the Department initiated it in *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 78990 (Dec. 8, 2020). Because the AR4_POR is subsequent to March 23, 2018, *i.e.*, the date on which the Section 232 duties went into effect, imports of NSC's HR steel from Japan were subject to these duties throughout the AR4_POR. On June 29, 2021, the Department selected NSC as a mandatory respondent in AR4. *See* "Respondent Selection for the 2019-2020 Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan," June 29, 2021 (AR4_APPX080044-80052). The Department indicated it would treat NSC/Nisshin/NSTC as a single entity for purposes of AR4. *See id.* at note 1 (AR4_APPX080044).

6

From July 2021 through November 2021, Plaintiff supplied the Department with information in response to its questionnaires.  *See, e.g.*, Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section A Questionnaire," DOC No. A-588-874, July 28, 2021 ("NSC's AR4_A_QR") (AR4_APPX080053-81714); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section C Questionnaire," DOC No. A-588-874, August 19, 2021 ("NSC's AR4_C_QR") (AR4_APPX082421-82865); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section E Questionnaire," DOC No. A-588-874, August 26, 2021 ("NSC's AR4_E_QR") (AR4_APPX083181-83698); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Second Supplemental Questionnaire," DOC No. A-588-874, November 9, 2021 ("NSC's AR4_Supp_QR2") (AR4_APPX084419-85189).

The Department published its preliminary results in *Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 64901 (Nov. 19, 2021) ("*AR4_Preliminary Results*") (AR4_APPX003631-3634), in which it calculated a weighted-average dumping margin of 26.81% for products produced and/or exported by NSC/Nisshin/NSTC.  *See id.* and accompanying "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments: Certain Hot-Rolled Steel Flat Products from Japan; 2019-2020," October 29, 2021 ("AR4_PDM") (AR4_APPX003196-3215), and Memorandum entitled "Preliminary Results Margin Calculation for Nippon Steel Corporation," October 29, 2021 ("AR4_Prelim NSC Analysis") (AR4_APPX003196-3215).  On December 20, 2021, Plaintiff submitted its case

brief, in which Plaintiff argued the Department, *inter alia*, improperly deducted the Section 232 duties from NSC's U.S. prices.  *See* Case Brief of Nippon Steel Corporation, December 20, 2021 ("NSC's AR4_Case Brief") (AR4_APPX085190-85231).

On May 24, 2022, the Department published its *AR4_Final Results* reducing NSC/Nisshin/NSTC's weighted-average dumping margin to 24.07%.  *See AR4_Final Results*, 87 FR at 31524 (AR4_APPX003721-3723).  However, the Department continued to deduct the Section 232 duties from NSC's U.S. prices.  *See* AR4_IDM at Comment 1 (AR4_APPX003709-3714); AR4_Final NSC Analysis (AR4_APPX085264-85266).  Because the Department made changes to the preliminary results margin calculation for NSC, the Department issued new versions of its SAS program logs and outputs and Excel calculation worksheets.  *See* (AR4_APPX085267-85302).[4]  NSC timely commenced Court No. 22-00183 to challenge the Department's determination in AR4.

With regard to AR5, the Department initiated it in *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 676 (Nov. 29, 2021).  Because the AR5_POR is subsequent to March 23, 2018, *i.e.*, the date on which the Section 232 duties went into effect, imports of NSC's HR steel from Japan were subject to these duties throughout the AR5_POR.  On February 23, 2022, the Department selected NSC as a mandatory respondent in AR5.  *See* "Respondent Selection for the 2020-2021 Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan," February 23, 2022 (AR5_APPX080089-80095).  The Department indicated it would treat NSC/Nisshin/NSTC as a single entity for purposes of AR5.  *See id.* at note 1 (AR5_APPX080089).

---

[4]     NSC notes data files are not subject to compilation in PDF and therefore not included in the AR3, AR4 and AR5 joint appendices.

From March 2022 through October 2022, Plaintiff supplied the Department with information in response to its questionnaires.  *See, e.g.*, Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section A Questionnaire," DOC No. A-588-874, March 25, 2022 ("NSC's AR5_A_QR") (AR5_APPX080629-82162); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section C Questionnaire," DOC No. A-588-874, April 26, 2022 ("NSC's AR5_C_QR") (AR5_APPX083661-84181); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, "NSC's Response to the Department's Section E Questionnaire," DOC No. A-588-874, April 26, 2022 ("NSC's AR5_E_QR") (AR5_APPX084182-84545); Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, DOC No. A-588-874, "NSC's Response to the Department's Second Supplemental Questionnaire," October 14, 2022 ("NSC's AR5_Supp_QR2") (AR5_APPX085705-85773).

The Department published its preliminary results in *Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Results of Antidumping Duty Administrative Review: 2020-2021*, 87 FR 66130 (Nov. 2, 2022) ("*AR5_Preliminary Results*") (AR5_APPX003171-3173), in which it calculated a weighted-average dumping margin of 7.81% for products produced and/or exported by NSC/Nisshin/NSTC.  *See id.* at 66131 (AR5_APPX003172) and accompanying "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Certain Hot-Rolled Steel Flat Products from Japan; 2020-2021," October 27, 2022 ("AR5_PDM") (AR5_APPX003147-3152), and Memorandum entitled "Preliminary Results Margin Calculation for Nippon Steel Corporation," October 27, 2022 ("AR5_Prelim NSC Analysis") (AR5_APPX085774-85792).  On December 2, 2022, and December 9, 2022, Plaintiff submitted its case brief and rebuttal brief, respectively, in which Plaintiff argued the Department,

*inter alia*, improperly deducted the Section 232 duties from NSC's U.S. prices. *See* Case Brief of Nippon Steel Corporation, December 2, 2022 ("NSC's AR5_Case Brief") (AR5_APPX085840-85897); Rebuttal Brief of Nippon Steel Corporation, December 9, 2022 ("NSC's AR5_Rebuttal Brief") (AR5_APPX085898-85907).

On May 4, 2023, the Department published its *AR5_Final Results* reducing NSC/Nisshin/NSTC's weighted-average dumping margin to 7.72%. *See AR5_Final Results*, 88 FR at 28501 (AR5_APPX003306). However, the Department continued to deduct the Section 232 duties from NSC's U.S. prices. *See* AR5_IDM at Comment 1 (AR5_APPX003281-3286); AR5_Final NSC Analysis (AR5_APPX085944-85990). Because the Department made changes to the preliminary results margin calculation for NSC, the Department issued new versions of its SAS program logs and outputs and Excel calculation worksheets. *See id.* NSC timely commenced Court No. 23-00112 to challenge the Department's determination in AR5.

## STANDARD OF REVIEW

NSC incorporates by reference the Standard of Review provided in NSC's AR3_Opening Brief at 8-9, AR3_ECF No. 32, and asserts this same standard applies in Court Nos. 22-00183 and 23-00112.

**ARGUMENT**

I.    **Notwithstanding *Borusan*, the Department's Deduction of the Section 232 Duties from NSC's U.S. Prices Was Contrary to Law and Unsupported by Substantial Evidence.**

Although the Federal Circuit's holding in *Borusan* may be binding, that does not mean *Borusan* authorizes the Department's deduction of the Section 232 duties from NSC's U.S. prices.  To the contrary, the Department's deductions were unlawful in this case and *Borusan* does not suggest otherwise for two reasons.

First, as *Borusan* confirms, Section 232 duties may not be deducted from NSC's U.S. prices unless the Department finds that those duties were "included in such price{s}."  19 U.S.C. § 1677a(c)(2)(A).  Here, the Department failed to make any record-supported findings to that effect, so the challenged deductions were contrary to law and unsupported by substantial evidence.

Second, *Borusan* does not speak to situations where, as here, the deduction of Section 232 duties under § 1677a(c)(2)(A) would violate the United States' international treaty obligations.  Basic principles of statutory interpretation and international law prescribe that Section 232 duties should not be treated as deductible in this context.  The Department erred by deducting them anyway—without accounting for the resulting violations of international law.

A.    **The Department Failed to Make Adequate Findings that NSC Included the Section 232 Duties in Its U.S. Prices—Nor Could the Record Support Such Findings.**

By its plain text, § 1677a(c)(2)(A) makes clear that "United States import duties" are deductible only if those duties were "included in" the relevant prices.  Moreover, in *Borusan*, the Federal Circuit sanctioned the deduction of Section 232 duties under § 1677a(c)(2)(A) *only* because "{t}here {was} no properly preserved dispute … that the duty imposed by Proclamation

11

9705 was in fact *included in* Borusan's U.S. prices."  63 F.4th at 31 (emphasis added).

Consequently, "{t}he *only* issue" *Borusan* addressed was "whether it was permissible for

Commerce to treat" these duties as "United States import duties."  *Id.* (emphasis added).

However, *that* issue is secondary here because "the duty imposed by Proclamation 9705" was

not "in fact included in {NSC's} U.S. prices."  *Id.*  First, the Department made no adequate,

record-supported findings to this effect.  Second, the record underlying each determination at

issue provides no facts that could have supported such findings.  Consequently, the Department's

deduction of these duties was contrary to § 1677a(c)(2)(A) and unsupported by substantial

evidence.

     1.    The Department Failed to Make Any Findings in AR3, AR4, and AR5 that the Section 232 Duties NSC Paid Were Included in the Price Charged to NSC's First Unaffiliated Customer.

In each of AR3, AR4, and AR5, the Department made no actual findings that NSC

included the Section 232 duties paid in the price charged to its first unaffiliated U.S. customer.

By contrast, in *Borusan*, the Department prepared a *separate* memo discussing its determination

that Borusan had included Section 232 duties in the price charged to its customers, on which

both the Court of International Trade and the Federal Circuit relied.  *See Borusan*, 63 F.4th at 30;

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 494 F. Supp. 3d 1365, 1374

(Ct. Int'l Trade 2021).

To elaborate, <u>in AR3</u>, the Department's AR3_IDM merely asserted—without citation to

any evidence—that "NSC included section 232 duties in the price of subject merchandise sold to

unaffiliated customers in the United States" (AR3_APPX002468).  This assertion was *ipse dixit*;

it was not a factual finding supported by substantial evidence—or, indeed, by any evidence at

all—because the Department provided no citation for this statement.

Furthermore, even the Department's AR3_PDM did not include any finding that NSC included the Section 232 duties in the price charged to its first unaffiliated U.S. customer.  The Department's AR3_PDM simply wrote, "NSC reported paying 232 duties on certain U.S. sales." (AR3_APPX002449) (citing AR3_APPX081367-81384, NSC's AR3_C_QR at Exhibit C-23 and Attachments).  However, stating that NSC "reported paying" Section 232 duties, which were required, does not substantiate that NSC included those duties in the price charged to its first unaffiliated customer.  The Department made no other statements in its AR3_PDM—let alone findings supported by the record—indicating that NSC included the Section 232 duties paid in the price charged to its first unaffiliated customer.

Moreover, as indicated, to support its statement that "NSC reported paying 232 duties on certain U.S. sales," the Department cited only Exhibit C-23 and its Attachments to NSC's AR3_C_QR.  These records only explain that NSC's affiliated U.S. importer, Nippon Steel Trading Americas, Inc. ("NSTA"), paid the Section 232 duties and that NSC did not reimburse NSTA.  In addition, the provided reconciliation shows only the amount NSC (through NSTA) paid in Section 232 duties applicable to this administrative review.  Thus, nothing in this exhibit or its attachments provides any evidence that the Section 232 duties were included in the prices NSC charged its first unaffiliated customer (*i.e.*, the customer to which NSC's further downstream affiliate Steelscape LLC ("Steelscape") sold the merchandise in question).

Similarly, in AR4, the Department's AR4_IDM merely asserted, without citation, that "NSC included section 232 duties in the price of subject merchandise sold to unaffiliated customers in the United States."  (AR4_APPX003711).  Furthermore, the Department's AR4_PDM simply wrote, "NSC reported paying 232 duties on certain U.S. sales," citing records that only indicate NSC's affiliated importer NSTA paid the Section 232 duties

(AR4_APPX003209) (citing AR4_APPX083264-83280, NSC's AR4_C_QR at Exhibit C-23 and Attachments).

Finally, in AR5, the Department's AR5_IDM again merely asserted, without citation, that "NSC included section 232 duties in the price of subject merchandise sold to unaffiliated customers in the United States."  (AR5_APPX003283).  Furthermore, the Department's AR5_PDM again simply wrote, "NSC reported paying 232 duties on certain U.S. sales," citing records that only indicate NSC's affiliated importer NSTA paid the Section 232 duties (AR5_APPX003164) (citing AR5_APPX084156-84168, NSC's AR5_C_QR at Exhibit C-23 and Attachments).

Thus, the Department never actually found in AR3, AR4, and AR5, based on record evidence, that NSC included the Section 232 duties paid in the price charged to its first unaffiliated U.S. customer.  For this reason alone, the Department's decision to deduct the Section 232 duties from NSC's U.S. price pursuant to 19 U.S.C. § 1677a(c)(2)(A) in each administrative review was not supported by substantial evidence and not in accordance with law, and this Court should remand these reviews for the Department to explain how the records in these reviews substantiate such conclusions.

      2.    <u>The AR3, AR4 and AR5 Records Do Not Contain Any Facts that Would Support a Finding that NSC Included the Section 232 Duties Paid in the Price Charged to NSC's First Unaffiliated Customer.</u>

NSC submits, however, that the AR3, AR4 and AR5 records do not contain facts that could support a finding that NSC included the Section 232 duties in the price charged to its first unaffiliated customer.  Instead, these records underscore the incoherence of the Department assuming that the Section 232 duties paid were included in the first unaffiliated price. Specifically, the records in each review indicate: (1) the supply chain involves multiple parties;

(2) Steelscape does not fulfill customer orders based on the hot-rolled steel ("HRS") source and therefore does not price its products differently based on whether the input HRS incurred Section 232 duties; (3) Steelscape's invoices do not contain a line item for Section 232 duties; and (4) the U.S. sales database does not indicate that Section 232 duties were included in the price charged to the first unaffiliated customer.  Thus, even upon remand, the Department cannot justify conclusions that NSC included the Section 232 duties paid in the price charged to its first unaffiliated U.S. customer based on the AR3, AR4, and AR5 records.

First, the Department's assumption that the Section 232 duties were paid by the unaffiliated customer is undermined by the multi-party chain of sale.  As explained in NSC's AR3_C_QR, for the sales at issue, "NSC sold HR steel to NSTC (formerly NSSBC), which resold the product to {NSTA} (formerly Nippon Steel & Sumikin Bussan Americas, Inc. ('NSSBA')), a company affiliated with NSTC who in turn sold the steel to Steelscape." (AR3_APPX080896).  NSTA is the importer that paid the Section 232 duties; and Steelscape is the affiliated entity that ultimately sold NSC's steel to the first unaffiliated U.S. customer.  *See* (AR3_APPX081368 – NSC's AR3_C_QR at Exhibit C-23).  NSC's AR4_C_QR (AR4_APPX082429-82430) and NSC's AR5_C_QR (AR5_APPX083669) indicate the same chain of sale during those PORs.  The Department failed to consider this chain of sale and whether the price paid by the unaffiliated U.S. customer included the Section 232 duties paid by NSTA, or whether NSTA or Steelscape absorbed those duties.  The remaining evidence, discussed below, indicates the latter to have been the case.

Second, Steelscape fills and prices its customer orders agnostically as to the source of the input HRS, which makes it implausible that Steelscape included the Section 232 duties paid in the price charged to the first unaffiliated customer.  As explained in NSC's AR3_C_QR,

Steelscape purchases HRS from NSC *and* other affiliated and unaffiliated producers.  During the AR3_POR, these other producers included an affiliated Australian steel producer and, notably, an affiliated *U.S. domestic steel producer* that would not have incurred any Section 232 duties.  (AR3_APPX080896-80897).  Steelscape then uses the procured HRS to produce merchandise to be kept as stock (i.e., made-to-stock ("MTS")) or for a specific customer (i.e., made-to-order ("MTO")).

As explained in NSC's E_QRs, when fulfilling both MTS and MTO customer orders, Steelscape does so in a way that is agnostic to the producer of the HRS input.  Steelscape does not distinguish its product, and hence its pricing, based on the HRS source.  Rather, for MTS orders, Steelscape selects the specific product irrespective of the HRS origin, and for MTO orders, Steelscape selects HRS from inventory irrespective of the origin.  (AR3_APPX085762-85764); (AR4_APPX083204-83206); (AR5_APPX084205-84207).

Moreover, Steelscape does not always use the HRS obtained from any producer (including NSC) immediately.  Indeed, certain of Steelscape's sales during the AR3_POR were made using NSC HRS that entered the United States prior to the preliminary determination in the original investigation in this proceeding (*i.e.*, before suspension of liquidation and before Section 232 duties), and thus were not reported in NSC's U.S. sales database.  *See* NSC's AR3_Supp_QR and Exhibit SC-2 (AR3_APPX081421-81424; AR3_APPX081829-81840) (providing a Steelscape invoice with NSC HRS that had entered Steelscape's inventory prior to the suspension of liquidation).  As noted, Steelscape also purchases from other non-U.S. producers, whose HRS also may have entered prior to the imposition of the Section 232 duties and sat in Steelscape's stockpile for several years.

Similar facts exist for AR4 and AR5.  During the AR4_POR and AR5_POR, Steelscape again purchased input HRS from not only NSC, but also other affiliated and unaffiliated suppliers, both international and *domestic* (which would not have incurred Section 232 duties).  *See* (AR4_APPX082429-82430); (AR5_APPX083669).  Moreover, nothing in the AR4 or AR5 records suggest that Steelscape suddenly became more directed about selecting HRS from its stock to fill customer orders or price its customer orders differently based on the source of the input HRS.  *See* (AR3_APPX080896-80905, AR3_APPX085749-85764); (AR4_APPX082428-82438, AR4_APPX083191-83206); (AR5_ APPX083668-83679, AR5_APPX084192-84207).

It is therefore illogical, and inappropriate, to assume that Steelscape's base HRS price in the price charged to its unaffiliated customers in AR3, AR4, and AR5 must include the Section 232 duties paid.  As demonstrated, any given amount of stockpiled HRS that Steelscape used to make its products may or may not have been subject to the Section 232 duties, and Steelscape did not price its products differently based on the HRS source.  The Department's assumption, therefore, was contrary to all of the record evidence.

Third, Steelscape's invoices do not indicate Section 232 duties were charged to the unaffiliated customer.  As explained in NSC's AR3_C_QR, Steelscape as a matter of course includes separate line items on its invoices for the base cost of HRS and any additional charges—*i.e.*, those charges beyond the base cost of HRS—passed through to its customer.  The base cost of HRS reported on the invoices is the figure NSC used to populate field GRSUPR1U in its U.S. database[5] (AR3_APPX080930), which is the field the Department used as the starting U.S. price before adjustments in its dumping margin calculation.  *See* (AR3_APPX082532-

---

[5]      For ease of verification, NSC converted these figures from pounds, which is how Steelscape makes it sales, to metric tons.  Therefore, Steelscape's sample invoices reflect pounds rather than metric tons.  (AR3_APPX080930).

82730 – Prelim NSC Analysis at Attachment 2 (SAS Log – Margin Program)).  Steelscape also separates out specific, additional charges passed through to its customers, such as freight charges (field FRTREVU) and fuel surcharges (field FUELREVU).  (AR3_APPX080930).  As evidence of this practice, Steelscape provided a sample invoice showing how these charges are reflected.  *See* (AR3_APPX080930-80931; AR3_APPX081172-81174 – NSC's AR3_C_QR at Exhibit C-12).  NSC's AR3_C_QR makes clear that "{t}hese charges are *intended to be a pass-through of the payments made by Steelscape* (*i.e.*, to charge the customer based upon the amount that Steelscape pays for the freight)."  (AR3_APPX080931) (emphasis added).  Moreover, Steelscape includes in its invoices separate line items for other charges, such as slitting, embossing, and cutting to length.  (AR3_APPX080931; AR3_ APPX081175-81177 – NSC's AR3_C_QR at Exhibit C-13).  These separate charges are also reflected in NSC's U.S. sales database (in fields EMBOSSREVU, SLITREVU, and CTLREVU).

In AR4 and AR5, Steelscape continued to include separate line items on its invoices for the base cost of HRS and additional charges passed through to its customer, as explained in NSC's AR4_C_QR and NSC's AR5_C_QR.  NSC used the base cost of HRS reported on the invoices to populate field GRSUPR1U in its U.S. databases, (AR4_APPX082463-82464; AR5_APPX083704), which is the field the Department again used as the starting U.S. price before adjustments in its dumping margin calculations.  *See* (AR4_APPX083885-84418 – Prelim NSC Analysis); (AR5_APPX085774-85823 – Prelim NSC Analysis and related programs).  Consistent with its past practice, Steelscape separated out specific, additional charges passed through to its customers, such as freight charges (field FRTREVU), fuel (field FUELREVU), slitting (field SLITREVU), embossing (field EMBOSSREVU), and cutting to length (field CTLREVU).  *See* (AR4_APPX082637-82648 – NSC's AR4_C_QR at Exhibits C-12 and C-13);

(AR5_APPX083957-83962 – NSC's AR5_C_QR at Exhibits C-12 and C-13).  NSC's AR4_C_QR and NSC's AR5_C_QR make clear that these charges "are *intended to be a pass-through of the payments made by Steelscape*."  (AR4_APPX082464) (emphasis added); (AR5_APPX083705) (emphasis added).

In other words, Steelscape's practice was to account for additional charges above the base cost of HRS in separate line items on its invoices in each of AR3, AR4 and AR5.  These invoices, however, contain no such line items for Section 232 duties, thereby affirming that those duties were not passed through to the first unaffiliated customer.

<u>Finally</u>, nothing in the AR3, AR4 and AR5 U.S. sales databases permits the Department to conclude that the Section 232 duties paid were included in the price charged to the first unaffiliated customer.  As just shown, the U.S. sales databases contain information on the charges Steelscape was known to have passed to its customers.  (AR3_APPX080974-81042 – NSC's AR3_C_QR at Exhibit C-1); (AR4_APPX082520-82546 – NSC's AR4_C_QR at Exhibit C-1); (AR5_APPX083748-83805 – NSC's AR5_C_QR at Exhibit C-1).[6]  The Department uses this and other information contained in the U.S. sales databases to calculate the U.S. price used in the dumping margin calculations.  Yet there is no field in the U.S. sales databases indicating that the Section 232 duties paid, reflected in field USDUTY2U, *see* (AR3_APPX081369 – NSC's AR3_C_QR at Exhibit C-23, Appendix V), (AR4_APPX083266 – NSC's AR4_C_QR at Exhibit C-23, Appendix V), (AR5_APPX084158 – NSC's AR5_C_QR at Exhibit C-23, Appendix V), were included in the price charged to the first unaffiliated customer, reflected in field GRSUPR1U.

\* \* \*

---

[6]    The referenced pages contain excerpts only; complete databases were submitted to the Department in SAS format.

Thus, in each of AR3, AR4, and AR5, the Department simply *assumed* NSC included the

Section 232 duties (USDUTY2U) its affiliated importer, NSTA, paid in the price (GRSUPR1U)

NSC's further downstream affiliate Steelscape charged to its first unaffiliated U.S. customer, and

deducted the amount of such duties accordingly.  As the record in each AR clearly shows,

however, the Department's conclusions are mere supposition and not based on any evidence at

all.  If anything, the more logical conclusion based on the foregoing discussion of the pertinent

facts is that the importer, NSTA, or its initial affiliated customer, Steelscape, simply absorbed the

cost of the Section 232 duties paid.

"{S}ubstantial evidence" requires "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Matsushita Elec. Indus. Co. v. United States*, 750

F.2d 927, 933 (Fed. Cir. 1984) (quotations omitted).  The Department's "{s}peculation" is

inadequate "support for a finding."  *Asociacion Colombiana de Exportadores de Flores v. United

States*, 704 F. Supp. 1114, 1117 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir. 1990).

Because the Department failed to make the required findings and instead offered nothing more

than bare "speculation" to support its deductions, those deductions must be set aside as contrary

to law and unsupported by substantial evidence.

**B.      The Department Also Erred by Deducting the Section 232 Duties Where
        Doing so Would Violate the United States' Treaty Obligations.**

NSC raises a separate, distinct issue not addressed in *Borusan*, which renders *Borusan*

non-precedential in this case: *i.e.*, by treating the Section 232 duties at issue here as ordinary

customs duties ("OCDs"), the Department and Federal Circuit have interpreted the statute in a

manner that conflicts with the United States' treaty obligations.  NSC begins by demonstrating

how the Department's and Federal Circuit's decisions violate the United States' World Trade

Organization ("WTO") obligations.  NSC then explains that the Department's and Government's arguments to the contrary are unavailing.

It is well established that a court owing deference to a higher court is "free to address {an} issue on the merits" in a subsequent case "{w}hen a prior decision does not 'squarely address{} {that} issue.'"  *Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1349 (Fed. Cir. 2018) (quotation omitted); *Houston Indus. Inc. v. United States*, 78 F.3d 564, 567 n.3 (Fed. Cir. 1996) ("{W}hen an issue is not argued or considered in a decision, such decision is not precedent on that issue.") (citation omitted).  Here, although *Borusan* generally held that Section 232 duties imposed by *Proclamation 9705* qualify as "United States import duties," the Federal Circuit's decision did not address—let alone "squarely address"—whether Section 232 duties qualify for deduction under 19 U.S.C. § 1677a(c)(2)(A) even when doing so would violate the United States' treaty obligations.  Principles of statutory interpretation and international law dictate that they should not be deducted in this context.  Therefore, the Department erred by deducting them in this case.

As a threshold matter, the statutory phrase "United States import duties" in § 1677a(c)(2)(A), which is indisputably ambiguous, *see Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007), "must be interpreted to be consistent with {international} obligations, absent contrary indications in the statutory language or its legislative history," *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (alteration in original) (*quoting Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1368 (Fed. Cir. 2002)).  That principle of statutory construction, known as the *Charming Betsy* canon, provides that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Id*. (quoting *Murray v. The Schooner Charming Betsy*, 6

21

U.S. (2 Cranch) 64, 118 (1804) ("*Charming Betsy*")); *see also Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1581-82 (Fed. Cir. 1995) (deferring to the Department's interpretation of whether dumping margins may be calculated in a tax neutral fashion in part because such interpretation was consistent with U.S. WTO obligations).

In AR3, AR4, and AR5, permitting the Department to treat the Section 232 duties imposed by *Proclamation 9705* as "United States import duties," as *Borusan* affirmed as a general matter, would result in the United States imposing OCDs on steel imports from Japan exceeding its bound tariff rates.  NSC established why this is so in this particular case in NSC's AR3_Opening Brief at 31-32, AR3_ECF No. 32, and NSC's AR3_Reply Brief at 16-19, AR3_ECF No. 39.  Accordingly, the United States would be in violation of its obligations under Article II:1(b) of the General Agreement on Tariffs and Trade 1994 ("GATT 1994"), which requires WTO Members to exempt products of another WTO Member from OCDs exceeding those set forth in their Schedule of Concessions.  In addition, interpreting "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A) to include the Section 232 duties would result in the United States violating its most-favored-nation obligations under Article II:1(a) of the GATT 1994 as well.

In each of AR3, AR4, and AR5, NSC argued, and the Department rejected, that interpreting the Section 232 duties to be "United States import duties" would violate the United States' WTO obligations.  Specifically, the Department asserted that: (1) because the Section 232 duties are treated as OCDs, they are not considered as part of the bound rate in the United States' Schedule of Concessions; and (2) Article XXI(b)(iii) of the GATT 1994 explicitly excludes actions taken for national security reasons.  *See* (AR3_APPX002470); (AR4_APPX003713-

3714); (AR5_APPX003285-3286).  NSC has previously explained why the Department's

arguments are unavailing.  *See* NSC's AR3_Reply Brief at 16-19, AR3_ECF. No. 39.

First, Article II:1(b) of the GATT 1994 states:

> The products described in Part I of the Schedule relating to any
> {WTO Member}, which are the products of territories of other
> {WTO Members}, shall, on their importation into the territory to
> which the Schedule relates, and subject to the terms, conditions or
> qualifications set forth in that Schedule, *be exempt from ordinary
> customs duties in excess of those set forth and provided therein*
> (emphasis added).

The Department's assertion that the Section 232 duties are treated as OCDs not to be considered

as part of the bound rate misses the mark because the plain language of Article II:1(b) simply

exempts WTO Members' products from OCDs in excess of the bound rate.  The Department

inexplicably invents an exception for "special" OCDs that does not exist.  Moreover, as NSC has

explained, the Section 232 duties must be either: (1) special duties that are not deducted from

NSC's U.S. price and excluded from the United States' bound rate commitments; or (2) OCDs

that are deducted from NSC's U.S. price and included in the United States' bound rate

commitments.  NSC's AR3_Opening Brief at 31-32, AR3_ECF No. 32.

Second, as explained in NSC's AR3_Reply Brief, merely asserting that the national

security exception in Article XXI(b)(iii) of the GATT 1994 applies does not make it so.  Rather,

the Department must demonstrate that the Section 232 duties at issue here meet the requirements

set forth—which they plainly do not.  *See* NSC's AR3_Reply Brief at 16-17, AR3_ECF. No. 39.

In short, Article XXI(b)(iii) provides that the United States must have been at war at the

time the Section 232 duties were imposed (it was not), or that there was some identified "other

emergency in international relations" that existed to have justified the imposition of these duties

(there was not).  On the latter point, the WTO panel in *Russia – Traffic in Transit* explained that

"political or economic differences between Members are not sufficient, of themselves, to

constitute an emergency in international relations for purposes of subparagraph (iii)"; rather, an

"emergency in international relations" "refer{s} generally to a situation of armed conflict, or of

latent armed conflict, or of heightened tension or crisis, or of general instability engulfing or

surrounding a state." *See* Panel Report, *Russia – Measures Concerning Traffic in Transit*, WTO

Doc. WT/DS512/R and Add.1 (adopted 26 April 2019) ("*Russia – Traffic in Transit*") at paras.

7.75-7.76.  Nothing of that sort existed at the time then-President Trump imposed the Section

232 duties.  Numerous recent WTO panels have also rejected the application of Article

XXI(b)(iii) when the measures at issue were not "taken in time of war or other emergency in

international relations."  *See, e.g.,* Panel Report, *United States — Certain Measures on Steel and

Aluminium Products (Turkey)*, WTO Doc. WT/DS564/R (circulated December 9, 2022) at para.

7.164.

Moreover, the condition in the *chapeau* that the Member's action must be "necessary for

the protection of its essential security interests" is also not satisfied with respect to the Section

232 duties.  Again, the WTO panel in *Russia – Traffic in Transit* explained that an obligation of

"good faith" applies for purposes of a Member identifying an "essential security interest," and in

this regard:

> The obligation of good faith requires that Members not use the
> exceptions in Article XXI as a means to circumvent their
> obligations under the GATT 1994.  A glaring example of this
> would be where a Member sought to release itself from the
> structure of "reciprocal and mutually advantageous arrangements"
> that constitutes the multilateral trading system simply by re-
> labelling trade interests that it had agreed to protect and promote
> within the system, as "essential security interests", falling outside
> the reach of that system.

*Id.* at 7.133 (citation omitted).  However, the United States justifying OCDs on imported steel articles in excess of its bound rates under the guise of an "essential security interest" would amount precisely to such circumvention prohibited by the *chapeau* of Article XXI(b)(iii).  For these reasons, the United States' argument based on the national security exception in Article XXI(b)(iii) of the GATT 1994 is inapposite.

Thus, even accepting the correctness of *Borusan*'s treatment of certain Section 232 duties as deductible "United States import duties," it simply does not follow that, here, where deducting the Section 232 duties at issue would violate the United States' international treaty obligations, the same interpretation should apply.  Rather, *Charming Betsy* would require a different interpretation in this specific context, and the Department acted contrary to law by nonetheless deducting these duties in a way that results in the United States violating its international law obligations.

## II.    *Borusan* Was Wrongly Decided.

For the foregoing reasons, *see supra* Part I, *Borusan* does not control the outcome of the three administrative proceedings under review.  However, in the event this Court disagrees, NSC reserves its right to seek *Borusan*'s overruling by the *en banc* Federal Circuit.  *See* Fed. R. App. P. 35(a).  Such overruling is warranted.  *Borusan*'s framework for determining whether the Section 232 duties are deductible "United States import duties"—which turns exclusively on the supposed intent underlying a given presidential proclamation—conflicts with prior Federal Circuit precedent and violates basic principles of statutory interpretation and administrative law. Moreover, even if *Borusan*'s singular focus on the intent behind a given presidential proclamation were appropriate, the *Borusan* panel misinterpreted *Proclamation 9705* and did not address multiple reasons why the Section 232 duties authorized by that proclamation should *not*

25

be treated as "United States import duties" under § 1677a(c)(2)(A), in large part because those reasons were not presented to the *Borusan* panel.

### A. *Borusan* Conflicts with Federal Circuit Precedent and Violates Basic Principles of Statutory Interpretation and Administrative Law.

*Borusan* addressed whether the phrase "United States import duties" in § 1677a(c)(2)(A) covers the Section 232 duties imposed by *Proclamation 9705*. *See* 63 F.4th at 31. The Department had long interpreted § 1677a(c)(2)(A) as covering only *normal* or *regular* or *ordinary* customs duties (*i.e.*, OCDs), and not *remedial* AD, countervailing ("CV") and Section 201 safeguard ("SG") duties. Moreover, the Federal Circuit had affirmed that interpretation— and the Department's framework for applying § 1677a(c)(2)(A)—as reasonable under *Chevron*. *See Wheatland*, 495 F.3d at 1363 (affirming the Department's interpretation of § 1677a(c)(2)(A) as excluding SG duties). In *Borusan*, the Department applied a truncated version of the framework upheld in *Wheatland* to determine that the phrase "United States import duties" in § 1677a(c)(2)(A) includes the duties imposed by *Proclamation 9705*. *See Borusan*, 63 F.4th at 30-31. However, in purporting to affirm the Department's determination, *Borusan* in fact jettisoned *Wheatland*'s interpretative approach and instead made the interpretation of § 1677a(c)(2)(A) turn exclusively on the President's intent in issuing *Proclamation 9705*. *Borusan*'s singular focus on the Presidential intent, *see* 63 F.4th at 32, not only conflicts with *Wheatland*, but also runs contrary to basic principles of statutory interpretation and administrative law.

In *Wheatland*, the Federal Circuit analyzed the Department's interpretation of § 1677a(c)(2)(A) under the traditional *Chevron* framework. 495 F.3d at 1359. The court first held that the AD statute's reference to "United States import duties" was ambiguous. *See id.* at 1360 (explaining that "Congress has not 'directly spoken to the precise question at issue'")

26

(quotation omitted).  The court next held that the Department's interpretation should—if reasonable—warrant deference because the interpretation was promulgated through "the agency's formal notice-and-comment rulemaking process."  *Id.*  Finally, the court considered whether the Department's interpretation excluding SG duties from § 1677a(c)(2)(A) was reasonable by analyzing "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole."  *Id.* at 1361.  The focus of this analysis—and of the Department's interpretive framework—was, as it should be, "how *Congress* would have intended § 201 duties to be treated in achieving the purposes of the antidumping objectives."  *Id.* at 1361-62 (emphasis added).

*Borusan*'s presidential-intent-focused approach repudiates *Wheatland*'s straightforward application of the *Chevron* framework and turns statutory interpretation upside down. Purporting to distinguish *Wheatland*, the *Borusan* court found it "unnecessary to apply the *Chevron* framework," *see* 63 F.4th at 36, because, in the *Borusan* court's view, "the only fair reading of Proclamation 9705 is that" the duties it imposed were meant to be treated as "United States import duties."  *Id.* at 35.  In other words, instead of focusing on the text of *the AD statute* and the intent of *Congress*—as the *Wheatland* court had done—*Borusan* focused on the text of *Proclamation 9705* and the intent of the *President*.  However, under *Wheatland*—and under basic principles of statutory interpretation and administrative law—there is no basis for making the President's intent dispositive of the statutory interpretation question.  Congress, not the President, makes the laws.  Therefore, the meaning of "United States import duties" cannot turn on whether the President wishes for a category of special duties to be treated as such.  Yet that was effectively *Borusan*'s holding.

27

Had *Borusan* adhered to *Wheatland*, the court's analysis would have been completely different.  First, *Borusan* would have had to follow *Wheatland* in acknowledging, at step one of *Chevron*, that § 1677a(c)(2)(A) is ambiguous—that is, Congress did not speak directly to whether the Section 232 duties imposed under *Proclamation 9705* are to be treated as "United States import duties."  Second, *Borusan* would have considered whether the Department's answer to this interpretative question qualifies for *Chevron* deference.  In *Wheatland*, the answer to that question was "yes"—because the Department had promulgated that interpretation through formal notice-and-comment rulemaking.  *See* 495 F.3d at 1360 (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)); *see also Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing Duties*, 68 FR 53104 (Sept. 9, 2003) (requesting comments on "the appropriateness of deducting section 201 duties and countervailing duties from gross unit price in order to determine the applicable export price or constructed export price used in antidumping duty calculations").  However, here the answer should be different; the Department did not go through notice-and-comment rulemaking, and insofar as the Department has jettisoned the framework affirmed in *Wheatland* (in favor of *Borusan*'s approach focused on the President's intent), that change demands an explanation.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22  (2016) (holding that an agency must provide "good reasons" for "changing position") (cleaned up).  Regardless, even if the Department's interpretation qualified for deference, the court would have upheld it only if it was "reasonable in light of the text, nature, and purpose of the statute."  *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 277 (2016).  For the reasons NSC has explained in its prior briefing, *see infra* Part II.C (incorporating arguments by reference), the Department's interpretation was plainly unreasonable in light of all these considerations.

28

In totality, *Borusan*'s departure from binding precedent and this settled and straightforward approach to statutory interpretation renders the decision clearly erroneous. NSC reserves the right to seek to have *Borusan* overruled on that basis.

**B.   *Borusan* Misinterpreted *Proclamation 9705*.**

*Borusan* also warrants overruling because it fails on its own terms. Even accepting that the intent underlying a given presidential proclamation could determine the meaning of § 1677a(c)(2)(A), the *Borusan* court misinterpreted the proclamation at issue. The Federal Circuit in *Borusan* asserted that "the only fair reading of Proclamation 9705 is that, when applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties {and} that result requires … subtraction of the Proclamation 9705 duty from the U.S. price …." *Borusan* 63 F.4th at 35. However, that is not "the only fair reading" of *Proclamation 9705*; rather, it is the inferior of two possible readings in light of the full context of *Proclamation 9705*. As NSC explains below, the alternate (and more appropriate based on full context) reading of *Proclamation 9705* is that when applied to an article covered by AD duties, the President intended for the *Proclamation 9705* duties *not to replace* the AD duties, and subtracting the *Proclamation 9705* duties from U.S. price in this circumstance results in a combined duty far higher than the President intended.

The Federal Circuit, in analyzing *Proclamation 9705*, relied principally on language in the Proclamation stating that "{t}his rate of duty, which is *in addition to* any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply …." *Id.* at 34 (quoting *Proclamation 9705*, 83 FR at 11627 (emphasis added)). *Borusan* further relied on the Proclamation's statement that "{a}ll anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed." *Id.* (quoting *Proclamation 9705*, 83 FR

at 11629).  Based on these statements, *Borusan* claimed that the "only fair reading" of

*Proclamation 9705* was to charge the Section 232 duties "*on top of* otherwise-determined

antidumping duties," which together would "result in a full imposition of both duties."  *Id.* at 34-

35 (emphasis added).  What the *Borusan* court failed to discern, however, was that "full

imposition" of both sets of duties does not require that the Department treat the Section 232

duties as "United States import duties."  In other words, "full imposition" of the Section 232

duties and AD duties does not require that the Section 232 duties be deducted from U.S. prices

and therefore factored in a second time in setting the level of AD duties.

To begin, it is instructive to recall that the President in *Proclamation 9705* and the

Department in its *Section 232 Report*, which the President relied upon in issuing *Proclamation

9705*, viewed the Section 232 duties precisely as an alternative to AD/CV duties to remedy the

same kind of injury to the domestic steel industry, and took that into account in setting the level

of Section 232 duties to be applied.  *See* NSC's AR3_Opening Brief at 19-22, 26-27, AR3_ECF

No. 32; NSC's AR3_Reply Brief at 12-14, AR3_ECF No. 39.  In other words, in this particular

case, notwithstanding the apparent "national security" objective of *Proclamation 9705*,

*Proclamation 9705* was in fact targeting the same kind of injury to the domestic industry

targeted by AD/CV duties.  This is well-illustrated by the following passage from the

Department's *Section 232 Report*:

> It is *these three factors*—displacement of domestic steel by
> excessive imports and the consequent adverse impact on the
> economic welfare of the domestic steel industry, along with global
> excess capacity in steel—that the Secretary has concluded create a
> persistent threat of further plant closures that could leave the
> United States unable in a national emergency to produce sufficient
> steel to meet national defense and critical industry needs.

*Section 232 Report*, 85 FR at 40207-08 (emphasis added).  The three factors listed by the Department are the *same exact* kinds of injury factors that AD/CV duties address.

Next, it is instructive to recall *why* the President imposed the Section 232 duties.  On this point, the President based *Proclamation 9705* on the *Section 232 Report*,[7] which recommended the President take action under Section 232 with respect to steel imports because, *inter alia*, although "antidumping and countervailing duty actions can address specific instances of unfairly traded steel products …, given the large number of countries from which the United States imports steel and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded steel"; and the "U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CV {duty} cases, {but} {s}maller steel manufacturers are financially unable to afford these type{s} of cases, or are hesitant to file cases." *Section 232 Report*, 85 FR at 40211.

These facts illustrate that the President used the Section 232 duties as *a shortcut* to impose remedial duties of the same ilk as AD/CV duties on the myriad of steel products that were not already subject to AD/CV duties because the President wanted to spare U.S. industry, particularly smaller U.S. manufacturers, from the burden of prosecuting individual AD/CV investigations; these facts do not illustrate that the President intended to inflate already existing AD/CV duties.

---

[7]     The fact that *Proclamation 9705* is based on the *Section 232 Report* is made clear by *Proclamation 9705* itself, in which the President summarized the findings and recommendations from the *Section 232 Report*, and then stated: "I concur in the Secretary's finding {in the *Section 232 Report*} that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and I have considered his recommendations."  The President then wrote: "I have decided to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff on steel articles … in light of the many factors I have considered, including the Secretary's report …."  *Proclamation 9705*, 83 FR at 11625-11626.

Thus, it is incorrect to read the language "in addition to" in *Proclamation 9705* to mean the President intended for the Section 232 duties to apply "*on top of* otherwise-determined antidumping duties," as the *Borusan* court concluded. *Borusan* 63 F.4th at 35 (emphasis added). Instead, the best reading of "in addition to" in *Proclamation 9705* is that the President intended to make clear that the Section 232 duties are not to apply *in lieu of* or *as a replacement for* accurate and non-punitive AD duties properly determined in accordance with the AD statute. Indeed, if the President had not used the "in addition to" language in *Proclamation 9705*, in light of its full context just discussed, *Proclamation 9705* could plausibly be interpreted to mean that in instances where AD/CV duties already existed on specific steel products from specific countries, the President intended for those specific AD/CV steel duties to be replaced by the sweeping Section 232 duties. That is because these duties all target the same kind of injury to the U.S. domestic industry the President found to exist, and once the sweeping Section 232 duties are imposed, the previously existing specific AD/CV steel duties could be considered redundant. The President therefore had to use the "in addition to" language in *Proclamation 9705* to foreclose this possibility.

This reading is further supported by the other language from *Proclamation 9705* that the *Borusan* court relied upon, *i.e.*, that "{a}ll anti-dumping, countervailing, or other duties and charges *applicable* to such goods shall continue to be imposed." *Proclamation 9705*, 83 FR at 11629 (emphasis added). That is, *Proclamation 9705* makes clear that after imposition of the Section 232 duties, what level of AD (and other) duties remains "*applicable*" is still a question, and for AD duties that level of course must be determined in accordance with the AD statute, including consideration of what is a "United States import duty" under 19 U.S.C. § 1677a(c)(2)(A). Thus, once the Section 232 duties are imposed, the "applicable" level of AD

duties must still be determined in accordance with the AD statute and taking into account the existence of the Section 232 duties, and it is that "applicable" level of AD duties that continues to apply.  If *Proclamation 9705* simply said "{a}ll anti-dumping, countervailing, or other duties and charges shall continue to be imposed," then perhaps the *Borusan* court's interpretation of "in addition to" to mean that the Section 232 duties apply "on top of" existing levels of AD duties determined without regard to the existence of the Section 232 duties might make more sense; however, that is not what *Proclamation 9705* says.  *Proclamation 9705* makes clear the "applicable" level of AD duties must still be determined, which makes the reading of "in addition to" to mean the Section 232 duties are not replacing specific AD/CV steel duties make more sense.

Based on the foregoing, a mathematical example helps illustrate why the *Borusan* court's interpretation of *Proclamation 9705* and the Section 232 duties as "United States import duties" to be deducted from U.S. price in the dumping calculation cannot be correct.  Assume absent any duties, the import price for one unit of a steel product is $100 and that is also the price at which the importer sells to its U.S. customer.  Then, pursuant to an AD investigation on this steel product, dumping and injury are found to exist, with the normal value calculated to be $150 per unit.  In this circumstance, an AD duty of $50 per unit is imposed, the importer pays an import price of $100 and an AD duty of $50 on each unit to alleviate the injury found to exist, and charges its U.S. customer $150 per unit.

Next, the President imposes a 25 percent Section 232 duty on all steel imports, including the specific steel product already subject to an AD duty.  With respect to this specific steel product with an import price of $100 per unit, the importer must now pay a Section 232 steel duty of $25 per unit, which it includes in the price at which it sells to its U.S. customer, thereby

charging $125 per unit. The question then is what level of AD duty remains "applicable" to this steel product when the normal value is $150 per unit and the $25 per unit Section 232 steel duty is already remedying the same kind of injury the AD duty is intended to remedy? It should follow that only an AD duty level of $25 per unit is necessary in this circumstance, such that the importer may continue charging $150 per unit to its U.S. customer. This level of AD duty is accomplished by *not* deducting the $25 per unit Section 232 steel duty from the $125 per unit price the importer charges its U.S. customer. If the $25 per unit Section 232 steel duty were deducted from the $125 per unit U.S. price in the dumping calculation, then the importer would be forced to pay an AD duty of $50 per unit and charge $175 per unit to its U.S. customer, thereby *over-remedying* the injury at issue. A proper reading of *Proclamation 9705*, in its full context, indicates that is not the result the President intended, which makes the *Borusan* court's reading of "in addition to" in *Proclamation 9705* wrong.

Thus, as demonstrated, deducting the Section 232 duties from U.S. price in the dumping calculation creates an artificial dumping margin and results in collection of the Section 232 duties twice—first as Section 232 duties, and then a second time as an increase in the dumping margin. This is contrary to the remedial purpose of the AD statute and the Department's obligation to calculate dumping margins "as accurately as possible." *See, e.g.*, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). This also provides Section 232 relief beyond what the President approved in *Proclamation 9705*, because the statute and regulations do not contemplate double relief, and there is no indication in *Proclamation 9705* that the President believed the Department effectively would increase the Section 232 duties by deducting them from U.S. price in calculating subsequent dumping margins. *See Stainless Steel*

34

*Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 FR 19153, 19160 (Apr. 12, 2004).  *Borusan* therefore incorrectly interpreted *Proclamation 9705* and should be overturned by the *en banc* Federal Circuit.

      **C.**    **The *Borusan* Court Was Not Presented with, and Therefore Did Not Consider, Additional Arguments Establishing that the Section 232 Duties at Issue Here Should Not Be Treated Like "United States Import Duties."**

A third basis for asking the *en banc* Federal Circuit to overrule *Borusan* is that the court was never presented with—and therefore did not consider—several arguments as to why treating the Section 232 duties as "United States import duties" is contrary to law.  NSC has already set out these arguments in its prior briefing and, therefore, incorporates them by reference here for the benefit of all three joined cases.  *See* AR3_Opening Brief at 9-33, AR3_ECF No. 32; AR3_Reply Brief at 2-19, AR3_ECF No. 39.  In sum, NSC argued the following:

- A complete analysis that considers all relevant aspects of the statute, its legislative history, the particular facts upon which the Section 232 duties are based, and the general revenue purpose of OCDs reveals that the Section 232 duties at issue here do not serve a general revenue purpose like OCDs but rather serve a special remedial purpose similar to AD/CV/SG duties;

- Like SG duties, the Section 232 duties are critically distinct from OCDs because both are temporary in that no Congressional action is needed to end them,[8] while OCDs are enacted by Congress and are permanent unless modified by Congress; and

- Deducting the Section 232 duties from the U.S. price imposes an impermissible double remedy (also illustrated above) because there is a clear statutory interplay between the Section 232 duties and AD/CV duties, thereby remedying substantially overlapping injuries twice, and increasing AD duties and Section 232 duties beyond the amounts authorized under U.S. law.

---

[8]    This is confirmed by the recent Section 232 Agreement entered into by Japan and the United States, pursuant to which, effective April 1, 2022, for imports into the United States of Japanese steel, the 25 percent Section 232 duty was replaced by a tariff-rate quota of 1.25 MMT with any volume above that amount assessed a 25 percent tariff.  *See* Announcement of Actions on Japanese Imports of Steels Under Section 232 (February 7, 2022), *available at* https://www.commerce.gov/sites/default/files/2022-02/US-Statement-on-Japan-232.pdf.

\* \* \*

For the foregoing reasons, it is clear that *Borusan* was wrongly decided, and NSC

reserves its right to seek *en banc* overruling of the decision.

## CONCLUSION

For the foregoing reasons, NSC respectfully requests that the Court grant its Motions for

Judgment on the Agency Record for each of AR3, AR4, and AR5, and remand the above-

captioned cases with instructions to recalculate NSC's dumping margins.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Justin R. Becker
Lindsey A. Ricchi

Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel for Nippon Steel Corporation

Dated: September 18, 2023

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC,<br><br>        Defendant-Intervenors. | Court No. 21-00533 |
| NIPPON STEEL CORPORATION,<br><br>        Plaintiff,<br><br>JFE SHOJI CORPORATION AND JFE SHOJI AMERICA, LLC<br><br>        Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>NUCOR CORPORATION,<br><br>        Defendant-Intervenor. | Court No. 22-00183 |

<table>
<tr><td>

NIPPON STEEL CORPORATION,

    Plaintiff,

  v.

UNITED STATES,

    Defendant,

NUCOR CORPORATION

    Defendant-Intervenor.

</td><td>

Court No. 23-00112

</td></tr>
</table>

## ORDER

Upon consideration of the Motions for Judgment on the Agency Record filed by plaintiff, Nippon Steel Corporation ("NSC"), and upon all other papers and proceedings herein, it is hereby

**ORDERED** that NSC's Motions for Judgment on the Agency Record are granted; and it is further

**ORDERED** that the U.S. Department of Commerce's determination in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 47615 (August 26, 2021) is unsupported by substantial record evidence and otherwise contrary to law because of the Department's: (i) deduction of the Section 232 duties from NSC's U.S. prices; and (ii) application of facts otherwise available with an adverse inference to the unreported downstream sales by certain of NSC's affiliated home market resellers; and it is further

**ORDERED** that the Redetermination Pursuant to Court Remand filed by the U.S. Department of Commerce in Court No. 21-00533 on August 1, 2022, is sustained; and it is further

**ORDERED** that the U.S. Department of Commerce's determination in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments: 2019–2020*, 87 FR 31523 (May 24, 2022) is unsupported by substantial record evidence and otherwise contrary to law because of the Department's deduction of the Section 232 duties from NSC's U.S. prices; and it is further

**ORDERED** that the U.S. Department of Commerce's determination in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review: 2020–2021*, 88 FR 28500 (May 4, 2023) is unsupported by substantial record

evidence and otherwise contrary to law because of the Department's deduction of the Section 232 duties from NSC's U.S. prices; and it is further

      **ORDERED** that these actions are remanded to the U.S. Department of Commerce for the purpose of recalculating NSC's dumping margins after: (i) including in NSC's U.S. prices the Section 232 duties for all three administrative reviews; and (ii) applying facts otherwise available without an adverse inference to the unreported downstream sales by certain affiliated home market resellers in the 2018-2019 administrative review; and it is further

      **ORDERED** that the Department of Commerce shall file its remand determinations with the Court within 60 days of this date; and it is further

      **ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

      **ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determinations.

      **SO ORDERED.**


_____

Stephen Alexander Vaden, Judge



Dated: _____, 2024

      New York, New York

## CERTIFICATE OF COMPLIANCE

In accordance with the Court's Orders issued on July 18, 2023, the undersigned certifies that this brief complies with the word limitations set forth in those Orders.  Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 9,972 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Shawn M. Higgins
Shawn M. Higgins

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached public document are being served by CM/ECF, on September 18, 2023, addressed to the following parties:

**On Behalf of the United States:**
Kyle S. Beckrich
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

**On behalf of Nucor Corporation:**
Alan H. Price
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

**On Behalf of the United States:**
David W. Richardson
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3614
Washington, DC 20230

**On behalf of Steel Dynamics, Inc. and SSAB Enterprises, LLC:**
Roger Brian Schagrin
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001

**On behalf of JFE Shoji Corporation, and JFE Shoji America, LLC:**
Brenda Ann Jacobs
Jacobs Global Trade & Compliance LLC
4134 N. River Street
McLean, VA 22101

/s/ Shawn M. Higgins
Shawn M. Higgins