A-588-874<br>
Remand<br>
Slip Op. No. 24-112<br>
POR: 10/01/2018 – 09/30/2019<br>
<strong>Public Document</strong><br>
E&C/OVII: JJZ

*Nippon Steel Corporation v. United States*,
Consol. Court No. 21-00533, Slip Op. No. 24-112 (CIT October 10, 2024)
**Certain Hot-Rolled Steel Flat Products from Japan**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) in *Nippon Steel Corporation, Plaintiff, and JFE Shoji Corporation and JFE Shoji America, LLC, Plaintiff-Intervenors v. United States, Defendant, and Nucor Corporation, Steel Dynamics, Inc., and SSAB Enterprises, LLC, Defendant-Intervenors*, Consol. Court No. 21-00533 (CIT October 10, 2024) (*Remand Order*). These final results of redetermination concern the 2018-2019 administrative review of certain hot-rolled steel flat products from Japan.[1] The plaintiff is Nippon Steel Corporation (Nippon Steel or NSC).[2]

Nippon Steel sought judicial review of the *Final Results*, claiming, *inter alia*, that Commerce improperly applied facts available with a partial adverse inference to the unreported downstream sales from certain of Nippon Steel's home market affiliates. On October 10, 2024,

---

[1] *See Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 47615 (August 26, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

[2] Commerce found that Nippon Steel, Nippon Steel Nisshin Co., Ltd., and Nippon Steel Trading Corporation are affiliated companies that should be treated as a single entity and as the successor-in-interest to Nippon Steel & Sumitomo Metal Corporation, Nisshin Steel Co., Ltd., and Nippon Steel & Sumikin Bussan Corporation, respectively. *See Certain Hot-Rolled Steel Flat Products from Japan: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 46713 (September 5, 2019).

the Court found Commerce failed to support its determination regarding application of facts available with a partial adverse inference to these unreported downstream sales with substantial evidence and remanded the issue to Commerce.[3]

Pursuant to the Court's *Remand Order*, we have further explained Commerce's decision to apply an adverse inference to Nippon Steel home market affiliates' unreported downstream sales.

## II.  BACKGROUND

In the *Final Results*, Commerce found that Nippon Steel's rate of dumping during the period of review was 11.70 percent. On August 1, 2022, Commerce completed a partial voluntary partial remand, granted by the Court, to add certain separately-reported service-related revenue to the U.S. price and revised Nippon Steel's rate of dumping for the POR to 10.12 percent.[4]

On October 10, 2024, the Court issued a remand to Commerce to reconsider or further explain Commerce's decision to apply facts available with an adverse inference to certain Nippon Steel home market affiliates' unreported downstream sales.[5] The Court remanded Commerce to respond to Nippon Steel's arguments regarding: (1) Japanese antitrust law[6] and (2)

---

[3] *See Remand Order* at 24.
[4] *See Final Results of Redetermination Pursuant to Court Remand, Nippon Steel Corporation v. United States*, Consol Court No. 21-00533 (CIT July 1, 2022), dated August 1, 2022 (*Final Remand*), available at https://access.trade.gov/public/FinalRemandRedetermination.aspx. No party contested these remand results. *See, e.g., Remand Order* at 18. In the draft remand Commerce released for comments, this rate was 10.38 percent, Commerce is revising this rate to 10.12 percent which is the actual final rate.
[5] *See Remand Order* at 25. Nippon Steel also challenged whether Commerce properly deducted section 232 duties from Nippon Steel's U.S. prices. The Court sustained Commerce's deduction of the section 232 duties as "United States import duties." *See Remand Order* at 20 and 25-38.
[6] *See* NSC's Letter, "NSC's Response to the Department's Section B Questionnaire," dated June 29, 2020 (NSC Section B Response) at Exhibit B-23 (Japanese Antimonopoly Documentation, "Guidelines Concerning Abuse of Superior Bargaining Position under the Antimonopoly Act," published by the Japan Fair Trade Commission, dated November 30, 2010, at 2 (hereinafter, "guidelines")).

2

communications logs reflecting efforts to engender affiliate compliance by Nippon Steel compared to past administrative reviews.[7]

## III. FINAL RESULTS OF REDETERMINATION

**Commerce's Determination that Nippon Steel Failed to Act to the Best of Its Ability When It Did Not Report Certain Affiliated-Party, Downstream, Home-Market Sales Is Supported By Substantial Evidence and Is in Accordance with Law**

In the *Final Results*, Commerce resorted to partial adverse facts available (AFA) for Nippon Steel's failure to report requested affiliated-party, downstream, home-market sales.[8] Nippon Steel asserts that it tried to get the information from its affiliated-party reseller, but the affiliated-party reseller refused to provide it and, thus, Nippon Steel acted to the best of its ability. Consequently, Nippon Steel argues, Commerce cannot resort to an adverse inference when selecting from among the facts available on the record to fill in the missing data. As we demonstrate below, Commerce's determination that Nippon Steel did not act to the best of its ability to obtain information related to these affiliated-party, downstream, home-market sales, is supported by substantial record evidence and in accordance with law.

### A. Legal Standard

Commerce will use facts otherwise available to fill gaps in the record if: (1) necessary information is not available or (2) an interested party withholds information requested by Commerce, (3) fails to provide the information by the deadline or in the manner requested, (4) significantly impedes the proceedings, or (5) provides information that cannot be verified.[9] If Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts

---

[7] *See Remand Order* at 25.
[8] *See Final Results* IDM at 11-15.
[9] *See* section 776(a) of the Act.

3

otherwise available.[10] Indeed, Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent."[11]

A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."[12] Further, the standard requires that importers "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so."[13] While the statutory requirement that a party act "to the best of its ability … does not require perfection and recognizes that mistakes sometimes occur," it also "does not condone inattentiveness, carelessness, or inadequate record keeping."[14] Finally, the statute provides that Commerce must provide the respondent with an opportunity to remedy any deficiency before it may resort to AFA.[15]

### B. Commerce's Determination That Nippon Steel Failed To Act To The Best Of Its Ability In Selecting Among The Facts Otherwise Available Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce's determination to resort to partial AFA is supported by substantial evidence and is otherwise in accordance with law. The fundamental basis for Commerce's dumping calculation is the comparison of the United States price with, in this case, the home market prices. This permits Commerce to determine if a company is selling its product at a higher price in the home market than in the United States, *i.e.*, dumping.[16] Therefore, to determine whether a

---

[10] *See* section 776(b) of the Act.
[11] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *See* section 782(d) of the Act.
[16] *See* section 773(a) of the Act (To determine whether a product is sold at less than fair value, *i.e.*, dumped, a "comparison shall be made between the export price or constructed export price {U.S. sales} and normal value {in this case home market sales}.); *see also*, section 771(35) of the Act ("The term 'dumping margin' means the amount by which the normal value {in this case home market sales} exceeds the export price or constructed export price {U.S. sales} of the subject merchandise.").

company is dumping, Commerce must review all of the respondent's home market sales of the foreign like product to perform the dumping calculation. Without this critical information, Commerce cannot calculate an accurate dumping margin, and a respondent could potentially manipulate the dumping calculation.

Nippon Steel does not dispute that: (1) Commerce requested the affiliated party downstream sales at issue; (2) Nippon Steel did not provide the requested sales; (3) Commerce notified Nippon Steel of the deficiency in its reporting; and (4) Nippon Steel once again did not provide the information.[17] Notwithstanding this, Nippon Steel argues that Commerce cannot apply an adverse inference in selecting among the facts available because "it acted to the best of its ability" by requesting information from the affiliate that refused to comply, and Nippon Steel alleges that, under Japanese law, it cannot force its affiliate to provide the requested data.

First, references to communications between NSC and its affiliate are not enough to overcome the obligation to act "to the best of its ability" in providing the necessary data for performing the dumping calculation here. As Commerce explained in the *Final Results*, such a finding would undermine the dumping calculation by putting respondents in the position of using affiliates to shield themselves from reporting "high priced home market sale{s} behind a wall of uncooperative affiliates" to "manipulate the dumping calculations."[18] To permit such shielding is not a reasonable interpretation of Commerce's statutory directive.[19]

Since the investigation in 2016, Nippon Steel has had ample time to make compliance with requests of this nature part of its contractual agreement with downstream affiliates.[20]

---

[17] *See* Commerce's Letter, "Request for Information" dated May 4, 2020, at B-2 and B-3; *see also* NSC's Section B Response at B-7 and B-8; Commerce's Letter, "Supplemental Questionnaire," dated January 14, 2021, at 1; and NSC's Letter, "NSC's Response to the Department's Supplemental Questionnaire," dated February 1, 2021, at 1-3.
[18] *See Final Results* IDM at 13.
[19] *See* section 773(a) of the Act; *see also* section 771(35) of the Act.
[20] *See Final Results* IDM at 13 ("In this administrative review, NSC had the choice of selling to affiliates {that} would cooperate and those that will not.").

Indeed, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Mueller* previously upheld an AFA determination based on a respondent's decision to do business with third parties that refuse to provide the respondent with necessary cost data.[21] Here, as in *Mueller*, there is an incentive for the affiliated supplier to submit its data because it will not be able to access a supply of hot-rolled steel from Nippon Steel if it does not provide the requested data.[22]

Moreover, this Court has addressed "affiliated persons" in the context of the best of its ability standard. In *Kawasaki*, this Court recognized that Commerce has a "general practice of attributing failure of an affiliate to the respondent."[23] Similarly, in *Hyundai Steel Co.*, this Court determined that an "assessment of whether {a respondent} put forth its maximum efforts to investigate and obtain the requested information from its records, necessarily must assess whether {it} could or should have been able to obtain the information in its affiliate's possession."[24]

Simply requesting the data several times is not the only action that Nippon Steel could have taken to induce compliance. As Commerce explained in the *Final Results* IDM, it is well-known to Nippon Steel that Commerce requires a respondent to report downstream affiliate sales when its sales to the affiliate fail to pass the arm's-length test. Indeed, this precise issue arose in the investigation and both prior reviews.[25] Indeed, the Court – in the context of Nippon Steel's predecessor entity failing to provide data of this nature – has found that Commerce's having

---

[21] *See Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1233-4 (Fed. Cir. May 29, 2014) (*Mueller*).
[22] *Id.*, 753 F.3d at 1235.
[23] *See Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029, 1038 (CIT 2000) (*Kawasaki*).
[24] *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1345 (CIT 2018) (*Hyundai Steel Co.*).
[25] *See Final Results* IDM at 13; *see also Certain Hot-Rolled Steel Flat Products from Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 53409 (August 12, 2016), and accompanying IDM at Comment 2; *Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 57821 (September 16, 2020), and accompanying IDM at Comment 4; *Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 31025 (June 28, 2019), and accompanying IDM at Comment 3.

requested the data consistently in prior reviews "would indicate to a reasonable respondent that Commerce would likely want this same information in a subsequent review."[26]

It is appropriate for Commerce to rely on its prior issues and decision memoranda and court cases to demonstrate that an issue was not of first impression and that the plaintiff is on notice that the affiliate party issue regarding downstream sales exists. However, Commerce has not relied on these prior decisions for its AFA determination in the underlying review proceeding. As explained above and below, Nippon Steel failed to provide the information requested in the instant review which is fully documented in the record of the underlying segment of the proceeding at issue.

Nippon Steel further asserts that it cannot force its affiliate to provide this information because it would be against Japanese law to require such a provision of information. However, the U.S. antidumping law does not contain a reporting exception to an antidumping duty questionnaire based on foreign government legal restrictions. The U.S. antidumping duty law simply provides that if Commerce asks twice for needed information and it is not provided, Commerce may use facts otherwise available with an adverse inference.[27]

In applying AFA, the statute provides that Commerce may make an adverse inference in the selection of facts available if a party has not acted to the best of its ability.[28]

Nippon Steel has not acted to the best of its ability, notwithstanding its assertion that it acted to the best of its ability because it was prohibited by the Japanese Antimonopoly Act from ceasing to do business with its affiliated customers if they did not provide the necessary downstream data or ceasing sales to affiliated customers if they do not provide downstream sales

---

[26] *See Nippon Steel & Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214, 1225 (CIT 2020).
[27] *See* sections 776(b) and 782(d) of the Act.
[28] *See* section 776(b) of the Act.

data.[29] As an initial matter, if Commerce were to institute such an exception, then foreign governments could freely impose data sharing prohibitions with Commerce, making it impossible for Commerce to calculate dumping margins as envisioned by the U.S. antidumping duty statute.

Nippon made a choice to export merchandise to the United States and must abide by U.S. laws. There is no fundamental or Constitutional right to import products into the United States, and those who import merchandise into the United States do so with the knowledge that Commerce may require the provision of information pursuant to the antidumping and countervailing duty laws.[30]

With respect to the substance of the Japanese guidelines[31] on "unjust refusal to trade," and advice letter attached thereto, Commerce has a good reason, as explained above, for not accepting any foreign law preventing the sharing of information with Commerce for dumping purposes as a basis to find a respondent acted to the best of its ability in an AFA analysis. To do so would undermine the statutory scheme envisioned by Congress to induce parties to cooperate. Indeed, accepting such arguments as an excuse for failure to submit information would have the opposite effect and would undermine Commerce's ability to obtain the information needed to remedy the unfair trading act of dumping.

However, in accordance with the Court's holding that Commerce "fail{ed} to engage with Nippon Steel's six pages of legal analysis in any meaningful way,"[32] we provide the following analysis which demonstrates Nippon Steel did not act to the best of its ability as they

---

[29] *See Remand Order* at 2 (citing NSC Section B Response at B-7).
[30] *See NEC Corp. v. United States*, 151 F.3rd 1361, 1370 (Fed. Cir. 1998)("Indisputably, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process); *Buttfield v. Stranahan*, 192 U.S. 470, 492-93, 48 L. Ed. 525, 24 S. Ct. 349 (1904).
[31] *See* Guidelines at 2.
[32] *See Remand Order* at 23.

do not provide a basis to prevent Nippon Steel from using its economic leverage to obtain the data Commerce needs. The legal memorandum concluded that Nippon Steel would unlawfully "abuse … {its} superior bargaining position" if it threatened to stop doing business with its resellers unless they provided the data and would result in an "unjust refusal to trade" under the Japanese Antimonopoly Act.[33] However, the legal memorandum claims that ceasing business with its affiliate unless they provided the necessary data for Commerce's antidumping review would constitute an "unjust refusal to trade" without addressing the limitations of the law according to the guidelines. The guidelines indicate that the Japanese anti-monopoly law is designed to cover only certain activity in which a "superior" company is using its clout to influence and unjustly skew the business relationship between the two to the detriment of the small entity.[34] It does not address the legitimate, normal business practice of responding to data collection for the purpose of an antidumping duty proceeding and does not provide any example which could be analogized to the facts of this case. The Japanese guidelines set out a law to prevent a company with economic leverage over another company from using that leverage to the disadvantage of the company with less economic clout. Namely, Article 2 of the Japanese Antimonopoly Act states:

> Taking any act specified in one of the following, unjustly in light of normal business practices by making use of one's superior bargaining position of the other party:
> (a) Causing the said party in regular transactions (including party with whom one intends to have regular transactions newly; the same shall apply to (b) below) to purchase goods or services other than the one pertaining to the said transaction;
> (b) Causing the said party in regular transactions to provide for oneself money, services or other economic benefits;
> (c) Refusing to receive goods pertaining to transaction for the said party, causing the said party to take back the goods pertaining to the transactions after receiving the said goods from the said party, delaying the payment of the transactions to the said party or reducing the amount of said payment, or

---

[33] *See* NSC's Section B Response at Exhibit B-23 (Japanese Legal Memorandum at 1).
[34] *See* Guidelines at 1.

>     otherwise establishing or changing trade terms or executing transactions in a way disadvantageous to the said party.[35]

This is with an eye toward preventing action which "impede fair competition."[36] The guidelines go on to further explain that the analysis is done on a "case-by-case basis" depending on the facts and focuses on the transactions between the parties.[37] The activity at issue here, the requirement to provide Commerce with information necessary to perform a dumping calculation, is not covered by the Japanese law.

Moreover, even *if* the law were applicable, Nippon Steel need not violate it to act to the best of its ability; indeed, since the investigation in 2016, Nippon Steel has had ample time to ensure compliance with requests of this nature part in its contractual agreement with downstream affiliates or it could have decided to simply adjust its selling activities such that it instead did business with different companies without making any threats. In addition, if the affiliates were concerned about Nippon Steel seeing their proprietary sales data, Nippon could have arranged to have it submitted by the affiliate directly to Commerce avoiding any possible nefarious "non-dumping" use of the affiliate data by Nippon Steel. Therefore, contrary to the opinion letter on the application of the law, using its economic strength to get data necessary to address a normal business practice responding to antidumping allegations is not an "unjust" activity barred by the Japanese law as reflected in the Guidelines. It is a just, normal business practice when trading with entities in foreign countries so ensure the unfair trading activity of dumping can be remedied.

Therefore, based on the foregoing, Commerce finds that the affiliate party's failure to provide information and, to the extent it applies, the Japanese law raised as a shield by Nippon

---

[35] *Id.* at 2.
[36] *Id.* at 3.
[37] *Id.* at 3-4.

Steel do not constitute substantial evidence that Nippon Steel acted to the best of its ability to obtain the information from its affiliate.

## IV.   COMMENTS ON DRAFT REMAND RESULTS AND ANALYSIS

Commerce released the draft remand redetermination on December 18, 2024, and invited interested parties to comment on these draft results of redetermination. Comments received comments on draft remand redetermination from the petitioners and Nippon Steel.[38]

*Nippon Steel's Comments:*

Nippon Steel did not provide the requested public executive summary regarding its arguments. Nippon Steel's arguments may be found on pages 2-3 of Nippon Steel's Comments.[39]

*Petitioners' Comments:*

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 2-6.[40]

> First, Commerce properly explains why Nippon Steel's references to communications with its affiliates are not enough to overcome the respondent's obligation to act to the best of its ability in providing the information requested by the agency. In this regard, Commerce is right to note that Nippon Steel could have taken other actions to induce compliance, especially since this same issue has arisen in previous segments of this proceeding.
>
> Second, Commerce adequately explains why Japanese law does not justify Nippon Steel's failure to provide information from its home market affiliates, reasoning that there is no exception for foreign legal restrictions and, even if the Japanese laws in question were relevant, they do not require Nippon Steel to refuse the data requested by Commerce.
>
> Accordingly, Commerce should continue to apply AFA regarding the downstream sales not reported by Nippon Steel's home market affiliates in reaching its final remand determination.

---

[38] *See* Nucor Corporation, Steel Dynamics, Inc., and SSAB Enterprises, LLC's Letter (collectively, the petitioners), "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated December 26, 2024 (Petitioners' Comments); Nippon Steel's Letter, "NSC's Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated December 27, 2024 (Nippon Steel's Comments).
[39] *See* Nippon Steel's Comments at 2-3.
[40] *See* Petitioners' Comments at 2-6.

11

**Commerce's Position:** Commerce has fully addressed the aspects of the AFA determination with regard to the home market affiliated parties' unreported downstream sales remanded by the court for further explanation.

Nippon Steel argues that the draft redetermination fails to address its additional efforts to obtain the requested data from the affiliate at issue.[41] However, Commerce has explained that references to communications between Nippon Steel and its affiliate, even through outside counsel, are not enough to overcome the obligation to act "to the best of its ability" in providing the necessary data for performing the dumping calculation. Simply requesting the data several times is not the only action that Nippon Steel could have taken to induce compliance. It is well-known to Nippon Steel that Commerce requires a respondent to report downstream affiliate sales when its sales to the affiliate fail to pass the arm's-length test, as this precise issue arose in the investigation and both prior reviews.

Further, NSC's assertion that the knowledge of the outcome of its additional efforts was not known at the time the sales were made is not relevant.[42] As explained in the remand, NSC has a history of experience under this order regarding treatment of unreported downstream home market sales. If the affiliate did not provide the requested data for Commerce, NSC knew the possible result based on its history under this order. The fact that the outcome of its new efforts also resulted in failure to get the data to Commerce does not give NSC a reprieve from the requirement to provide it or from application of Commerce's court-affirmed practice of attributing the failure of the affiliate to provide the data to NSC for purposes of applying AFA.

---

[41] *See* Nippon Steel's Comments at 2-3.
[42] *Id.* at 3.

Similarly, NSC's argument that the litigation in AR1 was not complete when the AR3 sales were made is a red herring.[43] NSC had already experienced this very issue in the investigation and the two subsequent administrative reviews. Therefore, this NSC's claim of no knowledge of the issue is similarly without any record foundation.

Moreover, contrary to Nippon's reliance on this,[44] the fact that the affiliate said at some point it would comply does not negate the fact that the affiliate never complied. Similarly, NSC's small minority share also does not matter for purposes of Commerce's ability to apply AFA here.[45] The companies at issue are longstanding affiliates of NSC and NSC failed to use its long-term economic relationships with these affiliates to establish procedures through which the affiliates at issue would report the downstream home market sales required by the antidumping duty statue.

Nippon Steel asks in its comments that Commerce review the questionnaire response Exhibit B-23 and SB-1 submitted in the underlying administrative review, however, these two exhibits are documentation regarding the Japanese Antimonopoly Act and a summary of Nippon Steel's affiliated reseller chart and documentation related to certain affiliates unable or willing to provide the home market reselling data, which Commerce has fully addressed above.[46] Thus, these documents do not support Nippon Steel's argument that Commerce should apply neutral facts available here.

Nippon Steel asserts that it cannot force its affiliate to provide this information because it would be contrary to Japanese law to require such a provision of information. Commerce

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *See* Nippon Steel's Letters, "NSC's Response to the Department's Section B Questionnaire," dated June 29, 2020, at Exhibit B-23; and "NSC's Response to the Department's Supplemental Questionnaire," dated February 1, 2021, at Exhibit SB-1.

explained that the U.S. antidumping law does not contain a reporting exception to an antidumping duty questionnaire based on foreign government legal restrictions. The U.S. antidumping duty law simply provides that if Commerce asks twice for needed information and it is not provided and the party has failed to act to the best of its ability, Commerce may use facts otherwise available with an adverse inference.[47] Moreover, as Commerce explained, if the affiliates were concerned about Nippon Steel seeing their proprietary sales data, Nippon could have arranged to have it submitted by the affiliate directly to Commerce avoiding any possible nefarious "non-dumping" use of the affiliate data by Nippon Steel with which the Japanese antimonopoly law appears to be concerned. Finally, as Commerce explained above, the documents concerning the Japanese Antimonopoly Law do not apply to this particular activity of conducting an antidumping duty proceeding.

## V.   FINAL RESULTS OF REDETERMINATION

We have further explained Commerce's decision to apply an adverse inference to Nippon Steel home market affiliates' unreported downstream sales. Commerce continues to find that the affiliate party's failure to provide information and, to the extent it applies, the Japanese law raised as a shield by Nippon Steel do not constitute substantial evidence that Nippon Steel acted to the best of its ability to obtain the information from its affiliates.

Recoverable Signature

X _____

Signed by: STEVEN PRESING

Steven Presing
Acting Deputy Assistant Secretary
 for Policy and Negotiations

---

[47] *See* sections 776(b) and 782(d) of the Act