

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

SHAWN.HIGGINS@SIDLEY.COM
+1 202 736 8020

AMERICA  •  ASIA PACIFIC  •  EUROPE

February 7, 2025

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

  Re: <u>*Nippon Steel Corporation v. United States*, Court No. 21-00533</u>

Dear Mr. Toscano:

  On behalf of Nippon Steel Corporation ("NSC"), in its role as plaintiff in the above-captioned proceeding, we hereby file NSC's comments on the Final Results of Redetermination Pursuant to Court Remand filed by the U.S. Department of Commerce ("Department") on January 8, 2025, pursuant to the remand order of the U.S. Court of International Trade (the "Court") in *Nippon Steel Corporation v. United States*, Court No. 21-00533, Slip Op. 24-112 (Ct. Int'l. Trade 2024) ("Remand Order").  These comments are timely filed in accordance with the deadline established in the Remand Order – i.e., "30 days from the filing of the Remand Determination," which is February 7, 2025.

  Copies of the attached submission have been served on the parties listed in the attached certificate of service.

# SIDLEY

Honorable Mario Toscano
February 7, 2025
Page 2

      Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

                Respectfully submitted,

                Shawn M. Higgins
                Rajib Pal
                Allison V. Reading
                Lloyd Lyall

                *Counsel to Nippon Steel Corporation*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>UNITED STATES,<br><br>　　　　　　Defendant,<br><br>NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC,<br><br>　　　　　　Defendant-Intervenors. | Court No. 21-00533<br><br>**PUBLIC DOCUMENT** |

**COMMENTS OF PLAINTIFF, NIPPON STEEL CORPORATION,
ON THE DEPARTMENT OF COMMERCE'S
FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Nippon Steel Corporation

February 7, 2025

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY ............................................................... 1

II.   ARGUMENT .............................................................................................. 5

  A.    The Remand Redetermination Continues to Ignore Factual Circumstances,
        Including NSC's Additional Efforts to Obtain Missing Data in AR3,
        Despite the Court's Express Instruction to Address These Efforts........................ 5

  B.    NSC Could Not Have Done More Without Violating Japanese Law, and
        the "Best of Its Ability" Standard Does Not Require a Respondent to
        Violate Foreign Law or Refrain from Exporting ................................................... 10

    1.    The Japanese Antimonopoly Act Prohibits NSC from Threatening
          Affiliates to Induce Compliance ............................................................. 11

    2.    The "Best of Its Ability" Standard Does Not Require NSC to Violate
          Japanese Law or Refrain from Exporting ................................................. 17

III.  CONCLUSION ............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canadian Solar Int'l Ltd. v. United States,*
  378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) .................................................. *passim*

*Hyundai Steel Co. v. United States,*
  319 F. Supp. 3d 1327 (Ct. Int'l. Trade 2018) ......................................................10

*Kawasaki Steel Corp. v. United States,*
  110 F. Supp. 2d 1029 (Ct. Int'l. Trade 2000) ......................................................10

*Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States,*
  753 F.3d 1227 (Fed. Cir. 2014) ......................................................4, 9, 10, 20

*Nippon Steel Corp. v. United States,*
  337 F.3d 1373 (Fed. Cir. 2003) ................................................................ *passim*

*Risen Energy Co. v. United States,*
  569 F. Supp. 3d 1315 (Ct. Int'l Trade 2022) .................................................. *passim*

*Venus Wire Indus. Pvt. Ltd. v. United States,*
  471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) .................................................. *passim*

**Statutes**

19 U.S.C. § 1677e(b) ................................................................................ *passim*

19 U.S.C. § 1677e(b)(1) ..............................................................................17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Court No. 21-00533 |
| Defendant, | **PUBLIC DOCUMENT** |
| NUCOR CORPORATION, STEEL DYNAMICS, INC. AND SSAB ENTERPRISES, LLC, | |
| Defendant-Intervenors. | |

**COMMENTS OF PLAINTIFF, NIPPON STEEL CORPORATION,**
**ON THE DEPARTMENT OF COMMERCE'S**
**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Nippon Steel Corporation ("NSC"), in its role as plaintiff in the above-captioned proceeding, hereby files its comments on the Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 81, filed by the U.S. Department of Commerce ("Department") on January 8, 2025, pursuant to the remand order of the U.S. Court of International Trade (the "Court") in *Nippon Steel Corporation v. United States*, Court No. 21-00533, Slip Op. 24-112 (Ct. Int'l. Trade 2024) ("Remand Order"), ECF No. 80.

## I.    INTRODUCTION AND SUMMARY

In its Remand Order, the Court ordered the Department to reconsider or further explain its decision to apply adverse facts available ("AFA") with respect to NSC's unreported downstream, home-market sales from one of its Japanese affiliates in the third administrative

review ("AR3") of the antidumping duty ("AD") order on Certain Hot-Rolled Steel Flat Products from Japan.[1]  Specifically, the Court ordered the Department to "respond to Nippon Steel's arguments regarding (1) Japanese antitrust law and (2) any increased efforts to engender affiliate compliance by Nippon Steel compared to past administrative reviews."[2]

However, in the Remand Redetermination, the Department continued to find that NSC did not "act{} to the best of its ability to comply with a request for information" from the Department for home-market sales data from the affiliate at issue as required by 19 U.S.C. § 1677e(b) (the "AFA Statute"), and thus continued to apply AFA for this reason.[3]  As explained below, the Department's decision on this issue continues to be unsupported by substantial evidence and not in accordance with law.

First, the Remand Redetermination fails to address the facts of AR3, including NSC's additional efforts to obtain its affiliate's data, contrary to the Remand Order's express instructions.[4]  Unlike previous reviews, in AR3 NSC made significant efforts to collect the requested information from its affiliate, and submitted evidence of those efforts.[5]  NSC could not have known these additional efforts would fail to induce its affiliate's compliance until after the sales were made.

Moreover, the "best of its ability" standard does not require respondents to deploy every tactic on downstream affiliates to collect data; it only authorizes AFA when "it is reasonable for

---

[1]    *See* Remand Order at 25, ECF No. 80.
[2]    Remand Order at 25, ECF No. 80.
[3]    *See* Remand Redetermination at 14, ECF No. 81.
[4]    *See* Remand Order at 23-24, ECF No. 80.
[5]    *See* Remand Order at 21, ECF No. 80.  *See also* Letter from Sidley Austin LLP to the Hon. Gina M. Raimondo, DOC No. A-588-874, dated March 25, 2021 ("NSC's Case Brief") at 26-27 (APPX83026-83027); Letter from Sidley Austin LLP to the Hon. Wynn Coggins, DOC No. A-588-874, dated February 1, 2021 ("NSC's Response to the Department's Supplemental Questionnaire") at Exhibit SB-1 (APPX81703-81747).

Commerce to expect that more forthcoming responses should have been made."[6]  Given NSC's additional efforts in AR3, the affiliate's repeated assurances of compliance amidst COVID-19, NSC's small minority share in the affiliate, and the fact that related litigation from the first administrative review ("AR1") did not conclude until after the AR3 period of review ("POR"), it was unreasonable here for the Department to expect more.[7]

Second, the Remand Redetermination also fails to establish that the "best of its ability" standard required NSC to violate Japanese law or refrain from exporting.  Specifically, the Remand Redetermination fails to demonstrate that NSC could have threatened its affiliate without violating the Japanese Antimonopoly Act, which prohibits dominant parties from threatening affiliates as a *means* of doing business, regardless of the ends.[8]  Nor could NSC have renegotiated its contracts or shifted to different customers "without making any threats";[9] such actions are still barred by the Japanese Antimonopoly Act.

Moreover, the Remand Redetermination's claim that prohibitions in the Japanese Antimonopoly Act are irrelevant to U.S. antidumping procedures is inconsistent with the Remand Order; the Court would not have ordered the Department to respond on this topic if it

---

[6]      *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("*Nippon Steel I*").

[7]      *See* NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).

[8]      *See* Letter from Sidley Austin LLP to the Hon. Wilbur L. Ross, Jr., DOC No. A-588-874, dated June 29, 2020 ("NSC's Section B Response") at Exhibit B-23 (APPX80633-80835), containing Memorandum from Shimada Hamba & Osajima on Abuse of Superior Bargaining Position and Unjust Refusal to Trade under Japan's Act on Prohibition of Private Monopolization and Maintenance of Fair Trade ("Japanese Law Firm Memorandum") at 2-4 (APPX80635-80637) (listing the elements required to find a violation of the Japanese Antimonopoly Act, none of which relate to the purpose for which a superior bargaining position is abused) and Guidelines Concerning Abuse of Superior Bargaining Position under the Antimonopoly Act ("Japanese Antimonopoly Act Guidelines") at 11, 17 (APPX80652, 80658) (addressing examples).

[9]      *Contra* Remand Redetermination at 10, ECF No. 81.

were irrelevant.  This position is also legally incorrect, because the "best of its ability" standard requires only best efforts within a respondent's ability, which does not include acts outside the respondent's "legal power to perform."[10]  The Remand Redetermination's further suggestion that if NSC was unable to obtain all information the Department requests, it should simply have never exported in the first place is similarly legally incorrect, because ample controlling precedent finds that a respondent can satisfy the "best of its ability" standard without presenting all requested information.[11]  Finally, aside from Japanese law, the Remand Redetermination fails to consider that NSC lacks sufficient leverage due to its minority stake in the affiliate at issue to induce cooperation through threats[12] – a circumstance under which reviewing courts do not require such threats.[13]

Accordingly, NSC requests the Court to remand this case to the Department again with instructions to recalculate NSC's dumping margin using neutral facts available instead of AFA with respect to NSC's home market affiliate's unreported downstream sales.

---

[10]     *See Nippon Steel I*, 337 F.3d at 1382, quoting Webster's New Collegiate Dictionary 104 (1981) at 2.

[11]     *See, e.g., Risen Energy Co. v. United States*, 569 F. Supp. 3d 1315, 1335-37 (Ct. Int'l Trade 2022); *Venus Wire Indus. Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1307-11 (Ct. Int'l Trade 2020).

[12]     *See* NSC's Case Brief at 29-30 (APPX83029-83030), citing NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).

[13]     *See, e.g., Risen Energy Co.*, 569 F. Supp. 3d at 1336-67; *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1322 n.32 (Ct. Int'l Trade 2019); *Venus Wire Indus. Pvt. Ltd.*, 471 F. Supp. at 1307-10.  *See also Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("if the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party").

## II.    ARGUMENT

### A.    The Remand Redetermination Continues to Ignore Factual Circumstances, Including NSC's Additional Efforts to Obtain Missing Data in AR3, Despite the Court's Express Instruction to Address These Efforts

The Remand Redetermination ignores numerous factual circumstances demonstrating that NSC acted "to the best of its ability" to comply with the Department's request for downstream, home-market sales data from the one Japanese affiliate at issue, and therefore the Department's continued application of partial AFA on this basis remains inconsistent with 19 U.S.C. § 1677e(b).  Chief among these factual circumstances is NSC's significant additional efforts to collect the missing data in AR3, which the Court implored the Department to consider, but which the Department continues to ignore.

As the Remand Order explained, NSC "went to some lengths attempting to obtain the missing data from its reseller," including through several new and increased data collection efforts.[14]  NSC hired local Japanese counsel solely for the purpose of assisting with data collection, began requesting data from its affiliate even before the Department initiated this review, offered suggestions on how the affiliate could provide the data, and made *multiple* written requests and telephone calls to the affiliate.[15]  Moreover, unlike in previous reviews, the record of this review includes detailed documentation of emails, letters, and communication logs, demonstrating NSC's significant efforts to collect downstream sales information from its affiliated reseller.[16]  As the Court recognized, "{t}hese additional steps went beyond the efforts Nippon Steel made in the past ….  Commerce cannot ignore these increased efforts."[17]

---

[14]    *See* Remand Order at 23, ECF No. 80.
[15]    *See* NSC's Case Brief at 26-27 (APPX83026-83027); NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).
[16]    NSC's Case Brief at 26-27 (APPX83026-83027).
[17]    Remand Order at 23, ECF No. 80.

The Court explicitly based its remand on the Department's failure to consider NSC's additional data collection efforts in AR3.[18]  It therefore expressly ordered the Department to "respond to Nippon Steel's arguments regarding … increased efforts to engender affiliate compliance by Nippon Steel compared to past administrative reviews," stressing that each administrative review is distinct.[19]

Nonetheless, the Remand Redetermination continues to ignore NSC's additional efforts to extract data from its affiliate in AR3, and again erroneously reaches conclusions in AR3 based on what transpired in previous reviews.  The Remand Redetermination merely reiterates that NSC should have done more, including threatening its affiliate, negotiating new contractual provisions, or "simply adjust{ing} its selling activities such that it instead did business with different companies."[20]  The Remand Redetermination argues that NSC's affiliates' failure to provide requested information in previous reviews put NSC on notice that similar data would likely be requested in this review, that NSC's affiliates would likely again fail to provide this data, and thus NSC had ample time to threaten, recontract, or shift its distribution model accordingly.[21]

This argument is unresponsive to the Remand Order.  NSC took a variety of *additional* actions to ensure its affiliate at issue complied in AR3.  NSC's affiliates' past non-compliance did not put NSC "on notice" that its additional efforts in AR3 with respect to the one affiliate at issue would be insufficient, because NSC applied these additional efforts for the first time in AR3.  NSC could not have possibly known that these additional efforts would fail to induce its

---

[18]    Remand Order at 23-24, ECF No. 80.
[19]    Remand Order at 24, ECF No. 80.
[20]    *See* Remand Redetermination at 5-7, 10, 12, ECF No. 81.
[21]    *See* Remand Redetermination at 7, 12, ECF No. 81.

affiliate to provide the requested information until well after NSC made the sales at issue during the AR3 POR.  NSC made its sales during the AR3 POR, i.e., between October 1, 2018, and September 30, 2019; however, NSC did not and could not know that its affiliate would fail to provide the necessary information until the course of AR3 (throughout 2020).

The "best of its ability" standard does not require a respondent to immediately deploy every conceivable tactic on downstream affiliates to collect data when it is reasonable in the circumstances to expect that a subset of those tactics will be sufficient.[22]  Rather, under the standard, "{a}n adverse inference may {be drawn} … only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."[23]  Yet, the Department ignores all the various factual circumstances present in this case.

Here, it is unreasonable for the Department to expect NSC to have done more under the circumstances of AR3.  First, as discussed, NSC applied a battery of additional efforts to extract data from its affiliate in AR3 for the first time.  Indeed, the things NSC did for the first time in AR3 – such as repeated letters and phone calls to its affiliate through local counsel – and placing evidence of those efforts on the record, are precisely the activities that the Court has previously described as sufficient proof that a party acted to the best of its ability in similar circumstances.[24]

---

[22]    *See Nippon Steel I*, 337 F.3d at 1382.

[23]    *Nippon Steel I*, 337 F.3d at 1382.

[24]    *See Risen Energy Co.*, 569 F. Supp. at 1336 (finding that respondent Trina acted to the best of its ability despite failing to cease doing business with uncooperative suppliers, on the basis that Trina "placed evidence on the record" that it made "formal written requests" and "requests … via … telephone" to its suppliers for missing data); *Canadian Solar Int'l Ltd.*, 378 F. Supp. 3d at 1322 n.32 (multiple requests were sufficient, even though respondent did not threaten to cease doing business with suppliers); *Venus Wire Indus. Pvt. Ltd.*, 471 F. Supp. at 1309 (emails to suppliers were sufficient).

Given that NSC's affiliate repeatedly assured NSC that it was planning to produce the data,[25]

NSC had no reason to suspect that further efforts were needed.[26]  Second, personnel from NSC's

affiliate repeatedly indicated not only that they would comply, but also that the delay in their

data collection efforts was due to the effect of the COVID-19 pandemic and that they were

working as best as they could under these circumstances[27] – a point the Department fails to

consider in the Remand Redetermination.  Third, NSC had a small minority share in the affiliate

at issue,[28] and thus no control over its decision whether to respond to NSC's requests, nor for this

reason could NSC use this affiliate as a "shield" for making high priced home market sales.[29]  In

the Remand Redetermination, the Department simply dismisses the ramifications of NSC's small

minority share in the affiliate at issue.[30]  Fourth, the boundaries of NSC's obligations vis-à-vis its

affiliated home market resellers in order to avoid AFA were not known until the Court's final

---

[25]    *See* NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).

[26]    The Remand Redetermination argues that these assurances are irrelevant because they "do{} not negate the fact that the affiliate never complied."  *See* Remand Redetermination at 13, ECF No. 81.  However, this response confuses the applicable legal standard: the applicable test is whether NSC acted "to the best of its ability" to ensure its affiliate's compliance, not whether the affiliate ultimately complied.  *See* 19 U.S.C. § 1677e(b).

[27]    *See* NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).

[28]    *See* NSC's Case Brief at 29-30 (APPX83029-83030), citing NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).

[29]    *See* Remand Redetermination at 5, ECF No. 81.

[30]    The Remand Redetermination argues that NSC's small minority share in its affiliate at issue "does not matter" because NSC's affiliates have "longstanding" relationships with NSC. *See* Remand Redetermination at 13, ECF No. 81.  However, it is the *economic leverage* – not duration – of a party's relationship with its suppliers that determines whether threats would be futile and thus not required under the "best of its ability" standard.  *See Risen Energy Co.*, 569 F. Supp. 3d at 1336-67; *Canadian Solar Int'l Ltd.*, 378 F. Supp. 3d at 1322 n.32; *Venus Wire Indus. Pvt. Ltd.*, 471 F. Supp. at 307-10.

judgment in NSC's AR1 appeal on November 10, 2020, well after the AR3 POR.[31]  In short, under the circumstances, it is unreasonable for the Department to conclude that NSC should have done more: NSC thus acted to the best of its ability in responding to the Department's request.

The Remand Redetermination's reliance on *Mueller* in response is misplaced.  The Remand Redetermination cites *Mueller* for the proposition that the Department may impose AFA based on a respondent's failure to cease doing business with third parties that refuse to provide data.[32]  However, as the Court recognized in *Canadian Solar*, while *Mueller* "contemplated a threat to end business as a mechanism for exercising leverage, the {*Mueller*} Court did not require it."[33]  Indeed, *Mueller* clarified that in situations where it is not reasonable in the circumstances to expect that a respondent should have done more – such as when a respondent has "no control over the non-cooperating {entities}," as is the case here as discussed above – an "adverse inference {due to the respondent's failure to threaten its affiliates} is potentially unfair."[34]  Because NSC could not have known that its additional efforts would prove insufficient until well after the sales were made, and due to the various other factual circumstances discussed above as well as the fact that threatening affiliates would be illegal under Japanese law as explained further below, it is patently unreasonable for the Department to expect that NSC could have or should have done more in this case.  Rather, as in *Canadian*

---

[31]    The Remand Redetermination describes the fact that AR1 litigation was ongoing when the AR3 sales were made as a "red herring" because NSC "had already experienced this very issue {regarding data collection from affiliates} in the investigation and the two subsequent administrative reviews."  Remand Redetermination at 13, ECF No. 81.  The Department misses the point.  The relevance of the ongoing AR1 litigation is that the contours of NSC's legal obligations with respect to its affiliates had not been settled at the time it made sales in AR3 – not that NSC was unaware that this issue would arise in AR3.

[32]    Remand Redetermination at 6, ECF No. 81.

[33]    *Canadian Solar Int'l Ltd.*, 378 F. Supp. 3d at 1322 n.32.

[34]    *Mueller*, 753 F.3d at 1235.

*Solar*, NSC's multiple requests to its affiliate were sufficient to satisfy the "best of its ability" standard in the circumstances.[35]

The Remand Redetermination's reliance on *Kawasaki* and *Hyundai Steel Co.* is equally misplaced.[36]  These cases establish the Department's "general practice" of attributing failure of an affiliate to a respondent.[37]  However, as ample precedent from the Federal Circuit and the Court explain, this "general practice" does not apply in circumstances where it is not reasonable "for Commerce to expect that more forthcoming responses should have been made."[38]

The Court's Remand Order stated that "{w}hen the facts change, Commerce cannot rest on its laurels and repeat the answers of yesterday.  It must instead explain how the new facts did or did not affect its analysis."[39]  Yet the Remand Redetermination still says nothing about how all the various facts in AR3 – including NSC's additional efforts to extract data from its affiliate – affected the Department's analysis.  The Remand Redetermination, therefore, remains unsupported by substantial evidence and not in accordance with law, and the Court should again remand this case for the Department to reconsider its Remand Redetermination.

### B.   NSC Could Not Have Done More Without Violating Japanese Law, and the "Best of Its Ability" Standard Does Not Require a Respondent to Violate Foreign Law or Refrain from Exporting

The Remand Redetermination reiterates the Department's argument that NSC nevertheless could have done more by threatening to cease doing business with the affiliate at

---

[35]   *See Canadian Solar Int'l Ltd.*, 378 F. Supp. 3d at 1322 n.32.

[36]   Remand Redetermination at 6, ECF No. 81, citing *Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029, 1038 (Ct. Int'l. Trade 2000) and *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1345 (Ct. Int'l. Trade 2018).

[37]   *See Kawasaki Steel Corp.*, 110 F. Supp. 2d at 1038.

[38]   *Nippon Steel I*, 337 F.3d at 1382; *see also Mueller*, 753 F.3d at 1227 (AFA is not appropriate for respondents who fail to threaten their affiliates when those respondents "ha{ve} no control over the {affiliates}"); *Canadian Solar Int'l Ltd.*, 378 F. Supp. 3d at 1322 n.32 (applying *Mueller*).

[39]   *See* Remand Order at 23-24, ECF No. 80.

issue unless it provided the missing information.  NSC replied before the Court that such action would violate Japanese law, and the Court explicitly ordered the Department to address this point on remand.[40]  The Remand Redetermination now argues that: (1) such action would not in fact violate Japanese law; and (2) even if it did, prohibitions in Japanese law are irrelevant to whether NSC acted "to the best of its ability" to comply with the Department's request for information.[41] The Remand Redetermination is wrong on both counts, and therefore the Court should again remand this case to the Department.

### 1.    The Japanese Antimonopoly Act Prohibits NSC from Threatening Affiliates to Induce Compliance

NSC placed a memorandum from a Japanese law firm on the record of AR3 advising that "it is illegal under the {Japanese} Antimonopoly Act for NSC to seek to have the Affiliated Resellers provide the downstream sales data by indicating that it would refuse to trade with them if they do not provide the data."[42]  In its Remand Redetermination, the Department now argues that the Japanese law firm's interpretation of Japanese law is wrong.  Instead, based on its own original analysis of the Japanese Antimonopoly Act and its guidelines, the Department – with no expertise in Japanese law – submits that NSC: (1) could have threatened its domestic affiliate without violating Japanese law; or (2) could have taken other measures to secure compliance.[43]

First, the Remand Redetermination concludes that NSC could have threatened its domestic affiliate because the Japanese Antimonopoly Act applies only to "unjust" uses of economic power, and therefore not to the "legitimate, normal business practice of responding to data collection for the purpose of an antidumping duty proceeding."[44]  This analysis is incorrect.

---

[40]    *See* Remand Order at 25, ECF No. 80.
[41]    *See* Remand Redetermination at 8-10, 13-14, ECF No. 81.
[42]    *See* Japanese Law Firm Memorandum at 5 (APPX80638).
[43]    Remand Redetermination at 8-10, ECF No. 81.
[44]    Remand Redetermination at 9, ECF No. 81.

It confuses means and ends. The Japanese Antimonopoly Act prohibits certain *means* of coercing businesses, regardless of whether that coercion is implemented in service of "just" or "unjust" objectives.[45] (This is just common sense: NSC cannot use illegal means, even if done to achieve a legal end). The goal of "responding to data collection for the purpose of an antidumping duty proceeding"[46] *in general* is clearly unproblematic. The problem here is the *way* the Remand Redetermination alleges that NSC should have collected the data – by threatening its downstream affiliate with cessation of doing business unless the affiliate provided the data. The Japanese Antimonopoly Act prohibits dominant businesses from using economic threats to pressure vulnerable counterparties into taking certain actions, even if the actions are in service of an end goal that is itself permissible.

The Guidelines to the Japanese Antimonopoly Act clearly explain that threats by a dominant party are illegal regardless of the end goal. The Guidelines state that abuse of a superior bargaining position arises in any case where a party with a superior position "requests the {vulnerable} party to dispatch, employees or the like," and (1) the request "impos{es} a disadvantage on the {vulnerable} party the cost of which the {vulnerable} party cannot calculate in advance," or (2) "the burden to be borne by the {vulnerable} party exceeds the scope as deemed reasonable considering the direct benefit … to be acquired by the {vulnerable} party."[47] The Guidelines do not consider the requesting party's reason or the background of the request in making this determination.[48]

---

[45]     *See* Japanese Law Firm Memorandum at 2-4 (APPX80635-80637) (listing the elements required to find a violation of the Japanese Antimonopoly Act, none of which relate to the purpose for which a superior bargaining position is abused); Japanese Antimonopoly Act Guidelines at 15-16 (APPX80656-80657).
[46]     Remand Redetermination at 9, ECF No. 81.
[47]     *See* Japanese Antimonopoly Act Guidelines at 15-16 (APPX80656-80657).
[48]     *See* Japanese Antimonopoly Act Guidelines at 15-16 (APPX80656-80657).

If NSC forced its affiliate to submit the downstream sales data, this request would force the affiliate to "dispatch {its} employees" (to extract and process the data) so as to impose a significant disadvantage on the affiliate, which "exceeds the scope … deemed reasonable considering the direct benefit {acquired by the affiliate}." On one hand, producing such data imposes a substantial disadvantage on the affiliate: it would require the affiliate to prepare materials that are not part of its operational processes, and therefore be extremely time-consuming and impose a heavy workload. On the other hand, submission of the data confers no "direct benefit" on the affiliate whatsoever: it does not economically benefit the affiliate at all. NSC's choice to force significant costs on the affiliate in exchange for zero economic benefit to that affiliate violates the Japanese Antimonopoly Act, regardless of the fact that the data are needed to respond to dumping allegations.

The request would also impose significant costs on the affiliate that the affiliate would not be able to "calculate in advance." The affiliate is under no contractual obligation to submit downstream data, and it is not standard in Japanese business practice to include contract terms requiring the counterparty to provide information for an AD investigation in a purchase and sale agreement. There is no reason to think that the affiliate would have factored data submission costs into the purchase price it negotiated for hot-rolled steel. Thus, NSC's choice to force significant *unanticipated* costs on the affiliate also independently constitutes a violation of the Japanese Antimonopoly Act, regardless of the purpose of NSC's threats.

The bottom line is straightforward. Because forcing the affiliate to provide downstream sales data imposes a disadvantage on the affiliate that it could not calculate in advance and that exceeds reasonable limits, such threats constitute abuse of NSC's superior bargaining position even if the sales information is required to respond to dumping allegations.

13

Indeed, notwithstanding the Remand Redetermination's claim to the contrary,[49] the

Guidelines to the Japanese Antimonopoly Act provide illustrative violations that are closely

analogous to the threats the Remand Redetermination alleges that NSC should have made.  For

example, one illustrative violation concerns a dominant party forcing a weaker party to use its

employees for activities that solely benefit the dominant party:

> An entrepreneur requests, and causes a transacting party to
> dispatch employees, etc., of the transacting party to engage in
> operations that only benefit the entrepreneur without paying the
> expenses for the dispatch.[50]

By forcing its affiliate to use the affiliate's employees' time to collect and transmit data,

NSC would force the affiliate to "dispatch employees" for NSC's sole benefit without paying for

the expenses of the dispatch.

Similarly, another illustrative violation clarifies that a dominant party's use of a threat to

cease doing business to force an affiliate to purchase goods or services is illegal:

> An entrepreneur causes a transacting party to purchase goods or
> services by making a request that could be taken to mean that the
> purchase would have an influence on future transactions, such as
> suggesting the termination of transactions with the transacting
> party or a reduction of the transaction volume in the event of a
> failure to make the purchase.[51]

Threatening to cease doing business to force an affiliate to collect and produce data is

functionally the same thing: both scenarios require the affiliate to expend money and resources to

provide an economic benefit to the dominant party.

Second, the Remand Redetermination argues that even if the Japanese Antimonopoly Act

prohibits NSC from threatening its downstream affiliate to induce compliance, NSC could still

---

[49]     *See* Remand Redetermination at 9, ECF No. 81 (stating that the guidelines "do{} not
provide any example which could be analogized to the facts of this case").
[50]     Japanese Antimonopoly Act Guidelines at 17 (APPX80658).
[51]     Japanese Antimonopoly Act Guidelines at 11 (APPX80652).

have legally: (1) renegotiated its contracts with its affiliate to impose contractual data-sharing requirements; or (2) "simply adjust{ed} its selling activities such that it instead did business with different companies without making any threats."[52]  Both of these actions are simply threats by different means, and both are still barred by the Japanese Antimonopoly Act.

The Remand Redetermination initially suggests that NSC could have renegotiated its contract with its affiliate to insert data-sharing provisions.[53]  However, under the Japanese Antimonopoly Act, abusing a superior bargaining position to force an affiliate to modify a contract is just as illegal as using the same leverage to force an affiliate to modify its behavior under an existing contract.  As the Japanese Law Firm Memorandum explains, the Japanese Antimonopoly Act prohibits dominant parties from "establishing or changing trade terms or executing transactions in a way disadvantageous to the counterparty."[54]  It makes no distinction based on whether the trade terms are changed through a contract modification or brute force. Indeed, the opposite result would lead to absurd policy consequences: a dominant party that sought to violate the Japanese Antimonopoly Act could avoid liability by simply forcing the weak party to accept a contract modification first.

The Remand Redetermination next suggests that NSC should have "simply adjust{ed} its selling activities such that it instead did business with different companies without making any threats."[55]  This is effectively the cessation of doing business with the company at issue for failure to provide the requested information.  It may be an implicit threat rather than an explicit

---

[52]    Remand Redetermination at 10, ECF No. 81.
[53]    *See* Remand Redetermination at 10, ECF No. 81.
[54]    Japanese Law Firm Memorandum at 3 (APPX80644) (emphasis added), citing the Japanese Antimonopoly Act at Art. 2(9)(v)(c) (APPX80643).
[55]    Remand Redetermination at 10, ECF No. 81.

one, but it is still barred by the Japanese Antimonopoly Act.[56]  It would be absurd if a party could avoid liability under the Japanese Antimonopoly Act for an otherwise illegal threat merely by declining to *label* it as a threat.  Indeed, the Department fails to explain how its suggested course of simply doing business with different companies is not an unjust refusal to trade with the affiliate at issue that NSC's Japanese counsel explained is a violation of Japanese law:

> {I}f NSC were to stop trading with the Affiliated Resellers who do not provide downstream sales data, it may be inferred that NSC refused to do so on the grounds that the Affiliated Resellers did not provide downstream sales data.  It is likely that this conduct would be deemed to constitute Unjust Refusal to Trade which is illegal under the Antimonopoly Law, unless it can be rebutted by evidence that the discontinuance of trade was commercially justifiable.  In sum, NSC is not permitted to stop trading with the Affiliated Resellers without a commercially justifiable reason (i.e., it has no choice but to continue trading with said parties).[57]

In addition, both of these strategies would have required NSC to anticipate that its local affiliate would be unresponsive to its additional efforts to secure the Department's requested information in AR3.  As explained above, the "best of its ability" standard does not require such telepathy.[58]

---

[56]    *See* Japanese Law Firm Memorandum at 5-6 (APPX80638-80639) (explaining that even in light of a business's right to "decide{} not to trade with a certain enterprise at its own judgment," refusing to do business with a particular entity would be illegal if done as "a means to secure the effectiveness of … {the dominant business's} dominant bargaining position," as would be the case if the refusal to trade was related to the affiliates' refusal to provide downstream sales data).

[57]    Japanese Law Firm Memorandum at 6 (APPX80639).

[58]    The Remand Redetermination also appears to suggest that NSC could have avoided violating the Japanese Antimonopoly Act by arranging to have its affiliate submit data directly to the Department.  *See* Remand Redetermination at 14, ECF No. 81.  This suggestion is irrelevant to legality under the Japanese Antimonopoly Act.  The Japanese Antimonopoly Act prohibits NSC from threatening its affiliates to produce data, regardless of whether that data is delivered to NSC or directly to the Department.  In any event, to the extent the Department is suggesting that offering such confidentiality would have induced the affiliate to voluntarily produce the requested data, the affiliate's responses make clear that confidentiality was not even a reason why it refused to submit the requested data.  Instead, the affiliate explained that the

### 2. The "Best of Its Ability" Standard Does Not Require NSC to Violate Japanese Law or Refrain from Exporting

The Remand Redetermination next asserts that even if the Japanese Antimonopoly Act prevents NSC from coercing its local affiliate, this prohibition is irrelevant to whether NSC acted "to the best of its ability" to comply with the Department's requests. This is allegedly the case because: (1) the AFA Statute does not contain exceptions based on legal restrictions on reporting arising under foreign law; and (2) holding otherwise would mean that "foreign governments could freely impose data sharing prohibitions with Commerce, making it impossible for Commerce to calculate dumping margins."[59]

The Remand Redetermination's position is inconsistent with the Remand Order. The Remand Order expressly directed the Department to respond to NSC's analysis demonstrating that threatening Japanese affiliates to provide data would be prohibited by Japanese law.[60] If the Japanese law prohibition was irrelevant, the Court would not have remanded for the Department's failure to consider it or ordered the Department to respond to it.

Moreover, the Remand Redetermination's position is legally incorrect. The AFA Statute permits the Department to make an adverse inference only when it finds that a party has "not act{ed} to the best of its ability to comply with a request for information."[61] In other words, a party must do its best, with respect to the things *within its ability*. As the Federal Circuit has held, the word "ability" in this phrase "refers to 'the quality or state of being able,' especially …

---

administrative burden of compiling the data and the burdens imposed by the COVID-19 pandemic were significant obstacles. *See* NSC's Response to the Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81707-81741). The COVID-19 pandemic and the level of detail required by the Department's data requests were wholly outside NSC's control.

[59]    *See* Remand Redetermination at 7-8, 13-14, ECF No. 81.

[60]    Remand Order at 25, ECF No. 80.

[61]    19 U.S.C. § 1677e(b)(1).

'physical, mental, or *legal power to perform*.'"[62]  Threatening to cut off a Japanese affiliate for failing to provide data is not within the "ability" of NSC, because NSC has no "legal power" to make those threats: such action would be illegal under the Japanese Antimonopoly Act.  Thus, the "best of its ability" standard does not require NSC to take actions that violate Japanese law.

Whatever merit the Department's policy concerns regarding foreign data-sharing prohibitions may have, they do not overcome clear statutory text and the express language of the Remand Order.  The AFA Statute reflects a careful balance of foreign policy priorities: while Congress may (or may not) have been concerned about foreign governments imposing data sharing prohibitions, it may also have been concerned about the foreign relations consequences of requiring foreign importers to violate their home countries' laws.  The Department must respect the balance Congress chose to strike through the text of the AFA Statute, rather than reinterpret the statute to serve its own ordering of foreign policy priorities.  Moreover, there is no evidence that the Japanese Antimonopoly Act was enacted to thwart U.S. antidumping law.  If there was such evidence, perhaps the answer could be different.  The Department's policy concern here about foreign governments imposing data sharing prohibitions to thwart the Department's ability to calculate dumping margins is accordingly alleviated, because the Department is free to come to a different conclusion in a future scenario where such evidence is present.  However, that is not the current scenario.

The Remand Redetermination next cryptically states that "Nippon made a choice to export merchandise to the United States and must abide by U.S. laws{, and} {t}here is no

---

[62]    *Nippon Steel I*, 337 F.3d at 1382, quoting Webster's New Collegiate Dictionary 104 (1981) at 2 (emphasis added).  *Nippon Steel I* did not limit the phrase "legal power" to "legal power under U.S. law," and there is no reason to read in such a limitation here.

fundamental or Constitutional right to import products into the United States."[63]  It is not clear

what these statements mean or what role they played in the Department's reasoning.  However, if

these references are meant to indicate that a respondent that fails to obtain all the information the

Department requests will never have acted to the "best of its ability" unless it never exported the

goods in the first place, this interpretation of the AFA Statute flies in the face of precedent and

common sense.  For one thing, the Court has repeatedly found that a party's failure to provide all

the information the Department requests does not alone establish that the party failed to act to the

"best of its ability."[64]  For another, the Remand Redetermination's apparent position has absurd

policy implications.  Respondents cannot know that their downstream domestic affiliates will

refuse to provide information at the time they make the decision to export to the United States.

The Remand Redetermination apparently asks respondents to cease exporting now long before

they know whether their downstream affiliates will provide requested information, or even what

the requested information might be.

Finally, even if such threats were legal, as discussed above, the Remand Redetermination

continues to ignore the fact that NSC lacks sufficient leverage over its particular affiliate at issue

here for a threat by NSC to cease doing business with the affiliate to induce the affiliate to

provide the data.  Reviewing courts have repeatedly held that the "best of its ability" standard

does not require parties to threaten to cease doing business with affiliates to induce data

production when it is clear the parties have too little leverage over their affiliates for this threat to

---

[63]      *See* Remand Redetermination at 8, ECF No. 81.
[64]      *See, e.g., Risen Energy Co.*, 569 F. Supp. 3d at 1335-37; *Venus Wire Indus. Pvt. Ltd.*, 471
F. Supp. at 1307-11.

work.[65]  As explained in NSC's Case Brief and above, this is precisely the situation that arose

here: NSC maintains only a small ownership share of its affiliate at issue and made a relatively

small quantity of sales to this affiliate during the POR.[66]  Controlling precedent provides that

NSC need not have threatened its affiliate in this scenario.  The Remand Redetermination

ignores it.

## III.    CONCLUSION

The Court's Remand Order instructed the Department to "respond to Nippon Steel's

arguments regarding (1) Japanese antitrust law and (2) any increased efforts to engender affiliate

compliance by Nippon Steel compared to past administrative reviews."[67]  The Remand

Redetermination meets instruction (1) with facially implausible arguments, and ignores

instruction (2) entirely.  Accordingly, NSC respectfully requests the Court to remand this case to

the Department again with instructions to recalculate NSC's dumping margin using neutral facts

available instead of AFA with respect to NSC's home market affiliate's unreported downstream

sales.

---

[65]        *See, e.g., Risen Energy Co.*, 569 F. Supp. 3d at 1336-67; *Canadian Solar Int'l Ltd.*, 378
F. Supp. 3d at 1322 n.32; *Venus Wire Indus. Pvt. Ltd.*, 471 F. Supp. at 307-10.  *See also Mueller*,
753 F.3d at 1235 ("if the cooperating entity has no control over the non-cooperating suppliers, a
resulting adverse inference is potentially unfair to the cooperating party").
[66]        *See* NSC's Case Brief at 29-30 (APPX83029-83030), citing NSC's Response to the
Department's Supplemental Questionnaire at Exhibit SB-1 (APPX81703-81747).
[67]        Remand Order at 25, ECF No. 80.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Allison V. Reading
Lloyd Lyall

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
shawn.higgins@sidley.com

Counsel to Nippon Steel Corporation

February 7, 2025

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

<table>
<tr><td>

NIPPON STEEL CORPORATION,

              Plaintiff,

    v.

UNITED STATES,

              Defendant,

NUCOR CORPORATION, STEEL
DYNAMICS, INC. AND SSAB
ENTERPRISES, LLC,

              Defendant-Intervenors.

</td><td>

Court No. 21-00533

</td></tr>
</table>

## ORDER

Upon consideration of the Comments of Nippon Steel Corporation ("NSC"), filed on February 7, 2025, regarding the Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination") filed by the U.S. Department of Commerce ("Department") on January 8, 2025, pursuant to the order of this Court in *Nippon Steel Corporation v. United States*, Court No. 21-00533, Slip Op. 24-112 (Ct. Int'l Trade 2024), and upon all other papers and proceedings herein, it is hereby

**ORDERED** that the Remand Redetermination with regard to the Department's application of adverse facts available ("AFA") to NSC's home market affiliate's unreported downstream sales in *Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 47615 (Aug. 26, 2021) is remanded for reconsideration and redetermination in accordance with this Opinion and Order; and it is

**FURTHER ORDERED** that the Department shall file, within 90 days from the date of this Opinion and Order, a new determination upon remand that conforms to this Opinion and Order and recalculates NSC's dumping margin using neutral facts available.

**SO ORDERED.**

_____
Hon. Stephen Alexander Vaden, Judge

Dated: _____, 2025

New York, New York

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1)(b), the undersigned certifies that these comments comply with the word limitation requirement.  The word count for the Comments of Plaintiff, Nippon Steel Corporation, on the Final Results on Redetermination Pursuant to Court Remand filed by the U.S. Department of Commerce, as computed by Sidley Austin LLP's word processing system (Microsoft Word), is 6,418 words.

_____

Shawn M. Higgins

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached filing have been served electronically via the Court's CM/ECF system on February 7, 2025, addressed to the following parties:

**On behalf of SSAB Enterprises, LLC. and Steel Dynamics, Inc.:**
Roger B. Schagrin, Esq.
Schagrin Associates
900 7th Street, NW
Suite 500
Washington, DC 20001
Email: rschagrin@schagrinassociates.com

**On behalf of Nucor Corporation:**
Alan H. Price, Esq.
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
Email: aprice@wiley.law

**On behalf of Tokyo Steel Manufacturing Co., Ltd.**
Daniel L. Porter, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006
Email: dporter@curtis.com

**On behalf of AK Steel Corporation**
Stephen P. Vaughn
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
svaughn@kslaw.com

**On behalf of the United States:**
Kyle S. Beckrich
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

David W. Richardson
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3614
Washington, DC 20230

_____
Shawn M. Higgins